1  RICHARD McREE

2  P.O. Box 14064

3  San Francisco, California  94114

4  Telephone:  (415) 437-0900

5  Facsimile:  (415) 437-0900

6  E-mail:  rjsmcree@comcast.net

**FILED**

MAR 0 3 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

#14
IFP
NP

7              UNITED STATES DISTRICT COURT

8         NORTHERN DISTRICT OF CALIFORNIA

9  Case No.:  CV 11 - 0991 DMR

10                           **COMPLAINT FOR**

11  RICHARD T. McREE, pro se       **PATENT INFRINGEMENT**

12         Plaintiff,              **UNCONSTITUTIONALITY**

13         v.                      **FRAUD**

14  RICHARD N. GOLDMAN, ET AL.     **UNFAIR COMPETITION**

15         Defendants             **NEGLIGENCE**

16                                        **AND**

17                           **DEMAND FOR JURY TRIAL**

        Plaintiff RICHARD T. McREE brings this action against Defendants named below

18  and alleges as follows:

19

20                        __PLAINTIFF__

21      1.  Plaintiff Richard T. McRee is a California Registered Architect (C6746), married, and a

22  forty-year resident of San Francisco, which is within this judicial district and its San Francisco

23  division.  Plaintiff is the sole owner of U.S. Patent No. 6,003,269, entitled "Retractable

24  Covering for Spaces" - hereinafter ("**the '269 Patent**") – and a copy of which is attached hereto

25  as **EXHIBIT A.**  Plaintiff uses the registered trademark "**SkyCover**", serial No. 75/577461; to

identify any Retractable Covering System ("**RCS**") using the inventions of the '269 Patent.

1  Plaintiff maintains full rights to the claims and causes of action in this suit and  ,prior to

2  discovering infringement, worked for years refining, and advancing the '269 Patent.

3

4  ### DEFENDANTS

5     2.  Upon information and belief, all Defendants reside in San Francisco, which is within

6  this judicial district and its San Francisco division.

7     3.  Defendant **Richard N Goldman** – hereinafter **("RN Goldman")** – only recently

8  deceased, was a highly successful insurance executive and later a famous philanthropist whose

9  years of altruism was and remains exercised and administered by the <u>Richard and Rhoda</u>

10  <u>Goldman Fund</u> – hereinafter **"(Fund)"** - with extensive resources for which he as Chairman of

11  the Board was accountable for his prime influence, major funding, and actions that induced and

12  prolonged the infringement of the '269 Patent.  In accordance with Rule 25 of the Federal Rules

13  of Civil Procedure, the late RN Goldman's actions in this matter "do not abate", and Plaintiff

14  moves to hold his son Douglas, with whom he planned matters, and the Fund through which he

15  acted thus accountable for RN Goldman's influence, funding, and actions regarding this matter.

16     4.  Defendant **Douglas E Goldman, M.D.** – hereinafter **("DE Goldman")** – is the son of

17  RN Goldman and a trustee of his father's Goldman Environmental Fund; in addition to being a

18  former emergency room physician who later became the Chairman and Founder of Certain

19  Software in San Francisco (**SF**).  DE Goldman's altruism is administered by the <u>Lisa and</u>

20  <u>Douglas Goldman Fund</u> with extensive financial resources for which he as Chairman of the

21  Board is accountable for influence, funding, and actions that induced and prolonged the

22  infringement of the '269 Patent.  Throughout the course of present matters, DE Goldman has

23  remained Chairman of the Board for the nonprofit <u>Stern Grove Festival Association</u> –

24  hereinafter ("SGFA") – which, under his direct oversight, contracted with and "indemnified"

25  the City and County of San Francisco – hereinafter ("City") for the actions that induced the

infringement of the '269 Patent and the design and construction work involved.

5.   Defendant **Willie L. Brown, Jr.** – hereinafter **("Brown")** - is an attorney and a well-known career politician (California Assemblyman from 1964 to 1995; Mayor of San Francisco from 1996 to 2004; newspaper feature columnist from 2008 to the present). In 1998, Brown and top Aides learned confidentially and directly from Plaintiff inside the Mayors Office of a) the inventions of the '269 Patent, b) the suggestion of an RCS application for Stern Grove, and c) Plaintiff's professional references and personal data. In 2008, after Plaintiff had repeatedly appealed for redress before the Board of Supervisors – hereinafter ("**Board**") - regarding the infringement, Brown was provided a prominent Sunday newspaper column "Willie's World" positioned in a top margin next to seasoned journalists, in which writing he freely promotes his views and image, and declares his deep and continual political involvement.

6.   Defendant **Gavin Newsom** – hereinafter ("**Newsom**") – a wine merchant and career politician, became a Brown protégé after helping Brown's successful 1995 mayoral campaign, after which Brown appointed him to vacant seats in Government including the Board, in which capacity he approved City actions to strategize with Defendants to create the Renewal that included the infringement of the '269 Patent. In 2004, Newsom succeeded Brown as Mayor. In 2010, Newsom was elected to the office of Lieutenant Governor of California with help of Defendants, in which office he may oversee matters in this action, including its relationship to Constitutions and Laws while in co-governing position with other State officers who are friends and associates of Defendants.

7.   Defendant **Bevan Dufty** – hereinafter ("**Dufty**") – became a Brown protégé after helping Brown's successful 1995 mayoral campaign and served as an Aide to Brown, after which Brown appointed him to a vacant seat on the Board during crucial events in this matter – an office to which he was later elected with help of Defendants and in which sworn role as Plaintiff's representative, Dufty approved City actions directly related to the infringement of the '269 Patent. Dufty and Plaintiff were members of a neighborhood association from the 1990's and during the earliest events in this matter, when they also interacted regarding City and neighborhood matters during crucial infringement actions that remained unknown to Plaintiff.

1    As Dufty's constituent, and when it had become necessary for Plaintiff to seek redress and

2    defend his work with the '269 Patent in public appeals to the Board, Dufty took pains to avoid

3    Plaintiff and ignore his appeals, as did his Aide, who proceeded to join the SGFA Executive

4    Board, thereby providing Defendants direct oversight during Plaintiff's City Hall actions.

5

6                            **JURISDICTION and VENUE**

7    8.    This Court has subject matter jurisdiction of this Action pursuant to the following:

8             15 U.S.C. §§ 4; and 28 U.S.C. §§ 1331, 1337, 1338 (a)(b), and 1367.

9    9.    Personal jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. 1400(b)

10   for Defendants have knowingly and purposefully directed their wrongful acts, actively induced,

11   prolonged, and obstructed resolution of infringement of the '269 Patent in this forum.

12   10.    Defendants are prominent leaders of business and elected government officers who

13   maintain substantial, systematic, and broad contacts with international, national, state, and local

14   agencies including the City, and who have done business in this judicial district, and who have

15   committed, and who have continued to commit unconstitutional acts of infringement, fraud,

16   unfair competition, and neglect regarding this matter in this judicial district.

17

18                          **INTRA-DISTRICT ASSIGNMENT**

19   11.    As this is an "Intellectual Property Action", assignment to any division of the Northern

20   District is proper under Local Rule 3-2(c) and the Assignment Plan of this Court.  Plaintiff

21   accordingly moves to assign this action to the San Jose Division owing to Defendants' over-

22   arching social, economic, and political influence in the San Francisco and Oakland divisions.

23

24                                  **REFERENCES**

25   12. For supporting allegations and time references indicted

     thus: "(**08=Sep 14**)", "(**08=September**)", etc. see **EXHIBIT B** attached herewith.

**-- DISCOVERY OF INFRINGEMENT** – June 20, 2005 --

13. Plaintiff hereby incorporates the allegations in paragraphs 1-12 above and alleges the following in accordance with the Northern District recommendation to "tell the story in the order it happened" and to summarize interactions of and with Defendants.

14. **05=Jun 20** -< The '269 Patent was a source of confidence, pride, and inspiration for Plaintiff for years. He had always believed patents worthy of respect and legally useful for stimulating innovation. The patenting process itself had proved invaluable. For many years, the patent bolstered Plaintiff's encouraging efforts to introduce the RCS innovations properly.

15. Plaintiff had confidentially shared his inventions with Defendants in Trust. However, they proceeded to surreptitiously induce the infringement for their own benefit. They took measures that made it unlikely that Plaintiff would discover what they had done until it was finished in 2005. It nullified more than a decade of Plaintiff's work promoting the inventions and establishing contacts for collaborating in a new "Green" industry. Defendants have, for selfish interest and personal benefit, thus undermined patents and suppressed innovation.

16. DISCOVERY: - < On June 20, 2005, Plaintiff opened the newspaper and was alarmed to see a lead article about the first concert at a freshly renovated and renewed Stern Grove – hereinafter ("**Grove**"), for he immediately recognized the first full-scale embodiment of a "SkyCover®" RCS - evidenced by a self-supporting proscenium shading the stage and forming a defining centerpiece above people dancing under its huge overhead RCS Panels with their dramatic RCS Supports - a vision faithful to many he himself had envisioned and enjoyed creating for numerous '269 Patent embodiments through the years and, moreover, in collaboration with respected friends, colleagues and others. Twelve thousand "awestruck" people attended and described the Renewal as "amazing // fantastic // phenomenal" - an Engineer commenting simply: "beautifully done."



17.   VERIFICATION: - < Plaintiff and his wife together with a colleague quickly drove to the Grove, and Plaintiff immediately experienced strong and conflicted emotions about what he saw - a "best dream / worst nightmare" experience.  The entire Renewal was strikingly beautiful and exceedingly well done, with the grand RCS stage proscenium itself true to the many RCS embodiments he had already envisioned and designed for clients and prospects excited about the '269 Patent inventions.  However, both the scale and the nature of the infringement clearly threatened in every way to set Plaintiff back many years and devastate more than a decade of his effort to develop new "Green" jobs for the design and construction industries.  Also likely to be overshadowed was the demonstrated potential of the RCS technology for energy savings.  While Plaintiff appreciated the great beauty of the work, conflicting anxiety arose that stress from trying to resolve the infringement done by people of great wealth and influence could easily force Plaintiff and his family to rearrange much of their lives.  Most troubling however; the entire vision faithfully reflected both the very same idea and same location Plaintiff had incidentally and confidentially mentioned to a Brown Agent inside the Mayors Office six years before, for the entire proscenium incorporated all of the fundamental elements of the '269 Patent that he had confided with top Brown Aides - RCS Supports (reaching high overhead and encompassing the entire stage) with huge RCS Panels (positioned and configured as only the '269 Patent inventions allow).  A picture of the infringing Grove RCS is shown below.

a. RCS "Support"-A =  Cantilever space frame structure anchored in concrete foundations and shaped in conformity to the stage to position panels.

b. RCS "Supports"-B =  Two (hidden) moment frames to resolve forces located behind the facade of a stage backdrop building.



c. RCS "Panels" =   Three overlapping retractable tensioned fabric panels mounted high above the stage.

d. RCS "Control Ring" =  A variable "269 Patent feature; fulfilled by guide plates specifically located and anchored to moment frames behind the facade.

e. RCS "Platform" =   (optional element) - fulfilled by "Support-A".

1    18. UNAUTHORIZED PATENT EXPOSURE: - < In the past six years, nearly one million

2    people have enjoyed the benefits of the RCS at Stern Grove.  During the same time, Defendants

3    have refused to meet Plaintiff; and instead used intermediaries – hereinafter ("**Agents**") – to

4    take their place.  Two (2) meetings have been held: one in City Hall that the Goldmans' prime

5    Agent avoided (<u>05=Sep 19</u>), and a second 18 months later, with City Agents excluded (<u>07=May

6    23</u>).  For these six years, Plaintiff has made exhaustive efforts seeking both legal representation

7    and Defendants accountability.  Regrettably, and before either might clear his own name, prime

8    Defendant RN Goldman and his Landscape Architect Lawrence Halprin have passed away.

9    19. OTHERS: - < Between 1998 and 2005, actions regarding the Renewal were executed by

10   the City, City Agencies, Nonprofits, and Contractors - hereinafter ("**Others**"):

      a.  SGFA "Legacy Team" – Corrina Marshall - Executive Director
11    b.  Department of Public Works - "(DPW)" – Ed Lee, General Manager (GM)
      c.  Recreation and Park Department – "(Rec/Park)" – Elizabeth Goldstein, GM
12    d.  Conversion Management Associates – "(CMA)" – Due diligence / coordination
      e.  Office of Lawrence Halprin – Master Plan / Landscape Design
13    f.  Hamilton + Aitken Architects – Design / Contract Documentation
      g.  Vance Brown Builders – General Contractor
14    h.  Pineapple Sails – Supplier of RCS Panels and RCS Gear

15   20. Once finished, the SGFA website declared that Stern Grove was now "more beautiful

16   than ever" (with) "new features: new stage and retractable canopy."

17   21. PATENT ACKNOWLEDGMENT: - < In 2006, said Others - through Defendants'

18   Agent - signaled their willingness to acknowledge the '269 Patent as follows (<u>06=Dec</u>  ):

19
      > "...the Stern Grove Parties acknowledge that, to the best of their knowledge,
20    > the Stage Canopy is the first application of the Licensed Patent"

21   The acknowledgement was reassuring coming from the colleagues and professionals who did

22   the beautiful work, and Plaintiff has expressed his appreciation and taken pains to keep them

23   continually informed as matters proceeded.   Nevertheless, said Others have continued to

24   infringe the '269 Patent by showing the inventions in promotional materials and other actions

25   which have damage Plaintiff's reputation, credibility, and prospects.  Plaintiff hereby holds

     Defendants accountable for correcting and compensating for any and all such offenses.

## MAYORS OFFICE MEETING - 1998

22.   September 9, 1998 - CALL TO THE MAYORS OFFICE: - < Public interest in Candlestick had grown [a] when Plaintiff learned that Brown [b] was soon to meet with the stadium Manager (the NFL) to discuss improving the existing stadium; whereupon he called the Mayors Office (98=Sep 9) and talked to a Brown Agent" [b] who requested Plaintiff deliver qualifications and references to the Mayors Office and immediately set an early appointment for a meeting.

### -- MEETING in MAYORS OFFICE – September 14, 1998 --

Plaintiff, together with his wife and his engineer, met in the Mayors Office with the Brown Agent, who signed Plaintiff's Confidential Disclosure Agreement (CDA) – a copy of which is attached herewith as **EXHIBIT C** – after which Plaintiff introduced the new inventions as a "state-of-the-art" melding of disparate technologies; explained the inventions advantages and how they had been inspired; [i] and proposed that they might also enable a Green Tech Center at a nearby abandoned shipyard to provide jobs for the depressed and long-neglected Hunters Point community.   The Agent's quick and fascinated interest prompted Plaintiff to incidentally comment aside that an RCS would also be "perfect for an amphitheatre like Stern Grove" - a statement that distracted her so much that Plaintiff will never forget needing to draw her attention back to Candlestick.   She liked what she had learned and informed Plaintiff that, although the City owns the stadium, the Mayors Office "defers to the NFL" [c]

a.   One year before Plaintiff's crucial meeting in City Hall (1997) there had been an unusual June Election to replace Candlestick with a "Stadium-Mall."   The measure barely won, and a resulting controversy led to the developer being investigated.

b.   Plaintiff and Brown once long before been on opposing sides of a battle to save a historic building (1980).   Nevertheless, Plaintiff believed in positive change, hoped that his work might benefit the City, and trusted that Mayor Brown would respect a U.S. Patent pending.

c.   Terezia Nemeth – "Special Assistant to the Mayor" - was a talented professional colleague of Plaintiff and well attuned to the technical discussion that ensued.   One year later, Nemeth would leave the Mayors Office for a lucrative position with an "entitlements" developer.

| 1 | **DEFENDANTS' WRONGFUL ACTS** - 1998 to 2005 |

23.   Plaintiff hereby incorporates the allegations in paragraphs 1-23 above and adds the following allegations regarding Defendants' interactions after the 1998 Mayors Office meeting.

24.   INTERDEPENDENCIES   - < Because U.S. Law fails to provide appropriate protection for individuals, the easy intercommunication enjoyed by Defendants enabled them to ignore Plaintiff's work and quietly violate his Rights with impunity.  With time on their side before Plaintiff would discover the infringement, productive years passed by; and more years would be lost dealing with the infringement.  Defendants [a, b, c, d, e] employed ethical appearance, political influence, and economic power to enable those working under them, either directly as their Agents, [f, g, h] or otherwise under their auspices to cooperate for infringing and prolonging the infringement due to the complexity of their social, political, and economic interdependency.

a.   RN Goldman (06=Aug 21) – "Forbes List" Billionaire / strong connections to Wall Street / "$5.5 Million General Owner" of the Giants (94=May 25) - - - RN Goldman did noble deeds of philanthropy from his self-supporting charity, and served as "Chief of Protocol" for Mayors.

b.   DE Goldman (05=Aug 9) –finished medical school / worked as an emergency room physician / switched to being a software executive / adopted Stern-Hass legacy with Stern Grove activities – Inherited influence and power allowed him insulation from facing Plaintiff.

c.   Willie L. Brown, Jr.  (98=Sep 9) – seasoned politician / knowledgeable about Plaintiff (1980) / "termed out" of State office / narrowly elected Mayor in 1995 and in 1999 in a rare December runoff election - - -  Brown facilitated new entitlements and unprecedented development, including RN Goldman's dream of a "downtown stadium" and DeBartolo's for a "Stadium Mall" before Brown's interest in improving existing stadium drew Plaintiff's attention.

d.   Gavin Newsom (05=Jun 28) – endowed wine merchant / campaign event host for Brown, who appointed him to a Commission, and later , the Board - - - Newsom is a close relative of Plaintiff's Representative in Congress, whom Plaintiff considered appealing about U.S. Patents.

e.   Bevan Dufty (06=May 09) –politically motivated / devised PR strategies for Brown, who later appointed him to the Board - Dufty undercut neighborhood concerns and dodged Plaintiff.

f.   Lisa Mirza (94=May 25) - politically ambitious / "set out to conquer the world" / worked for the Giants under RN Goldman / was "asked to volunteer" for Brown's 1995 mayoral campaign / Brown-appointed "Director of Protocol" (like RN Goldman) the Mayors Office, where Brown "wanted to be informed about everything" - - - Mirza, just before Plaintiff's 1998 meeting, left the Mayors Office to open an etiquette consulting business.

g.   Terezia Nemeth (98=Sep 14.a) – left the Mayors Office for an "entitlements" developer.

h.   Corrina Marshall (¶19) (04=Jun 14) – coordinated SGFA-Rec/Park (2000 – 2004)

Case No.: 3:10-cv-xxxxx-xxx   Document 1   Filed 02/xx/2011   Page 10 of 29

25.   1999 - < The Goldmans, the City, and the Giants share long-stading ties.

26.   99=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

27.   99=July~ - < The Goldmans witnessed Halprin draw a sketch of the Renewal.

28.   99=September - < The Goldmans "made a commitment" to the Renewal (05=Nov 16)

29.   2000 - < The Goldmans pondered Halprin's sketch while Brown and the Board devised a measure for officially soliciting DE Goldman and his nonprofit for "strategies".

30.   00=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

31.   00=Sep 25 - < < Browns measure now ready, the City now moved officially to solicit the Goldmans for "strategies" that would create the Renewal and induce the infringement.

---

**Board of Supervisors Hearing**

Board Item 001688 - President Ammiano

"Hearing to inquire into strategies to promote and improve the Stern Grove Summer Music Festival" ... From Supervisor Ammiano, To Director, Stern Grove" (ed. DE Goldman) – Goal: "Inquire into the capital improvement needs of Stern Grove Festival and maintain the Festival's success while simultaneously addressing concerns of neighbors"

Board of Supervisors - Finance and Labor Committee 9/25/2000 –

Supervisors approving: T. Ammiano, A. Becerril, S. Bierman, A. Brown, L. Katz, B Kauffman (on SGFA Board in 2005), M. Leno, G. Newsom, M. Teng, M. Yaki, L. Yee)

---

32.   2001 - < A few newspaper articles now denigrated independent inventors as "Patent Trolls", and accused them of "sitting on" their patents, ready to pounce on people like Defendants.  None of the writers would respond to Plaintiff, and the topic seemed to fade.

33.   With the City-SGFA strategy begun, the Goldmans hired Halprin to initiate design and had their organizations earmark $8 million for "seed" funding.

34.   01=Apr 30 - < News investigation revealed that Brown tripled his staff, that they were exempt from Civil Service exams; and that he required them to "volunteer" for his reelection.

35.   01=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

36.   01=September - < Similar to many City projects and planning schemes during Brown's tenure, virtually no evidence of wide Press coverage regarding the Renewal has been found. Such "notification" seems to have often limited only to the immediate neighborhood.

37.   01=Sep 11 - < All aspects of U.S. life were now upset by a sudden tragic event:

> "9/11" – WORLD TRADE CENTER ATTACKS

38.   2002 - < Renewal Design proceeds; Master Plan completion set for June

39.   02=June - < Renewal Master Plan now completed – Schematic Design begins.

40.   02=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

41.   02=July~ - < While incidentally attending a Grove concert, Plaintiff happened to contribute his own money to the "Legacy Campaign" — money that would ironically ultimately help infringe his own '269 Patent. No drawings or other indications of the project were seen, and his family had no idea that the project might be of any importance to them in the future.

42.   02=Aug 12 --< Renewal Plans were now reviewed by the Board.

43.   2003 - < RN Goldman makes an inspiring statement regarding his philanthropy:

> "… implementation of the core values of our country - **charity, fairness, democracy** -
> requires backing by the top sources of wealth. - (¶ 13)
> Richard and Rhoda Goldman Fund – 2003 Annual Report (emphasis, Ed.)

44.   03=March - < Renewal Plans were now incorporated in the City Budget:

45.   03=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

46.   03=September - < Dufty accommodated Plaintiff for a neighborhood event.

47.   03=Aug 10 - < RN Goldman publicly stated positions regarding politics and ethics:

> "…if we don't get Gavin Newsom as our next mayor, we're in trouble. Why? Because
> I know Gavin, and I know his dedication. We're lucky he's even willing to do it. …
> Fortunately, our congresswoman (Rep. Nancy Pelosi, D-San Francisco, the House
> minority leader) is a good friend of mine, and she cares about it (i.e. the City.
> " Best business decision? "Cashing out of Levi." "
> "Pet peeve? "Greed, which is related to selfishness, particularly in business, and
> insensitivity to the less fortunate."
> Chronicle - "On the Record / Richard Goldman" - By Ken Howe, et al.

48.   03=Aug 15~ - < Plaintiff and neighbors met with Yomi Agunbiade, who had been directed by Brown to replace the Project Architect as Plaintiff questioned City irregularities.

**49.**   03=Aug 19 - < Grove season over, Board presents SGFA an unusual commendation:

> Board Commendation for SGFA
>
> "... for its work planning and organizing the (Festival) ... congratulating the Association on a successful 66th concert season ... WHEREAS ... non-profit organization dedicated to providing the public with admission-free access to a diversity of performing arts ... coordinating ... since 1938; and, ... recently concluded a successful 66th season"
>
> Board of Supervisors - Ma, Newsom, Hall - - 8/19/2003

50.   03=Sep 1~ - < After having accommodated Plaintiff in July, Dufty now tried to intimidate Plaintiff in a neighborhood meeting regarding Brown and his Agent Agunbiade.

51.   03=Oct–Dec: - < Newsom, forced into a rare December runoff in a hotly-contested race to replace Brown, won when his $4 million campaign outspent opponents 10 to 1.

52.   03=Dec 3 - < RN Goldman, in a rare interview, revealed his motivation for the Fund:

> PND: "When did you start thinking of (the Fund) as something other than a tax-advantaged vehicle for a portion of your assets?
> RG: "At least twenty-five years ago" (c.1978, Ed.)
> Philanthropy News Digest (PND) - December 3, 2003

53.   03=Dec 18 - < Brown departing the Mayors Office, Renewal plans solidified:

> Recreation and Park Commission
> "(item) 5. Discussion and possible action to approve the conceptual plan for Stern Grove Concert Meadow renovation..."
> (ACTION) - Murray, Guggenhime, Lazarus, Prozan – 12/18/2003

54.   **2004** - < After Newsom was sworn in as new Mayor, the SGFA-CITY Agreement [a] was signed in which the City was indemnified by the Goldman interest.

> City-SGFA Agreement [a]
> "FOR DESIGN, RENOVATION AND CONSTRUCTION OF THE CONCERT MEADOW AT SIGMUND STERN GROVE"
> Signed for CITY: Elizabeth Goldstein [b] - GM, Rec/Park Dept.;
> Signed for SGFA: Corrina Marshall [c], Ex. Dir. and Harry O'Brien,

a. Defendants repeatedly failed to respond to Plaintiff questions regarding its validity
b. Goldstein oversaw all Renewal actions between 2000 and 2004
c. Marshall would be reported "excited" upon receiving copies of the SkyCover brochure.

55.   04=March - < Candlestick remained usable, according to Rec/Park Minutes:

> Recreation and Park Department
> "The Department maintains the Candlestick Park Stadium.  The Department and the 49ers have identified (repairs and semi-routine maintenance)":

56.   04=Apr 5 - < Renewal Plans generated enthusiasm in City Agencies:

| Arts Commission |
| --- |
| "… the renovation and redesign of Stern Grove … is an exciting transformation of the area. … may be Halprin's last significant work. … (he is) thrilled with the project." – |

57.   04=Apr 6 - < With little press coverage, the City accepts a huge Goldman Gift

| Board of Supervisors |
| --- |
| "Stern Grove - Concert Meadow Renovations – … possible action to … accept and expend a gift-in-place valued at approximately $10,000,000 from (SGFA)…" |

58.   04=May 25 - < Rec/Park accepted Goldmans "gift-in-place" for Renewal:

| Recreation and Park Department |
| --- |
| "$12,000,000 Gift-in-Place … from the Stern Grove Festival Association to the Recreation and Park Department … to fund …construction … " - |

59.   04=Jun 13 - < PUBLIC EVENT:  SGFA asserts that "numerous public meetings" were held, but they were apparent focused only on the immediate area.  With design work long over and construction set to begin, a "public meeting" of doubtful input value occurred, during which the following SGFA staff received unauthorized copies [b] of Plaintiff's brochure:

Corrina Marshall [c], SGFA Executive Director from 2002 – 2006
Judson Gregory, Dir. of Development – (still on Staff in 2010)
Monica Ware, Dir. of Marketing and Public Relations (still on Staff in 2010)
Kate Duffy, SGFA, Assoc. Dir. - Finance and Administration (gone in 2008)
Peter Palermo, Dir. of Operations (gone in 2008)
Amber Nixon, Development Coordinator (status undetermined)

60.   04=Jun-Aug - < FREE CONCERTS @ Stern Grove– average attendance: **c. 9000**

61.   04=Jun 22 - < Plaintiff nearly dismissed the Grove matter as the drawings seen were reported "sketchy" and with no suggestion of a SkyCover; but to be sure he called Halprin's Office and was told the project was "already done" - some "shroud" to be used over the stage..

62.   04=June - < Drawings done and construction set to begin, Goldstein left Rec/Park, and Newsom appointed Agunbiade (03=Aug 15) to serve as Interim GM – a post he held until 2008 (i.e., during Plaintiff's appeals to the Board for redress of Newsom and Dufty's negligence). Newsom would fire Agunbiade in 2008, and the Board would commend him.

1  63.  04=Aug 17 - < Construction set to begin; SGFA again received Board recognition:

> **"TAILS RESOLUTION"**
>
> **"COMMENDING THE STERN GROVE FESTIVAL"**
>
> "Resolution commending (SGFA and Rec/Park) ...for a successful season
>
> "...and extending best wishes to the Association's efforts with the
>
> Stern Grove Festival's Legacy Campaign
>
> "... #6 WHEREAS, (SGFA) has launched its legacy campaign which is designed to
>
> (1) create a one-of-a-kind performing arts venue with state-of-the-art a features;
>
> (2) enhance and protect the natural beauty of Stern Grove; and,
>
> (3) endow the Festival's mission for generations to come: now, therefore ..."
>
> Resolution No. 543-04 - Elsbernd, Ammiano, Ma - 08/17/2004
>
> Supervisors approving (11): Alioto-Pier, Ammiano, Daly, Dufty, Elsbernd, Gonzales, Ma, Maxwell, McGoldrick, Peskin, Sandoval."

10  64.  04=Sep 14 - < Board adopts "TAILS RESOLUTION" - Two years later (06=Jun 6),

all of the following Members approving the City action will publicly ignore Plaintiff's appeals.

12  65.  2005 - < By May, Construction finishing up; reports announce the fact:

> "Lawrence Halprin's 60 years of green innovation"
>
> "...There is a truss, designed as if it were part of the forest,
>
> arching over the front of the stage to provide sound and fog lamps...
>
> "The Stern Grove updo started festering six summers ago (1999. Ed.)
>
> "...Halprin (started) sketching a design ...nothing came of it for two years.(2001, Ed.)
>
> S.F. Chronicle "Magazine", 5/22/2005, p. 9, "A Part of the Landscape, Sam Whiting:"

17  66.  05=June 14 - < Construction finished; the Board bestowed another unusual honor:

> Board Commendation for SGFA
>
> **"COMMENDING THE STERN GROVE FESTIVAL ASSOCIATION"**
>
> "Resolution commending (SGFA and Rec/Park) ... for its work planning and organizing
> the 68th Annual Stern Grove Festival in San Francisco
>
> and congratulating the Association on the rededication of new facilities
> at Sigmund Stern Grove and the Rhoda Goldman Concert Meadow."

67.  05=June 19 - < Unaware of most of the above, Plaintiff was optimistic about the '269

Patent and had no suspicion of infringement. He trusted that Owners, Builders, and Venture

Capitalists would soon understand Climate Change and realized the help it could offer.

68.  05=Jun 19  - < FREE CONCERTS Renewal opens with RCS; attendance = **"13,000"**

69.  05=Jun 20 - < Next day, Plaintiff discovered the infringement.

| 1 | **EFFORTS SEEKING RESOLUTION - 2005 to 2011** |

2

70. Plaintiff hereby incorporates the allegations in paragraphs 1-69 above and alleges the

following footnote outline of his efforts seeking redress and resolution with Defendants.

**2005**

05=Jun 19 - < Plaintiff unaware of Renewal opening tomorrow

05=Jun 19 - Grove's FIRST SEASON opens

05=Jun 20 - < DISCOVERY - < Plaintiff identifies infringement in newspaper (¶ 12).

05=Jun 20 < Plaintiff's First Visit -  < Plaintiff visits Grove to verify infringement (¶ 13).

05=Jun 24 < Halprin – NOTIFICATION °: (mailed RRR):

05=Jun 28 < Mayor (Newsom) –NOTIFICATION °: (hand-delivered)

05=Jul 7 < Newsom – Letter #2: (hand-delivered)

05=Jul 11 < Halprin – Letter #2: (mailed)

05=Jul 22 < Newsom – Letter #3:  (coordinated with others) - (hand-delivered):

05=Jul 22 < Halprin – Letter #2: (coordinated with others) - (hand-delivered):

05=Jul 22 < Isaacson – Letter #1: (coordinated with others) - (hand-delivered):

05=Jul 28 < Newsom – Letter #4: (hand-delivered):

05=Aug 9 - < DE Goldman - NOTIFICATION ° : (letter - hand-delivered):

05=Aug 9 - < Newsom Agent voicemail to Plaintiff:

05=Aug 10, 12 - < Others –NOTIFICATIONS - total sent: 7: (mail / certified)

05=Aug 21 - Grove's FIRST SEASON ends - '269 Patent Exposure: ~120,000

05=Sep 19 - < CONFERENCE #1- City: CA Elizondo, DCA Emery

05=Nov 16 - < Lippetz to Smegal: (email)

05=Nov 30 - < Smegal to Lippetz: (3-page letter)

05=Dec 7 - < Lippetz to Smegal (phone conference)




**2006**

06=Feb 14 - < Lippetz response to Smegal: (email)

06=Feb 21 - < Smegal response to Lippetz: (3-page letter):

06=Apr 6 - < Lippetz to Smegal:

06=Apr 17 – < DE Goldman – Letter #2 – (private - no copies sent / hand-delivered):

06=Apr 25 - < Lippetz to Smegal: (email) CLANDESTINE MEETING PROPOSAL

06=May 09 - < BOARD –  Testimony  - Appeal for Redress #1:

06=May 31 - < DE Goldman – Letter #3: (cc to DCA Elizondo only)

06=Jun 6 – BOARD –Testimony #2:

U6=Mar 24 - < DEG Press

06=Jun 18- Grove's SECOND SEASON opens

06=Jul 19 – > Lippetz to Plaintiff: (email)

06=Aug 1 – BOARD – Testimony #7

06=Aug 20 - Grove's SECOND SEASON ends - '269 Patent Exposure: ~**240,000**

06=Aug 21 - < DE Goldman – Letter #4: (cc: RN Goldman, Newsom, Halprin, Isaacse

06=Aug 21 - < RN Goldman – NOTIFICATION ° (certified mail - att. DEG #4)

06=Aug 22 - < Lippetz to Plaintiff: (email)

2006=Sep-Oct - "BENEFIT": - FIRST ISSUE - "Why Gavin Gives" …………

06=September – SGFA announces hiring Steven P. Haines for ED Goldman duties

2006 Nov-Dec - "BENEFIT"- SECOND ISSUE: - "The Goldman Rule" …

06=Dec 5 - < Lippetz to Plaintiff: (email) "Patent License Agreement"

2007 -

07=Mar 6 – < DE Goldman – Letter #5: (cc: all, incl Others)

07=Mar 06 – < Mayor (Newsom) – Letter #5: (att. DEG #5)

07=Apr 10 < RN Goldman  – Letter #2 (att. DEG #5)

07=April 27 -:< Plaintiff to Lippetz: (email)

07=May 23 –CONFERENCE #2- - - SGFA:  Lippetz, Muzio, Haines (for Goldman)

07=Jun 4 - < Plaintiff phone conference with Haines: (Haines assertions)

07=06-17 - Grove's THIRD SEASON begins

07=Jul 10 – BOARD – Testimony #8

07=Aug 07 – BOARD –Testimony #9

07=Aug 19 - Grove's THIRD SEASON ends - '269 Patent Exposure: ~**360,000**

07=Sep 13 –DE Goldman – Letter #6

07=Sep 13 –RN Goldman – Letter #3 (no copies – att. DEG #6)

07=Oct 17 – Others – Letter #3 (att. DEG #6)

07=Oct 23 – BOARD – Testimony #10

07=Oct 30 - < BOARD – Testimony #11

07=Dec 15 – MEETING with Alioto-Pier: month wait / Alioto-Piers skips meeting

07=Dec 20 – BOARD –Testimony #14 - - -

2008 -

08=Jan-May - < Plaintiff continues testimony before Board

08=Jun 15 - Grove's FOURTH SEASON begins

07=July - < Plaintiff Meetings with VENTURE CAPITAL

08=Aug 17 - Grove's FOURTH SEASON ends - '269 Patent Exposure: ~**480,000**

08=September - <  European RCS w/ U.S. distributor appears in literature.

08=Oct-Nov - < Brown: "(I still know what's going on before City Hall does)"

08=November - < ELECTIONS
  Aaron Peskin  - (04=Sep 14) – termed out – voted head of DCCC
  Sandoval - (04=Sep 14) - (08=June) - elected to Municipal Court
  Ammiano - (04=Sep 14) - elected to California Assembly
  Gonzales - (04=Sep 14) - will join Ralph Nader campaign

08= Dec 15 - < Letter to Board President Peskin RE: SUPPRESSION OF TESTIMONY

08= Dec 15 - < Letter to Board President Peskin RE: SUPPRESSION OF RECORDS

08= Dec 15 - < Letter to Board Clerk RE: SUPPRESSION OF RECORDS

08=Dec 16 –  Plaintiff Testimony before the sitting Board RE: SUPPRESSION OF RECORDS

2009  - < *Plaintiff - radiation treatment / 6 months convalescence* >

09=Jan 7 – BOARD – < email to Supervisors

                              09=Jun 21 - Grove's FIFTH SEASON begins

09=Jun-Aug – Prospective IP lawyer requires "folder" from past attorney

                              09=Aug 23 - Grove's FIFTH SEASON ends - '269 Patent Exposure: ~**600,000**

09=September – Prospective IP lawyer loses "folder"  / declines representation

09=Oct 24 - < LAWRENCE HALPRIN DIES

09=Oct 27 – BOARD – Halprin Memorial

09=Nov 10 - BOARD – Halprin Memorial

09=12-31 –RN Goldman  – Letter #4: (mailed. RRR)– FINAL w/ Halprin Memorial

2010  -

10=Jan-April – < *study Hunter Point E.I.R (Brown entitlement) (write "Letter 48")* >

10=Mar 25 –FINAL LETTERS to DE Goldman, Newsom and Others – NOTICE ACTION

10=Apri-Jun        < *study Law* >

10=May 11 – BOARD –Testimony #49: (Body reminded Members complicit)

                              10=Jun 20 - Grove's SIXTH SEASON begins

10=Jun-Aug        < *begin Complaint* >

            10=Aug 22 - Grove's SIXTH SEASON ends        '269 Patent Exposure: ~**720,000**

10=Sep-Dec        < *work on Complaint* >

10=November - < ELECTIONS
  Newsom elected California Lieutenant Governor (Defendant Brown associate
  Dufty (04=Sep 14) –  termed out / replaced by Scott Weiner (former DCA)
  Kamala Harris elected California Attorney General (Defendant Brown associate)

10=Nov 29 - < RN GOLDMAN DIES

10=December – BOARD appoints Ed Lee Interim Mayor to replace Newsom

  (Ed Lee: 2000-2004 Renewal Work, DPW GM // 2005+ City Administrator for Newsom

2011  - < *finish / file Complaint* >

## SUMMARY OF RESOLUTION EFFORTS - 2005 to 2011

71. Plaintiff hereby incorporates the allegations in paragraphs 1-70 above and alleges the following to summarize facts and events documented in the Appendix in EXHIBIT B.

72. As the preceding outline illustrates and the corresponding Appendix materials demonstrate, Plaintiff has made numerous and unceasing appealing to Defendants trusting them to be what they profess, believing their integrity to be consistent with their own oaths and proclamations as leaders of government and business. Plaintiff has sought a mutually beneficial resolution; but Defendants have refused to meet him even once. They hired Agents who have deflected Plaintiff's efforts with intimidation, misrepresentation, delays and other devious tactics. Meanwhile, they themselves have procured and otherwise enjoyed self-promotion in publications presenting themselves as apart from these matters; resting secure that public perceptions would overpower Plaintiff's efforts. As a result, Plaintiff has suffered great harm.

73. But for Defendant's actions, Plaintiff's family would not have surrendered significant past investment made toward implementing the '269 Patent. They proceeded in Trust and good faith that a U.S. Patent would offer necessary sanctions to discourage such abuse of an individual person. The family has been forced by Defendant's willful infringement to employ expensive legal representation; only to be informed that U.S. Patent Law has no provision for allowing patent lawyers to recoup proportionate expenses for defending an individual like Plaintiff as opposed to established entities up to 500 employees. Such entities and patentees who are individual persons are presently both classified as "Small Entities" without differentiation. Plaintiff was advised that fees to prosecute such cases often range from $300,000 to $500,000. Plaint remains indebted to lawyers and consultants, and is now worse off than before. Meanwhile, a competing European RCS product has been highly refined and introduced to American markets. Rather than willfully infringing the '269 Patent for years, Defendants might better have chosen to use Stern Grove and their resources to embrace the '269 Patent as an asset for the City to employ the technology as a new San Francisco Industry.

## ISSUES

74. Plaintiff hereby incorporates the allegations in paragraphs 1-73 above and alleges the following to summarize Issues documented beginning at ¶146 in EXHIBIT B.

75. INNOVATION: - < Plaintiff brings this action in firm belief that U.S. Patents are vital for American Innovation and that the '269 Patent defines a technology for countless "Green" jobs.

76. INDIVIDUALS: - < The Founding Fathers, familiar with Old World suppression, used words a that allowed individual persons the benefit of the only federally-sanctioned monopoly:

> U.S. Constitution - Article 1, Section 8 (Powers of Congress) [a]
>
> *"To promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."*

a. In the writing, there is no suggestion of "entities" of any kind. Nor was there mention of individuals privileged by birth, fortune, or office. Thomas Jefferson was particularly proud of Section 8 for the creativity it fostered in his own time, for it inspired increased innovation.

77. LAW: - < Congressional Acts recognize the importance of context (emphasis, Ed):

> 1 United States Code, Section 1
>
> "Words denoting number, gender, and so forth"
>
> *"In determining the meaning of any Act of Congress, **unless the context**[a] **indicates otherwise** ... the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals..."*

a. CONTEXT: - < In the context of U.S. Patents; an "individual person" cannot logically or fairly be equated to an "entity" of any size. The creative work of an individual is inherently vulnerable to misuse by others –particularly those privileged with greater power. However, for many years, Patent Law has classified both equally as "Small Entities", and making no provision for proportionate protection in the event of infringement.

78. California Law recognizes the vulnerability of individual persons thus (emphasis, Ed.):

> ca bus & prof §22370 (a)
>
> *"**The Legislature finds that there are** in the State of California members of the general public who have ideas or inventions that they believe have substantial commercial value but which members of the general public **do not have the resources or expertise necessary to develop, manufacture or market** these ideas or inventions; that these members of the general public are commonly referred to as "inventors"; that these inventors are generally **not** people who earn their livelihood from developing, manufacturing, promoting or marketing ideas or inventions, from manufacturing or marketing products, from publishing literary works or from owning, operating or controlling commercial enterprises"*

79. POWER: - < The present action represents a classic case of inequality. Defendants' complex ties and ready philanthropic riches of half a billion dollars have allowed them to present themselves as patriotic and honorable through their oaths and good deeds. Defendants' disproportionate economic, social, and political influence enables them to weather investigations and exercise influence over vital institutions of government. Defendants abused that responsibility and have caused great harm - no only to Plaintiff and his family, but also to prospects, friends, and associates who have long encouraged and supported the work with the '269 Patent.

80. PATENTS: - < Some lament the state of American Innovation and the loss to other nations of our intellectual property. If the Courts and other government vehicles for enforcement are unable to correct the present matter, there will be little reason for any individual to seek patent protection. In his lifetime, the lack of respect for patents is troubling for its implications for future gerations, and Plaintiff hopes that this humble effort might serve to help things change. Plaintiff is ill-suited (as are many creative people) to effectively deal with the complexity of inventor" infringement of the '269 Patent

81. DEFENDANTS: - < Defendants appear to be refined and caring gentlemen, but have shown nothing but callous disregard for Plaintiff, and no consideration for the far-reaching damage caused by their insensitivity and desire for self promotion. If people of Defendants' station profess commitment to their oaths and pronouncements, yet stand by and condone the opposite being done in his name, it undermines Trust at every level, and must be rejected.

82. PHILANTHROPY: - < Charity is a noble instinct, but if it is employed for masking ulterior motives, it becomes a serious form of fraud on all society and leaves a legacy of shame.

83. GOVERNMENT: - < For anyone in Government to condone, or in any way to work so as to undermine an individual's U.S. Patent, that person become responsible for undermining future welfare in a most serious way. Plaintiff is testimony to the extreme difficulty inflicted by Defendants acts that discourage both creativity and future happiness and welfare.

# CAUSES

84. Plaintiff hereby incorporates the allegations in paragraphs 1-83 above, and adds the following regarding Causes 1 through 5, which follow hereinafter.

85. The Constitution and Law make special acknowledgement of individual persons:

United States Constitution, art. I, section 8, cl 8 - (Powers of Congress)

"To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries;

1 United States Code, Section 1 –
Words denoting number, gender, and so forth

"In determining the meaning of any Act of Congress, unless the context indicates otherwise … the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals…"

86. Plaintiff, in the context of Patent Law, is an individual person, and the following Causes are not as likely to have arisen had present U.S. Law provided proportionate protections for individual persons in recognition of inherent limitations as compared with "entities" of any size. Plaintiff has long suffered great abuse of that fact by Defendants.

87. Defendants represent a "class" of leaders in philanthropy, business, and government who, upon information and belief, were politically and prejudicially motivated to take unfair advantage of Plaintiff's status as an individual by avoiding their fiduciary duties and otherwise allowing and enabling their Agents (¶___) to attempt – among other offenses - intimidation, obfuscation, and undermining Plaintiff's work, reputation, and Free Speech.

88. In order to fulfill the purposes and provisions of 15 U.S.C. §§ 3718, 8111, and 8112; Plaintiff hereby moves to engage the Intellectual Property Enforcement Coordinator ("IPEC") and the President's Council on Innovation and Competitiveness ("PCIC") to fulfill their mandated goal to "improve the economic, environmental, and social well-being of the United States" and to derive maximum public benefit. The spirit and letter of Federal, State, and Local Laws, in part refenced below, all speak to the Causes in this action.

89. Causes in this action relate to Federal Law, including the following:

The U.S. Constitution ("US Const");

U.S. Const. art. 1, cl. 3, 8, 10, 18; amend. XIV;

Federal Rules of Civil Procedure (" Fed Rules Civ  ???  "),

Fed Rule 25;

The United States Code (U.S.C.)

15 U.S.C. §§ 1, 2, 4, 5, 12, 15, 3701, 3702, 3703, 3718, 8101, 8111, 8112, 8113;

18 U.S.C. §§ 2, 3, 4, 241, 371, 1001, 1016, 1018, 1341, 1346, 1349; and 6003;

28 U.S.C. §§ 1331, 1337, 1338, 1367, 1400; 1603 and 2202;

35 U.S.C. §§ 5, 41(h)(1)(2), 100, 101, 102, 103, 271, 281, 282, 283, 296(a)(b), and

Manual of Patent Examination and Procedure ("MPEP"), incl Appendix ("appx.")

MPEP appx. R § 1.27.

90.  Causes also relate to provisions of State Law, including the following:

The California State Constitution ("ca const."):

ca const art 1 §§ 1, 2, 3(a), 3(b)(1)(2) and (4),  7(a)(b), 14, 16, 19(a); 24, 26,

28(a)(1)(2)(4), 28(b)(4)(5)(13); 28(e), 29, 30, 31,

ca const art 7 §§ 1, 4, 5, 7;

ca const art 11 §§ 1(a); 3, 4, 5, 12, 13;

The California Business & Professions Code ("ca bus & prof")

ca bus & prof §§ 301, 302, 17000, 17001, 17002, 17040, 17048, 17070, 17078,

17082, 17084, 17095, 17096, 17100, 17200, 17203, 17206.1, 17206.1 (a)(1), 17206.2,

17500, 17508, 17510, 17519.8, and 22370;

91. Causes are further brought under provisions of Local Law, including the following:

The San Francisco Charter (2008)  ("sf charter");

sf charter preamble; sf charter §§ 2.105; .108; .114, and .117; sf charter 3.100, sf

charter 15.100; and sf charter 16.114 ("Sunshine Ordinance");

The San Francisco Administrative Code (2010) - ("sf admin").

sf admin §§ 1.50, 2.1-1, 2.95, and 2A.25; sf admin §§ 6.0, .1, .2, .3, .7, .22, and .23; sf

admin §§ 8.1, .2, .3, and .31; sf admin §§ 8.4; .5; .7, and.9; sf admin §§ 12L.1, .2; .3;

.4; .5, .6, .7, .8; .9, and .10; sf admin §§ 67 ("Sunshine Ordinance")15 and.16; and sf

charter appx C3.699-13

Board of Supervisors Rules ("bos rules").

bos rules §§ 1.1, 1.2.1, 1.5, 6.14, et al.

## FIRST CLAIM FOR RELIEF:  PATENT INFRINGEMENT

( INFRINGEMENT of U.S. Patent 6,003,269 under 35 U.S.C. 271, 283, and 296, et al )

92. Plaintiff incorporates by reference the foregoing paragraphs.

93. Defendants directly, indirectly, contributorily and by inducement, have willfully infringed the '269 patent by making and using the patented inventions for the stage proscenium at Stern Grove, and have willfully prolonged the infringement of the '269 patent by continuing their use of the patented inventions despite Plaintiff's diligence and repeated efforts to assert his Rights.

94. Defendants' infringement has thus suppressed the development of the '269 Patent for the benefit of American Progress; has caused and continues to cause incalculable and irreparable harm to Plaintiff, for which there is no adequate remedy at law unless this Court enjoins and restrains Defendants activities and provides restitution of the Rights of Plaintiff.  To compensate for the loss of the time during which the RCS technology has been thus suppressed by Defendants actions, Plaintiff hereby moves to request an extension of the term of the '269 Patent.

95. Under 35 U.S.C. §296, Defendants Brown, Newsom, and Dufty are not immune from accountability for their actions and inactions in this matter.

96. Under 15 U.S.C. §3701, technology and innovation are of "central" importance to the U.S. and warrant careful attention.  Accordingly, 15 U.S.C. §3718 established the "President's Council on Innovation and Competitiveness" to monitor implementation of public laws, and Plaintiff hereby moves to engage the Council to see how this case might lead to improvement.

97. Under 15 U.S.C. §8111; the President shall appoint an Intellectual Property Enforcement Coordinator ("IPEC") to "coordinate ... the Joint Strategic Plan against counterfeiting and infringement."  Given the great piracy and suppression of the RCS work experienced by Plaintiff that clearly resulted from the disregard and ease with which Defendants felt no concern about infringing (buoyed by deficiency of Patent Law), Plaintiff hereby moves to engage the IPEC to "assure the coordination of intellectual property enforcement policy" and hopefully create future benefit from this trying matter.

## SECOND CLAIM FOR RELIEF:  UNCONSTITUTIONALITY

Under U.S. Const. art. 1, § 8, cl. 8; 1 U.S.C. § 1; MPEP Appendix R §1.27:

98.    Plaintiff incorporates by reference the foregoing paragraphs.

99.    In the Constitution, the Founding Fathers (familiar with Old World oppression) granted one monopoly – for "Writers and Inventors" to allow protection for the individuals' inherently vulnerable work, for many must work in relative isolation to develop their ideas.

100.    For many years, individual persons have been equated in Patent Law to entities of 500 people - both classified "Small Entities" with equal sanctions against infringement despite obvious inherent differences.  No one is more vulnerable than individual persons; generally lacking resources for dealing with theft.  Under strict scrutiny, there is no compelling interest for government to require individuals to compete on such an unleveled playing field.

101.    By disadvantaging individuals, Laws have aided and abetted actions like those of Defendants, who deprived Plaintiff of liberty and property, undoing extensive work with the '269 Patent, and abridging the privileges and immunities previously granted him.

102.    By classifying individual persons as Small Entities, MPEP Appendix R, §1.27 puts them on the same battleground with much larger non-profits and universities with access to superior legal resources for defending intellectual property - lopsided misclassification that pits vulnerable individuals against the more powerful – even within the same class.  This disparity is manifest in current Patent legal practice with "remedies" having negative incentive for counsel to defend individuals, as in Plaintiff's case.  This places them at the mercy of opportunists and greater market forces.  Plaintiff has learned that even the smaller of the "Small Entities" are discouraged by the disparity and shy away from U.S. Patents due to the difficulty of enforcing them, which does nothing for the country but have a chilling effect on American Progress.

103.    The lack of proportionate "remedies" for individuals results in a decided lack of experienced legal representation for the "Writers and Inventors" originally specified in the U.S. Constitution.  The document makes no mention or suggestion of "entities" of any kind.

### THIRD CLAIM FOR RELIEF: FRAUD

Under 18 U.S.C. § 2, 3, 4, 241, 371, 1001, 1016, 1018, 1341, 1346, 1349,

104.  Plaintiff incorporates by reference the foregoing paragraphs.

105.  REPRESENTATION OF FACT: Defendants presented themselves as honorable men and sworn representatives.  They represented the Renewal as a bone fide sole endeavor.

106.  MATERIALITY: Defendants - for social, political and economic reasons - wanted the Renewal with the RCS to look like their own original "Big Idea."   The perception of mastery helped them maintain status, power, and credibility.

107.  FACTS FALSITY:  Defendants already knew of Plaintiffs RCS work.

108.  SPEAKER'S KNOWLEDGE OF ITS FALSITY:  Defendants were savvy financiers and political strategists who enjoyed power.  In the 1990's they had learned confidentially of the inventions through Agents.  They believed that Plaintiff lacked resources to defend a patent.  If they kept the RCS use subdued, Plaintiff would not detect it until later – when it may be too late.

109.  SPEAKER'S INTENT FOR FACT TO BE BELIEVED, ACTED UPON:  Defendants enjoyed their influence, and knew that if people belived the RCS was simply their idea, most people would believe them, and even kick in money to make it happen on a grand scale.  Defendants planned to only notify the nearby community, and not the whole City until the Renewal would be finished.  Plaintiff might not even still be around.

110.  PLAINTIFF'S IGNORANCE OF ITS FALSITY:  Plaintiff would know little of the Goldmans financial connections and dealings, and they let on little.  Plaintiff was busy with prospects and other work, and heard nothing of the Renewal between 1998 to 2005.  From the mid 1980's, Plaintiff had admired the Richard and Rhoda goldman Fund for sponsoring NPR.

111.  PLAINTIFF'S RELIANCE ON TRUTH OF FACT:  Even after Defendants refused to meet with him, Plaintiff still wanted to believe that they were as good as they portrayed.

112.  PLAINTIFF'S RIGHT TO RELY UPON IT: one must trust leaders as much as possible.

113.  CONSEQUENT DAMAGES SUFFERED BY PLAINTIFf: infringement / life change.

Case No.: 3:10-cv-xxxxx-xxx   Document 1   Filed 02/xx/2011   Page 26 of 29

## FOURTH CLAIM FOR RELIEF:  UNFAIR COMPETITION

Under section 43(a) of the Lanham Act, et al.

Under 15 U.S.C. §§ 1, 2, 4, 5, 15, 3701, 3702, 3703, 3718, 8101, 8112

Under 18 U.S.C. §§ 2, 3, 4, 241, 371, 1001, 1016, 1018, 1341, 1346, 1349,

114.   Plaintiff incorporates by reference the foregoing paragraphs.

115.   Defendants and their Agents, Agencies, and Contractors, separately and/or together, have used the principal elements and inventions of the '269 Patent to form a major stage Proscenium comprising a large cantilever steel space frame RCS Support high above and conforming to the stage and large de-mountable and retractable RCS Panels for defining and protecting the stage itself.  The full RCS provides a distinctive major functional design component of the Grove's Renewal that provides a grand focal point for all events in free summer concerts at the widely appreciated venue attended by over 12,000 spectators each weekend, and have done so for the past six years while Defendants have avoided Plaintiff and delayed matters as much as possible.  Plaintiff has worked with Defendants contractors in the past, which make matters even more awkward for Plaintiff to proceed with honor.

116.   Defendants and their Agents, Agencies, and Contractors, separately and/or together, have used numerous full and partial images of, and references to, the Proscenium, which have been in wide use in interstate commerce; being promulgated in publications, on the internet, and in other media.  Defendants own websites feature prominent dynamic view of the RCS to introduce web pages to view.

117.   Defendants and their Agents, Agencies, and Contractors, separately and/or together, have presented the Proscenium as their exclusive creation which is likely to cause confusion as to source, sponsorship, or association; thus making it likely that Plaintiff's professional colleagues, contacts, and associates in Industry (including the Marine, Fabric, Awnings, and Tensile Structure Industries) may assume that the Grove's RCS possesses no other significance and is therefore free to be copied without further attribution; thereby undermining Plaintiff's credibility and prospects when attempting to professionally advance the '269 Patent with collaborators, clients, prospects, and suppliers.

### FIFTH CLAIM FOR RELIEF:  NEGLIGENCE

Under 18 U.S.C. § 2, 3, 4, 241, 371, 1001, 1016, 1018, 1341, 1346, 1349,

118.   Plaintiff incorporates by reference the foregoing paragraphs.

119.   DUTY: The Philanthropist-Defendants have fiduciary duties to the Public Trust to act in ways that are true and consistent with their own statements and their public image and roles as leaders striving for virtue and altruism – self-described as supporters of "fairness and democracy."  The Elected-Defendants have fiduciary duties as officials to be true and consistent with their sworn responsibilities.  Thus, the Public expects Philanthropists to be motivated by ethical and moral guidelines, and expects the Elected to abide by their solemn oath to look out for the Rights of their constituents.

120.   BREACH: While all members of society have a duty to exercise reasonable care toward others and their property, Defendants believed themselves immune from accountability for the consequences of their actions – as one Agent said "an arm's length away."  The Goldmans held themselves out as altruistic; yet when confronted with Plaintiff's problem, they refused to respond and instead sent Agents to intercept him (Agents who acted in a decidedly un-philanthropic manner).  In similar fashion, the Elected-Defendants refused take action to defend Plaintiff's Rights, and instead likewise sent Agents.  Thus, in Plaintiff's matter, all Defendants failed to uphold their own public persona and their sworn duties.

121.   CAUSATION: Defendants disregarded and disrespected Plaintiff and the '269 Patent throughout this affair.  None ever met Plaintiff to discuss the matter.  One turned on his heel when he saw Plaintiff approach, blurted out "I'm not talking to you!" and sped away.

122.   DAMAGES:  Thus the tactics employed by Defendants left Plaintiff in a constant dilemma about what to do next; thereby distracting him from work, causing him to suffer loss of credibility with peers, and ultimately forcing him to abandon years of work advancing the '269 Patent - only to now refocus on unfamiliar Law … and generally not do so well any more. In such manner, Defendants' actions have suppressed the '269 Patent and undermined virtually all of Plaintiff's work with the '269 Patent, forcing him to now defend his Patent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the following relief:

JUDICIAL DETERMINATION:

a. A judicial determination that present U.S. Patent Law unfairly and unconstitutionally equates an individual person holding a U.S. Patent with entities including organizations comprising from one or two persons up to five hundred persons, including nonprofits and institutions, by virtue of all such parties being equally classified as "Small Entities"; and that such equal classification results in individual persons being unfairly and unconstitutionally vulnerable to the greater resources and/or influence of any such entities and greater forces within society by virtue of said individual persons not being granted proportionate and effective protection and sanctions in the event of infringement.

b. A judicial determination that Defendants have willfully infringed the '269 Patent, have willfully prolonged said infringement, and have willfully engaged in acts of unfair competition; fraud; and negligence;

c. A judicial determination that, as a direct and proximate result of willful acts of Defendants, Plaintiff has been injured and will continue to suffer substantial, continuing, and irreparable injury to his business and reputation unless Defendants are restrained by the Court from continuing their unconstitutional acts;

d. A judicial determination that, in accordance with 35 U.S.C. 296, Defendants and others acting in an "official capacity" regarding infringement "shall not be immune" in this matter, including by virtue of their no longer being in office.

INJUNCTION

e. A judicial order that preliminarily and permanently enjoins Defendants and any person or persons acting in privity or in concert with Defendants to effect and/or prolong infringement of the '269 Patent, and that permanently enjoins Defendants, their

Case No.: 3:10-cv-xxxxx-xxx   Document 1   Filed 02/xx/2011   Page 29 of 29

Contractors, and any affiliates from committing new acts of infringement, unfair

competition, fraud, and negligence, and to cease all such existing acts:

## DAMAGES – COSTS - FINES

f.  Award to Plaintiff of Costs and Damages in an amount adequate to compensate for

infringement, including interest on the amount of damages found, including pre-

judgment and post-judgment interest; and such other and further relief as the Court

may find equitable, just, and proper.

g.  Increase of such Damages by three times the amount found or assessed;

h.  Extension of the term of the '269 Patent in accordance with MPEP art. 1 § 8, Rule

1.750 (E8r6, September 2007) to enable continuation Progress.

i.  A Fine to Defendants for infringement in an amount that is reasonable in light of the

intent to so infringe and to willfully prolong said infringement to the further detriment

of Industry, Plaintiff, and other individual persons who are patentees.

j.  A Fine to Defendants for infringement in an amount that will enable the City to heal

from any wounds from this action on the basis of the otherwise noble ideals of

Goldman philanthropy to provide such benefit, whereby such funds will be transferred

to the City in Trust for a "Green Industry Center" at Hunters Point to derive benefit

from the '269 Patent for those unemployed and in need to training and jobs.


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands trial by jury of all issues that may be so tried.


Dated this 1st day of March, 2011


RICHARD McREE,
Architect - Inventor
(pro se)

Case 3:11-cv-00991-EDL   Document 1   Filed 03/03/11   Page 30 of 72

US006003269A

# United States Patent [19]

## McRee

| [11] | Patent Number: | **6,003,269** |
|---|---|---|
| [45] | Date of Patent: | **Dec. 21, 1999** |

[54] **RETRACTABLE COVERING FOR SPACES**

[76] Inventor: **Richard T. McRee**, 4417 18th St., San Francisco, Calif. 94114

[21] Appl. No.: **08/838,451**

[22] Filed: **Apr. 7, 1997**

[51] Int. Cl.⁶ ...................... **E04B 7/14; E04B 7/16; E04B 1/342; E04C 3/14**

[52] U.S. Cl. .......................... **52/6; 52/63; 52/66; 52/82; 52/83**

[58] Field of Search .................................. 52/5, 6, 22, 23, 52/63, 66, 82, 83, 222

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| 1,286,895 | 12/1918 | Arrel . | |
| 1,711,994 | 5/1929 | Erickson . | |
| 1,800,984 | 4/1931 | Erickson . | |
| 2,140,220 | 12/1938 | Colvin . | |
| 2,692,566 | 10/1954 | Mitchell . | |
| 2,848,756 | 8/1958 | McCann . | |
| 3,510,996 | 5/1970 | Popil . | |
| 4,259,819 | 4/1981 | Wemyss | 52/222 |
| 4,727,688 | 3/1988 | Kida et al. | 52/6 |
| 4,751,800 | 6/1988 | Kida . | |
| 4,942,895 | 7/1990 | Lynch | 135/99 |

| 5,062,243 | 11/1991 | Kumagai | 52/66 |
| 5,167,097 | 12/1992 | Robbie . | |
| 5,203,125 | 4/1993 | Sugizaki . | |
| 5,295,501 | 3/1994 | Vigne | 135/99 |
| 5,311,699 | 5/1994 | Huffman | 47/17 |
| 5,355,641 | 10/1994 | Levy | 52/66 |
| 5,555,681 | 9/1996 | Cawthon | 52/63 |

### FOREIGN PATENT DOCUMENTS

| 219522 | 3/1985 | Germany | 52/66 |
| 86/04371 | 7/1986 | WIPO | 52/66 |

### OTHER PUBLICATIONS

Progressive Architecture Fuller p. 1±–137 Jun. 1967 "Bucky's Biggest Bubble".

Architectural Forum Becket p. 9 Sep. 1963 Survey of Stadiums.

Architectural Forum Otto p. 6 Oct. 1966.

*Primary Examiner*—Robert Canfield

[57]                **ABSTRACT**

A retractable covering for buildings (**20**) or spaces (**22**) comprising a plurality of flexible retractable panels (**32**) and attached retractable cables (**36**) stored at the perimeter of the space and capable of being deployed in a helical pattern converging near a predetermined point above the space.

**20 Claims, 9 Drawing Sheets**







FIG 3



FIG 4-A

FIG 4-B

FIG 4-C

FIG 4-D

Case 3:11-cv-00091-EDL   Document 1   Filed 03/03/11   Page 34 of 72



FIG 5-A

FIG 5-B

FIG 5-C

FIG 5-D





FIG 7-A

FIG 7-B

**U.S. Patent**     Dec. 21, 1999     Sheet 7 of 9     **6,003,269**



FIG 8-B

FIG 8-A

FIG 9-B

FIG 9-A



6,003,269

1

## RETRACTABLE COVERING FOR SPACES

### BACKGROUND—FIELD OF THE INVENTION

This invention relates to buildings and other functional spaces, specifically those which may alternately benefit from both open-air use and the provision of overhead protection. It is adaptable to any size and shape of space, from very small, e.g. residential courtyard; to very large, e.g. sports stadium.

### BACKGROUND—DESCRIPTION OF PRIOR ART

Although relatively few in number, retractable coverings designed for buildings and spaces, particularly for very large spaces such as sports stadia, are generally of two varieties. They may be (a) large movable roof elements or (b) lighter assemblies of more-flexible materials used in panels or membranes, and braced in various ways.

The first variety is only indirectly related to the present invention and is also quite rare, as the roof components tend to be heavy and expensive to build, maintain and operate. Robbie's SkyDome is an example which consists of three massive, rigid segments which are slidably and rotatably operated to form a complete enclosure. When open, however, large portions of these elements still remain in view. It has been reported that this retractable covering takes 20 minutes to close, and also takes a great deal of power to retract and deploy; each such operation reportedly consuming more than $500 worth of electricity. Recent patents for this variety, such as Sugizaki's Operable Roof and Kida et al.'s Operable Dome-shaped Roof Structure tend to share these same disadvantages. Large movable roof elements are usually found applied only in new facilities, where their demanding requirements can be accommodated. Regarding the present invention, they illustrate the desire and need for a roof covering for large-scale buildings which can be retracted

The second variety, lighter assemblies, is directly related to the present invention. Flexible materials have been greatly-improved in recent years, and there has been a wide range of fixed-roof applications of these materials. However, retractable coverings of this variety have been limited in application, usually for small-scale and intermediate-scale projects. The lack of large-scale application of these new materials is even more pronounced. To date, patents for this variety often rely upon rectangular panels and rectangular configuration of rigging. They therefore lack the necessary inherent geometry for practical application and efficient use of the strength of flexible materials available. This geometry constraint also places limitations on the location and nature of structural elements. Most large stadia tend to be circular or oval in shape, and many employ compound curves in their geometry. Hence, adaptation of these patents to most large spaces is difficult. For example, both versions of Erickson's Night and Day Stadium relied on rectangular panels deployed by numerous rolling elements, and supported by numerous heavy fixed cables in rectangular arrays. Arrel's Canopy Structure relied upon separated rectangular panels with suspension loops for supporting the edges from intermediate fixed lines. W. Colvin, Jr.'s Roof proposed large, fixed truss elements together with rectangular panels. Consequently, all of these provide little or no possibility of using panels in a circular array. Additionally, a frequent disadvantage of this second variety is the reliance upon excessive apparatus, such as closely-spaced edge pulleys running on edge cables, or heavy trucks running on overhead

2

cables to effect closure of the space. This reliance adds additional expense and weight as the scale of application increases.

Both types of retractable coverings often fail to address a further, and major, desirable characteristic. That is to provide such a covering which may also be retroactively applied to an existing large-scale structure. Most existing buildings are not limited merely by overall shape. Structurally, they are usually limited in their ability to carry new static or dynamic loads. In addition, other serious limitations may include insufficient space available for accommodation of a major new covering. Unfortunately, most concepts for retractable coverings presented to date cannot be adapted for such retroactive use without adverse consequences.

With the development in recent years of more-efficient and more-durable lightweight materials, new applications of coverings of all sizes have been realized. However, most of the large-scale applications have been limited to immovable, fixed-panel installations. These have commonly used either inflated or suspended membranes. Some applications have been retractable, but these are usually limited in scale and application. Otto's retractable covering for an open-air theater consists of three primary, independent, canopies freely gathered to a central point for retraction. In addition, secondary canopies, suspended underneath, are required to carry off rain water. Mitchell's Flexible Roof Furling System for Amphitheaters or the Like required a very tall mast for supporting a massive, continuous membrane covering, the base of which must be drawn around the entire perimeter in order to encircle the space.

An additional variety of retractable coverings consists of lighter retractable shading devices. These usually require a primary covering for protection from forces of wind and rain. Most of these are not adaptable for large-scale exterior applications. Fuller's Shading Device for Exp. '67, Montreal, in addition to requiring a primary covering, makes no provision for a continuous overlap of adjacent panels important for exterior applications.

Although not retractable, Beckett's (proposed) helical tension fixed roof structure for a sports stadium has shown how a circular array of helical cables may be utilized to form a fixed roof structure over a large space. No proposal has been evident that this principle may be used for a retractable roof.

The challenge remains to provide a universal lightweight covering system which allows both open-air, partially-closed, and completely-enclosed use—as desired. Such a system must be easily and efficiently built, operated and maintained. It should allow positive rainwater runoff. It should also present minimal visual obstruction when either open or closed. Ideally, this system should also be capable of installation on any size and shape of space—e.g. from a small courtyard for a private residence to a large athletic stadium. Perhaps most important, such a system should be practical for retroactive installation on existing buildings, without requiring structural revisions to the existing facilities.

### OBJECTS AND ADVANTAGES

My retractable covering solves the aforementioned difficulties, allows for easy and economic outfitting of a multitude of new and existing facilities, and provides all-weather use for any space. Accordingly, a number of objects and advantages of my invention are as follows:

3

A Economical, durable and lightweight.

B Efficiently and quickly operated and placed in any desired intermediate position.

C Adaptable to spaces of any shape.

D Total coverage and effective closure with a minimum of panel material.

E No visual obstruction when open or closed.

F Structural design of overall system is inherently stable.

G Structural design of individual panels is inherently stable.

H Structural design minimizes cost of supporting structure.

I Reinforcing of panels maximizes utilization and strength of panel material.

J Interactive operation enhances efficiency of movement.

K Counterweight provides additional strength and shock-absorbing stabilization

L One motor may propel an entire array.

M Economical and practical for installation on existing structures.

N System is adaptable to perimeter-only coverage.

O System is adaptable for portable application.

With the ever-increasing importance of energy conservation, some of these qualities constitute one way of saving energy. On one hand, closing off a space from the elements may make it more comfortable—obviating or lessening any need for heating or air conditioning which consumes energy. On the other hand, the extension of the life and use of a building makes replacement unnecessary. Studies have demonstrated that very-significant quantities of energy are consumed in the process of simply fabricating the concrete and steel essential for buildings. Because my invention can be easily adapted to existing structures, increasing their usability and life-span, the energy which would have been used for replacement can be used for alternative uses.

Presently, despite public concern about energy conservation, at least one famous, structurally adequate (earthquake-tested) and still-useful sports stadium has actually been proposed to be demolished and replaced because it is too "windy". The simple application of my invention would diminish or remove this major objection entirely and could rejuvenate the entire facility with its continuing serviceability and widely-admired history. Great quantities of energy could thus be conserved by not having to replace it.

Further objects and advantages of my invention will become apparent from a consideration of the drawings and the ensuing discussion.

DRAWING FIGURES

In the drawings, closely-related figures have the same number, but different alphabetical suffixes.

FIGS. 1-A to 1-C show three views of 32-panel embodiment for a new sports stadium. Panels are shown in the fully-deployed, or closed position. Views are isometric, front and plan views, respectively.

FIG. 2 shows an isometric view of a 2-panel embodiment for a residential courtyard. One panel is deployed for shade. The other is retracted for sun.

FIG. 3 shows a perspective view of a 32-panel embodiment for an existing sports stadium. The panels are shown in an intermediate position.

FIGS. 4-A to 4-D show isometric views of a 6-panel embodiment for an asymmetrical space. Successive figures

4

depict four positions for the panels. Shown are the retracted (open), first intermediate, second intermediate, and deployed (closed) positions, respectively.

FIGS. 5-A to 5-D show plan views of the same embodiment shown in FIGS. 4-A to 4-D.

FIGS. 6-A to 6-D show front views of the same embodiment shown in FIGS. 4-A to 4-D.

FIG. 7-A is a detail of one interactive pair of panels and cables from FIGS. 4-A to 4-D. The panels are shown beginning deployment from the retracted (open) position.

FIG. 7-B shows the same view with the panels approaching full-deployment (closure).

FIG. 8-A shows the control ring, with the panels and cables prior to closure.

FIG. 8-B shows the same view with the panels fully closed (deployed)

FIG. 9-A shows a portion of the service platform, illustrating the reels for panels and cables.

FIG. 9-B shows another portion of the service platform, illustrating a motor and a transfer drive.

FIG. 10 is a view of a counterweight and its relationship to movable cables and panels.

FIGS. 11-A to 11-D show various dispositions and configurations for the retractable covering

FIG. 12-A shows a modification of the invention which provides perimeter-only coverage Panels are shown in the fully-deployed, or closed position.

FIG. 12-B shows a detail of the rigging of FIG. 12-A. Panel are shown in an intermediate position.

FIG. 12-C is a plan view of a single panel application of the invention. Panels are shown in an intermediate position.

REFERENCE NUMERALS IN DRAWINGS

| 20 | building |
| 22 | open space |
| 24 | primary tower |
| 26 | secondary tower |
| 28 | stationary cable |
| 30 | control ring |
| 32 | retractable panel |
| 34 | panel reinforcing |
| 36 | retractable cable |
| 38 | service platform |
| 40 | roof |
| 42 | tension ring |
| 44 | pulley |
| 46a | panel reel |
| 46b | cable reel |
| 48 | motor |
| 50 | transfer drive |
| 52 | counterweight |
| 54 | counterweight cable |
| 56 | service car |

Description—FIGS. 1A to 10

The retractable covering of my invention is readily-adaptable to a wide variety of sizes, types and shapes of spaces. Therefore, a few representative examples of these embodiments are presented. The applications illustrated range from large-scale to small-scale. The subsequent detailed discussion of the elements of my invention will focus on the fourth embodiment, shown in FIGS. 4 to 10.

All figs show that each embodiment of my retractable covering may be similarly applied to a facility, or a building 20. The purpose of the covering is to provide overhead protection or other enclosure for an open space 22 which may be surrounded by structure. Depending on the

6,003,269

5

application, there may be a number of primary towers 24 and/or secondary towers 26 located at the perimeter of the open space or the surrounding building. A number of stationary cables 28, may be suspended from the towers. Some of these cables may be used to support a service platform 38. Other cables may support a suspended annulus, or a control ring 30. This ring may be located at some predetermined level and location above the open space. Whether or not the control ring is utilized, the common component of all embodiments is a helical array of sloping retractable panels 32. These panels may have a panel reinforcing 34 for maximum strength and efficiency. Attached to each panel is a co-active line, or a retractable cable 36. The entire array of panels and cables may be fully-deployed, drawn near to a central predetermined point. All panels and cables pass at predetermined distances from each other in a helical-pattern the pattern of a helix about this point. Properly configured and shaped, the edges of these converging panels can overlap when fully deployed, thereby creating complete coverage of the space. Alternatively, this array of panels may be partially-, or fully-retracted to the perimeter of the open space. Around this perimeter, retracted panels and cables may be stored on a service platform 38. Above this service platform may be provided a roof 40 for protecting all gear. Depending on various factors, some or all of the aforementioned elements may be utilized. In some cases, only a few of the elements will be needed.

FIGS. 1-A to 1-C show an ideal embodiment of my retractable covering. Various elements of the present invention have been integrated with the design of the building. Such a facility presents a space to be covered which may measure more than 150 meters of width, or clear opening. Control ring 30 may be more than 60 or 70 meters above the space to be covered. When retractable panels 32 are fully-deployed, or in the closed position, their adjacent edges overlap by one or two meters. The panels are designed to allow these edges to maintain this continuous overlap, ensuring a reliable, protective covering over the space.

When the panels are fully retracted, or open, only the control ring and the helical array of retractable cables is visible to the spectators. The panels may consist of any flexible assembly or material. They may also have various visual characteristics, such as opaque, translucent, or transparent membranes; or an open-web network for simple shading. Primary towers 24, whose minimum height is based only on the desired height for the control ring, may be pylons or other suitable structure.

FIG. 2 shows a much smaller-scale embodiment, such as for a residential courtyard. Only the basic elements of the invention are necessary in this instance. Open space 22 may measure only a few meters, or less, in width and/or length. In this case, retractable panels 32 and retractable cables 36 have no need for a control ring or supporting towers. Instead, the surrounding building provides sufficient support and stability. Each retracted panel is stored on a panel reel 46a. A strategically-located pulley 44 guides the cable for proper alignment of each panel. Even for such small-scale applications, panel reinforcing 34 may be desirable, providing added strength and stability against forces of wind and rain.

FIG. 3 shows the most challenging embodiment of the invention. It shows the retractable covering retroactively applied to an existing stadium. As such, it must be self-supporting—i.e. structurally independent of the existing structure. It must also be capable of large-scale application. Furthermore, it must conform to an asymmetrical and irregularly-shaped plan configuration. The structure and the

6

function of the existing facility shown have not been affected by the retrofit installation. In addition to taller primary towers 24, there are a number of secondary towers 26. These do not require the height of the primary towers because they are not required to carry the higher control ring 30. Like the primary towers however, they are spaced at predetermined points around the perimeter of building 20. All of the towers combine to carry all loads of the retractable covering system. The inner perimeter of service platform 38 contains a continuous tension structure, or a tension ring 42. This structural element keeps the bottom of the service platform suspended at a predetermined distance above the existing roof. This tension ring, in some form, is required for such applications in order that no structural loads will need to be carried by the existing building. However, for many applications of my retractable covering, this tension ring may not be required, as most loading is carried by the perimeter towers. Thus, the lesser loading of the inner perimeter of service platform 38 may easily be borne by many existing structures.

FIGS. 4-A to 4-D show aerial views of a comprehensive embodiment of my retractable covering, illustrating four positions for retractable panels 32. This embodiment, although of irregular shape, is the prime model for the detailed description which follows. All features of the invention are utilized so that the fullest use of the system can be appreciated. It is analogous to the prior embodiment shown in FIG. 3, being assymetrical, self-contained and independently supported. The size is indeterminate, but considered to be intermediate-scale. The average width of open space 22 to be covered measures about 75 to 100 meters in width.

The covering material in retractable panels 32 may be any suitably-flexible assembly or material capable of repeated retraction and deployment. Also, the covering material may be opaque, translucent, transparent, or an open network. Each panel contains, at its edges and within its field, a network of panel reinforcing 34. This reinforcing may consist of high-tensile-strength material attached to, underlying, or integrated with, the covering material itself. This reinforcing may be such means as: cables encased at joints in the panel material, tensile material bonded or otherwise combined with the covering material itself, or any material of sufficient strength and flexibility. This reinforcing network may be structurally self-sufficient, i.e. structurally independent of the panel covering material itself. Furthermore, this network may be so routed within the boundary, or field, of a panel, that the ends of the network gather at the corners of the panel. FIG. 4-D best-illustrates that, when the panels are in the fully deployed or closed position, the corners provide the strongest points for panel support and the gathering point for panel reinforcing 34.

Illustrated in FIG. 4-A are three positions for an accessory service car 56. The first position, shown on the left, indicates the service car dismounted and stored on service platform 38. The second position illustrated shows the service car moved into position for rigging to retractable cable 36. The third position shows the car in transit to control ring 30 while attached to retractable cable 36 for retractable panel 32. This service car may be used for transporting personnel and equipment to control ring 30 for service and repairs. It's use is most-important for larger-scale applications of the invention. Smaller applications may use variations of the concept as simple as a boatswain's chair to permit similar access to remote components. Simple embodiments may not require this provision.

FIGS. 5-A to 5-D best illustrate the variable configuration of individual retractable panels 32. The travel length of any

7

panel is measured along a line perpendicular to the base of the panel and intersecting the retractable apex of the fully-deployed panel. Both the travel lengths and the widths of the bases of panels are variable for any and all panels in an array. This variability makes the retractable covering applicable to virtually any size or shape of space. Control ring 30 is the meeting point of all panels when they are in the closed position. The apexes of the panels are the attachment points for their respective attached moving cables. Also best-illustrated in this series of Figs is the circular pattern of the panels as they are being retracted or deployed.

FIGS. 6-A to 6-D most-clearly show that the height of primary towers 24 is primarily determined by the desired height of control ring 30. The height of secondary towers 26 may be less than this because they do not to carry this highly-positioned load. Another factor allowing decreased height is the fact that pulleys in the control ring allow retractable cables 36 to return directly to service platform 38 after reaching their desired elevation. All static and dynamic loading of the entire system. including service platform 38. is in suspension above the top of building 20 by means of stationary cables 28. FIG. 6-A best illustrates that, when panels 32 (not seen) are fully retracted (open), the primary apparatus visible above the open space may be control ring 30 and retractable cables 36. The towers. being located at the perimeter of building 20. are of secondary importance when viewed from the central open space 22.

FIGS. 7-A & 7-B show the rigging of a system of one pair of interactive panels 32 in an array. As retractable cables 36 traverse open space 22. it is not necessary that they travel in a straight line. Pulleys located in control ring 30 enable each of the cables to travel upwards toward the control ring. and then continue downwards toward service platform 38. These pulleys also allow a lateral change in direction. permitting a wide range of possibilities for rigging. Upon reaching the opposite side of the space. the retractable cable for each panel may be routed through additional pulleys until it reaches a drum. or cable reel 46b. This cable reel may be connected to an adjacent panel reel 46a for its corresponding panel. These interconnected reels are each wound in oppo-site rotational directions. thereby creating an interactive and synchronous system of movement. Arrows indicate direction of movement during deployment of the panels.

FIGS. 8-A & 8-B show that control ring 30 is the central gathering point for all forces of retractable cables 36 and their attached retractable panels 32. including forces from panel reinforcing 34. These forces are transferred to the control ring by a number of pulleys 44 which are mounted on the control ring. The control ring itself is a tension ring of predetermined size. supported by stationary cables 28. in turn supported by the primary towers. In this illustration. the control ring is depicted as a two-tiered assembly. with the lower tier representing a catwalk for servicing the pulleys. as for a large scale application of the invention. Alternatively. the catwalk itself may form a single tension ring. or be eliminated. and pulleys suspended from a one-tier tension ring.

The pulleys may be precisely located at predetermined points on the circumference of the ring. These points deter-mine the helical crossing of the panels and their attached retractable cables. Consequently. there is created a predict-able horizontal and vertical clearance between adjacent retractable panels and their respective moving cables.

FIG. 8-B shows that. once closure is complete. an overlap of all adjacent panels may be created. The control ring can provide further stability and alignment control for these overlaps. The placement of guides at specific locations on

8

the control ring can provide stabilizing. downward force on the apex of each deployed panel. Such guides may also ensure the proper overlap of adjacent deployed panels. Alternatively. because the exact configuration of the helical crossing is variable. this overlap may be eliminated alto-gether and spaces allowed between the fully-deployed pan-els.

Control ring 30 may be of any predetermined aspect and size. Pulleys 44 may be replaced by other devices for controlling alignment. such as simple guides which would serve the same function. Furthermore. as in a residential or other small-scale application. the control ring may be entirely eliminated. It may also be as simple as a unitary and free-floating ring which fixes the gathering point of deployed panels.

FIGS. 9-A & 9-B show the overlapping juxtaposition of the ends of adjacent panel reels 46a mounted on service platform 38. This overlap ensures a continuous overlap of deployed retractable panels 32. The overlap of the reels may be formed either horizontally (as indicated here). or verti-cally. Alternatively. this overlap may be eliminated if desired and a predetermined space provided between deployed panels. Also shown in these figs is the convergence of panel edges and panel reinforcing 34 at the ends of the panel reels when the panels are fully-deployed. This convergence allows for a full concentration of panel loads at the point of strongest support for each panel reel.

FIG. 9-A depicts the overlap of two independently-operated panel reels 46a. Pulley 44 allows retractable cable 36 to be reeved upon cable reel 46b as required.

FIG. 9-B shows how a motor 48 may be connected to a series of interactive cable reels 46b and panel reels 46a. Alternatively. a means of linear propulsion may be applied to retractable cable 36 at some intermediate point in the line. Manual means of imparting such propelling forces is a further option. particularly for small-scale applications. Also illustrated here is a means of transferring propulsive energy from one non-aligned reel to another. or a transfer drive 60. This may be in the form of a geared transmission as depicted here. a drive train with universal joints. a series of pulleys and cables. or other suitable means.

FIG. 10 shows one manner in which a counterweight 52 may be linked to a number of pulleys 44a for a number of retractable cables 36 by means of a counterweight cable 54. These pulleys. or a single pulley. may be positioned at some intermediate point on the path of retractable cable 36. Counterweight cable 54 is supported at primary tower 24 by a separate pulley 44b. mounted on the tower. For a large-scale application. the counterweight may weigh in excess of 10 tons. It may even be the dead weight of the service platform itself. Alternatively. this counterweight force may be substituted by other means. such as tension from a spring or the force of the motor previously described. In a small-scale application. manual tightening of the retractable lines. or cables. may be sufficient to apply adequate tension for panel stability.

FIGS. 11-A to 11-D show diagrams of four varied shapes of open space 22 to which my retractable covering may be applied. Many configurations of retractable panels 32 are possible for the spaces shown. Most importantly. virtually any shape of space imaginable may be accommodated by this retractable covering. In all cases. they may be arranged to provide complete coverage. Note that the configuration of panel reinforcing 34 is. likewise. adaptable to many con-figurations.

FIG. 11-B shows that the overlap of adjacent panels can be varied. with some panels overlapping both adjacent

6,003,269

9

panels (and vice versa). Also illustrated here is the utilization of two flexible panels 32a and two solid panels 32b. Whereas flexible panels may be retracted on reels, as previously described, solid panels may be retracted in their entirety. Both types of panels may benefit from the use of a control ring. The projection lines show the open position for the two solid panels.

FIG. 11-C illustrates that control ring 30 (shown in FIGS. 11-A and 11-B) may not be required if primary towers 24 are strategically located along the path of travel of retractable cables 36. Also illustrated here is a combination of panel reinforcing. Besides tension reinforcing 34a, each retractable panel in this embodiment also has compression (solid) reinforcing 34b positioned parallel to the base of the panels

FIG. 11-D illustrates that panels are not limited to triangular shapes. The same operation and advantages may be provided with the use of rectangular and truncated triangular panels. Similarly, multiple control rings may be utilized as shown by the two rings in this diagram.

FIGS. 12-A to 12-C show that the principles for a circular retractable covering are equally adaptable to perimeter-only and single-panel application.

FIG. 12-A shows an embodiment of the invention which provides perimeter-only coverage of seating in open space 22 for a ball park. In addition, the limits of a confining site are represented. The primary difference with previous examples occurs in the central area where there are no panels or cables. In this case, the helical crossing of the paths of travel is hypothetical—occurring beyond the limits of the retractable panels. Nevertheless, the same overlap of adjacent panels, and the same adaptable and stable configurations of tension members are provided. Also, as for a circular array of panels, the rigging of various panels in an array may have synchronous and interactive motion.

The perimeter-only coverage is accomplished by using a combination of rectangular, or truncated triangular retractable panels 32 Curved portions of the arc are covered by wedge-shaped panels. Straight portions are covered by rectangular panels. The entire array is suspended from stationary cables 28 and anchored by primary towers 24 and secondary towers 26 located within the confines of the site. Tension ring 42 takes the form of an arc formed by a stationary cable suspended between the primary towers The arc of this tension ring is formed by resolving static tension forces with the stationary cables from the perimeter secondary towers. Control ring 30 takes the form of a suspended platform from which running gear is rigged.

FIG. 12-B is a detail from FIG. 12-A. Retractable cables 36 are rigged from the leading corners of retractable panels 32. Just as for a circular array, these cables are routed in a manner which provides synchronized, interactive operation. These retractable cables may be stored on cable reels 46b connected to panel reels 46a for respective, interactive panels. All other features and advantages of my invention, such as the panel overlap, are equally adapted here.

FIG. 12-C illustrates a single, rectangular retractable panel 32 providing a reinforced covering for open space 22. This embodiment utilizes features of the invention for greater stability and ease of operation. Counterweight (52) has been replaced by simple springs to provide additional tension force. Panel reinforcing 34 relieves the forces acting on the panel edges, allowing them to remain taut. Also shown here is the manner in which rigid, or compression, panel reinforcing may be provided. This reinforcing is rigid, but nevertheless capable of deployment, retraction and storage on reels. Such battens or other rigid material located in the field of the retractable panel may be positioned parallel

10

to panel reel 46a. This allows for unimpeded winding of the retractable panel upon its panel reel as the rigid members are thus automatically positioned lengthwise along the reel.

Further illustrated in FIG. 12-C is the manner in which a single panel can utilize the feature of connected panel reel 46a and cable reel 46b for interactive operation.

From the description above, a number of the advantages of my retractable covering compared to prior art become evident:

1. Inherent configuration of tension members provides increased structural stability and strength
2. Fewer and Lighter members
3. Maximizes efficient use of material
4. Wide scope of application
5. Adaptable to any size or shape of space
6. Adaptable to perimeter-only application

Operation—FIGS. 4A to 10

FIGS. 4-A to 4-D show that retractable panels 32 and retractable cables 36 are continuously deployable and retractable above open space 22. Because each panel and its respective cable are securely fastened at the apex of the panel, a unified movement is created for both of these elements. These combined elements, configured in arrays, may be drawn in unison, in individual pairs, or separately, to the helical meeting point near control ring 30.

FIG. 4-B best shows that, in an asymmetrical array, the longer panels may be the first to deploy enroute to control ring 30. Also depicted here is the manner of retractable cable rigging and movement across open space 22. The control ring allows cables from one side to change directions and continue downwards to the opposite side of the open space

FIG. 4C shows that, despite the asymmetry and variable length of retractable panels 32, all panels may approach and arrive at full-deployment in unison. Thus, the longer panels, although having deployed first, may complete their longer path of travel at the same time as the shorter panels.

FIG. 4-D illustrates that, once each of the retractable panels 32 is fully-deployed, panel reinforcing 34 collects all tensile forces from the body, or field, of each panel. These networks, in turn, carry all of these forces directly to the corners of the panels. These corners are the strongest load-bearing points. As a result, each edge of the panels is required to carry only minor loading, thereby minimizing edge deflection. Thus, the panel edges remain taut and most of the static and dynamic forces acting on the panels, including wind and rain, are carried internally. As a further benefit, the covering material itself is also relieved from bearing any forces beyond its own capacity. Being so-relieved of excess strain, the panel material may consist of virtually any suitable material. Most importantly, deployed panels may carry additional forces which may far-exceed the forces needed for support and operation alone. This additional force amplifies the strength and stability of the entire assembly. One means of applying this additional tension force will be described in FIG. 10 below.

Although of secondary significance, FIG. 4-A also illustrates the operation of the accessory service car 56. Normally, this vehicle may be dismounted and stored on service platform 38. When needed, it may be mounted upon retractable cable 36 when panel 32 is retracted. By the simple deployment of the panel with the car thus attached, the car will automatically be transported to control ring 30. For less-intensive applications, the alternative and similar use of a boatswain's chair or other carrying means may be sufficient.

FIGS. 5-A to 5-D illustrate the plan view of the operation described in FIG. 4.

6,003,269

11

FIG. 5-A shows a portion of roof 40 which may be provided to protect all running gear.

FIG. 5-B illustrates the circular pattern of the panel movement as panels 32 approach full deployment. Also, with synchronous operation, panels with shorter travel distances from base to apex are the last to deploy. Thus only five of the panels appear to be beginning deployment.

FIGS. 5-C & 5-D show the panels completing their travel to control ring 30.

FIGS. 6-A to 6-D illustrate the side view of the operation described in FIG. 4. It may be seen that, during operation of panels 32, observers may not be able to detect the movement of retractable cables 36 as these members merely travel longitudinally. This illusion will add an atmosphere of magic to the experience of the movement of the panels appearing suddenly from the end of the cables.

FIGS. 7-A & 7-B illustrate the operation of an interconnected, and interactive, pair of retractable panels 32. The rotation of each cable reel 46b for retractable cable 36 is connected to the adjacent panel reel 46a for the corresponding retractable panel. This connection results in a unified action of all movable gear for the interactive pair. The diagrams with the directional arrows show a simple manner in which this action can be unified. As illustrated here, adjacent and co-axial reels may be wound in opposite directions. Therefore, when a cable reel is retracting cable, the connected panel reel is simultaneously deploying panel material. In similar fashion, when a cable reel is deploying cable, the panel reel is retracting panel material. Thus, this pair of panels, moves in synchronous motion—when one panel moves, the corresponding panel moves equally. The same result may be created, without opposite-winding, through the use of a reversing gear or other mechanism. Such linking of the operation of pairs of panels helps to equalize loading on the system and reduce the number of motors and other gear to implement a complete system of retractable panels.

Because the retractable panels 32 may be of different lengths, the shorter panel will be the first to become fully retracted on its panel reel 46a. In this case, retractable cable 36 attached to this shorter panel will continue to wind upon its panel reel. This winding continues until the longer interactive panel has become completely retracted upon its own panel reel. It may be seen that, during a deployment of the same panels, the operation is the reverse of the foregoing.

This interactive-pair operation is one option for application of my retractable covering. However, individual panel movement may be preferred for certain purposes, such as providing shade on only one side of a space, or providing a more basic operation. In a small-scale application, each reel might simply have its own spring-activated retraction mechanism similar to that for a window roller shade. In another application, each cable reel 46b might be directly attached to an independent motor for deployment of each individual panel. A further option might be a simple pull cord which could be manually operated to provide the same deployment. These are only a few examples of many possible variations.

FIGS. 8-A & 8-B show the helical pattern of operation for retractable cables 36 and panels 32 at control ring 30. Pulleys 44, located at predetermined locations on the control ring, precisely establish the desired helical pattern. This precision means that, at all times, the panels and cables pass in juxtaposition to each other by a set horizontal and vertical distance. This helical configuration may allow any number of multiple, adjacent panels to overlap when they are com-

12

pletely closed as shown in FIG. 8-B. This pattern also allows them to operate either independently or simultaneously. The apexes of the panels may be drawn upwards toward the control ring, even passing the center point of the array. The panels may continue their travel until the overlapped edge of one panel comes into contact with the overlapping body of the adjacent panel. In this manner, the overlap may be continuous along the entire length of adjacent panels. This continuous overlap offers positive protection from weather. Rain, falling on the main body of the panel, is carried naturally down the fall line of the panel. This rainwater runoff may then be collected and drained away below panel reels 46a located at the base of panels 32.

In addition to fixing the helical configuration, pulleys 44 mounted on control ring 30 also carry a significant portion of the loading of a system of panels. As retractable cables 36 cross these pulleys, they change direction downwards and the vertical load of the cables is transferred to the control ring. This vertical load includes loading from panel reinforcing 34 with its collected forces from retractable panels 32. This loading is then carried by stationary cables 28 anchored by the primary towers described earlier.

It may be seen that control ring 30 is an optional feature of my invention and may be eliminated entirely. The same helical configuration of the prior discussion may be duplicated without the benefit of a control ring. One way would be to simply provide taller towers at the perimeter of open space 22. These towers would be strategically placed to intersect with the extrapolated paths of travel for retractable panels 32. Another way to eliminate control ring 30 would be to lower the peak, or meeting point for retractable panels 32. Since one of the reasons for using the control ring is to provide such additional height for the peak of the retractable covering, if this height is not required, then a control ring might not be needed. In fact, if little or no additional height is needed, then the towers at the perimeter of open space 22 might also be eliminated. For example, if the level of the peak is close to the level of service platform 38 and panel reels 46a, then retractable cables 36 may be rigged at the service platform, thereby obviating the towers.

FIG. 9-A & FIG. 9-B illustrate the relative movements of adjacent panel reels 46a, and interactive panel movement. Both illustrations show a detailed view of the opposite winding and interconnection of panel reels 46a and cable reels 46b. When cable 36 is deployed, panel 32 is simultaneously retracted. Conversely, when the cable is retracted, the panel is simultaneously deployed. Also shown is the manner in which pulleys 44 can be positioned in various ways to guide each moving cable 36 on any predetermined path.

FIG. 9-A shows that two adjacent panel reels 46a may be independent in operation, yet still provide an overlap for the deployed panels.

FIG. 9-B shows that a motor 48 may be used to propel a cable reel 46b and other running gear attached or otherwise linked to it. Most importantly, illustrated here is one manner of linking the motion of adjacent panels in a series by means of a transfer drive 50. Thus connected, it is possible for only one motor or other propulsive force to operate two or more reels in unison. If panels are further rigged in interactive pairs, it is possible for only one such propulsive force to fully-power an entire array of panels by connecting only half of the reels in the array with some form of this transfer drive.

In a residential or other small-scale application of my retractable covering, the motor may be eliminated. A simple hand crank or an endless loop may be substituted to apply manual motive force.

6,003,269

13

FIG. 10 shows one means by which additional stabilizing, and shock-absorbing, tension may be applied to deployed retractable panels 32 via retractable cables 36. Because each retractable cable is attached to a corresponding panel, any tension applied to one of these cables is transmitted directly to its panel. In this illustration, this tension is applied at a turning point of retractable cable 36 by cable pulley 44a. This pulley communicates with a counterweight 52 by means of a counterweight cable 54. Thus, the stabilizing force of the tension from the counterweight is transferred directly to the retractable cable. The resultant forces are transferred to tower 24 through a counterweight pulley 44b mounted on the tower. This counterweight pulley allows the counterweight itself to move up and down, and the pulley guiding the retractable cable to move back and forth in unison with it. Any sudden shock or movement in the retractable cable may thus be absorbed by the corresponding movement of the counterweight.

An important feature of this counterweight force is the very high loading that may be applied. This may be particularly beneficial for large-scale applications where great forces may accumulate. In such cases, counterweights weighing many tons may be used for each panel. As one alternative to the use of counterweights, equivalent tension might even be derived simply from the dead weight of service platform 38. Regardless of the source of the tension, the exact amount may be predetermined. Therefore, panel reinforcing and retractable cables may be specifically designed accordingly. A maximum design force may thus be imparted to the deployed panels. This additional force further stabilizes the entire assembly against forces of wind and rain.

Through hydraulic or other means, this tensional force may be repeatedly decreased and reapplied. During operation of the panels, this tension may be nearly eliminated. By minimizing this force during operation of the panels, much friction may be relieved from moving parts. This results in a more economical and more rapid operation of the systems during retraction or deployment. Consequently, a complete deployment or retraction cycle may be measured in seconds, rather than a number of minutes. Additionally, the cost of these operations is correspondingly minimized.

Alternative means of tensioning, such as a spring or the force of a motor used for motive power, may also be used to apply sufficient additional force once deployment is completed. In a small-scale application, manual tightening of the retractable lines, or cables, may be sufficient to provide the same proportional forces.

SUMMARY, RAMIFICATIONS, AND SCOPE

Accordingly, the reader will see that any space utilizing my retractable covering provides the advantages of both open-air use, and enclosed protection from the elements, as desired. In favorable weather the retractable panels may be fully retracted for the greatest enjoyment of the open air. Equally important, preferred natural vegetation may be used for landscaping or for playing fields for sports. In only a few minutes, or even seconds of time, the covering may be quickly and economically closed, providing reliable weather protection. Additionally, aesthetic and acoustical advantages may be provided for concerts or other gatherings. In the case of a sports stadium equipped with my retractable covering, one can even imagine a brief and exciting operation of the panels upon an important score by the home team.

From the above description, it is evident that there may be a multitude of embodiments for many sizes, shapes, and types, of spaces. Some may measure more than 100 meters

14

of clear opening; others, only 1 or 2 meters in width. Some may be circular or oval; others, simple squares or rectangles. Some may provide formal enclosure; others, very informal.

Since most of the requisite structure may be accomplished by using simple tension members, embodiments may easily be made for temporary or even portable use. They may consist of all the elements described, or only a few. Even individual elements of the invention may take various forms and still provide similar effects in any embodiment. For example: the walls of a building may provide the major support of the primary and secondary towers which have been described; light ropes may replace cables; hinged, insulated rolling panels—or even solid roof segments—may replace flexible panel membranes or flexible networks; rotating frames may replace reels; simple guides may replace pulleys; and so on. Even a single retractable panel may utilize the interactive winding feature, or the counter-weighted tensioning feature for greater stability and ease of operation.

In addition to making this straight-forward adaptability possible, the inherent configuration of my retractable covering also allows variable horizontal and vertical locations for the meeting point of the deployed panels. This variability makes panel configurations virtually limitless. Furthermore, the natural accommodation of well-braced panel reinforcing maximizes the efficient use of virtually any covering material, regardless of its strength.

The general structural design provides important potential for suspending secondary functions, such as lighting catwalks, announcement and score boards, television projection screens, even viewing positions, from the static structure. In the process of retrofitting an existing facility with my retractable covering, it is also a relatively simple matter to simultaneously build new public facilities, concessions, or other ancillary space while constructing the new independent foundations and structure.

Operation of the retractable covering is quick and efficient, as the panels themselves may be extremely light. Yet, once deployed, these panels can be tightened with great force to provide a stable and effective covering. Panels may be operated individually, in interactive pairs, or in coordinated sets of interactive pairs. In smaller scale applications, operating power may be provided by manual means, or assisted by spring-activated mechanisms. In most applications, panels will be motor-driven.

Although the description above contains many specific provisions, these should not be construed as limiting the scope of the invention. These specific provisions merely provide an illustration of some of the presently preferred embodiments of this invention. Thus the scope of the invention should be further defined by the appended claims and their legal equivalents.

I claim:

1. A retractable covering for a space, said covering comprising a plurality of retractable panels having three or four sides, said panels having shapes corresponding to sectional divisions of said space, each of said panels having one base side, said base sides mounted at the perimeter of said space, said panels having leading corners movable toward the inner portion of said space, said leading corners having fixedly attached thereto cables or other means of supporting in tension, said cables movable longitudinally along paths of travel passing in helical crossings near predetermined points above said space, said cables supported in tension beyond said helical crossings, said covering further including means for driveably retracting and

6,003,269

15

deploying said panels and said cables whereby a full deployment of said panels may effect an overlapping of the edges of said space and an overlapping of the edges of adjacent said panels resulting in a covering of said space, said covering further including means for storing said panels and said cables when retracted.

2. The retractable covering of claim 1, said panels comprising flexible covering material, said panels having edges, fields, and corners, said edges having reinforcing means for accommodating tension forces along the edges of said panels, said fields having reinforcing means for accommodating tension and compression forces within said fields, whereby additional forces exceeding the capacity of said material may be accommodated, and whereby said forces may be concentrated at said corners.

3. The retractable covering of claim 1, further including an independently-supported platform located beyond said helical crossings and above predetermined points above said space, said platform having attached, at predetermined points, pulleys or other means for guiding said paths of travel of said cables, whereby the location and configuration of said helical crossings is fixed, and whereby forces from said cables may be transferred to said platform.

4. The retractable covering of claim 1, said cables further including extensions beyond said helical crossing, said extensions having means of returning to said base sides of said panels, said extensions fixedly attached to said base sides whereby forces between said extensions and said panels are joined, and whereby the motion of retraction and deployment of said panels and said cables, respectively, is unified and synchronous.

5. The retractable covering of claim 1, further including panel reels and cable reels for storage of said panels and said cables, respectively, said reels mounted at said perimeter of said space, said panel reels and said cable reels counterwound, respectively, and interconnected for synchronous rotation whereby an interactive movement is provided for said panel reels and said cable reels resulting in the retraction and deployment of said panels and said reels, respectively, being simultaneous, and whereby tension forces acting on said panels and said cables are unified.

6. The retractable covering of claim 5, wherein said panel reels and said cable reels are interconnected by geared or other means for providing synchronous rotation whereby said interactive movement is provided.

7. The retractable covering of claim 1, further including means of applying additional and variable tension acting perpendicular to said cables and said extensions at a predetermined point along said cables and said extensions, whereby an increase in tension provides an additional stabilizing force for said panels, and whereby a variable tension allows a shock-absorbing movement for said panels, and whereby a decrease in tension allows a more-rapid and more-efficient operation during deployment or retraction of said panels.

8. The retractable covering of claim 1, wherein said means of applying additional and variable tension is a counterweight.

9. A retractable covering for a space, said covering comprising a plurality of retractable panels having three or four sides, said panels having shapes corresponding to opposing sectional divisions of said space, each of said panels having one base side, said base sides mounted at the perimeter of said space, said panels having leading corners movable toward the inner portion of said space, said leading corners having fixedly attached thereto cables or other means of supporting in tension, said cables movable longi-

16

tudinally along paths of travel passing in helical crossings near a predetermined point-above said space, said cables supported in tension beyond said helical crossings, said covering further including means for driveably retracting and deploying said panels and said cables whereby a full deployment of said panels may effect an overlapping of the edges of said space and an overlapping of the edges of adjacent deployed panels, resulting in a covering of said space, said covering further including means for storing said panels and said cables when retracted.

10. The retractable covering of claim 9, said panels comprising flexible covering material, said panels having edges, fields, and corners, said edges having reinforcing means for accommodating tension forces along the edges of said panels, said fields having reinforcing means for accommodating tension and compression forces within said fields whereby additional forces exceeding the capacity of said material may be accommodated, and whereby said forces may be concentrated at each corner of said panels.

11. The retractable covering of claim 9, further including an independently-supported annulus located beyond said helical crossings and above predetermined points in said space, said annulus having attached, at predetermined points, pulleys or other means for guiding said helical paths of travel of said cables whereby the location and configuration of said helical crossings is fixed, and whereby forces from said cables may be transferred to said annulus.

12. The retractable covering of claim 1, said cables further including extensions beyond said helical crossing, said extensions returning to the bases of said panels, said extensions fixedly attached to said bases, thereby joining forces between said extensions and said panels whereby the motion of retraction and deployment of said panels and said cables, respectively, is unified and synchronous.

13. The retractable covering of claim 9 further including panel reels and cable reels for storage of said panels and said cables, respectively, said reels mounted at said perimeter of said space, said panel reels and said cable reels counterwound, respectively, and interconnected for synchronous rotation whereby an interactive movement is provided for said panel reels and said cable reels resulting in said retraction and said deployment of said panels and said reels, respectively, being simultaneous, and whereby tension forces acting on said panels and said cables are unified.

14. The retractable covering of claim 9, further including means of applying additional and variable tension acting perpendicular to said cables and said extensions at predetermined points along said cables and said extensions, whereby an increase in tension provides an additional stabilizing force for said panels, and whereby a variable tension allows a shock-absorbing movement for said panels, and whereby a decrease in tension allows a more-rapid and more-efficient operation during deployment or retraction of said panels.

15. A retractable covering for a space, said covering comprising a plurality of retractable panels having three or four sides, said panels having shapes corresponding to perimeter segments of said space, each of said panels having one base side, said base sides mounted at the perimeter of said space, said panels having leading corners movable toward the inner portion of said space, said leading corners having fixedly attached thereto cables or other means of supporting in tension, said cables movable longitudinally along paths of travel passing in helical crossings located near a curvilinear series of predetermined points above said space, said cables supported in tension beyond said helical crossings, said covering and said cables further including

6,003,269

**17**

means for driveably retracting and deploying said panels and said cables whereby a full deployment of said panels may effect an overlapping of the edges of said space and an overlapping of the edges of adjacent deployed panels, resulting in a covering of said space, said covering further including means for storing said panels and said cables when retracted.

16. The retractable covering of claim **15**, said panels comprising flexible covering material, said panels having edges, fields, and corners, said edges having reinforcing means for accommodating tension forces along the edges of said panels, said fields having reinforcing means for accommodating tension and compression forces within said fields, whereby additional forces exceeding the capacity of said material may be accommodated, and whereby said forces may be concentrated at said corners.

17. The retractable covering of claim **15**, further including an independently-supported platform located beyond said helical crossings and above predetermined points above said space, said platform having attached, at predetermined points, pulleys or other means for guiding said paths of travel of said cables, whereby the location and configuration of said helical crossings is fixed, and whereby forces from said cables may be transferred to said platform.

18. The retractable covering of claim **15**, said cables further including extensions beyond said helical crossing, said extensions having means of returning to said base sides

**18**

of said panels, said extensions fixedly attached to said base sides whereby forces between said extensions and said panels are joined, and whereby the motion of retraction and deployment of said panels and said cables, respectively, is unified and synchronous.

19. The retractable covering of claim **15**, further including panel reels and cable reels for storage of said panels and said cables, respectively, said reels mounted at said perimeter of said space, said panel reels and said cable reels counter-wound, respectively, and interconnected for synchronous rotation whereby an interactive movement is provided for said panel reels and said cable reels resulting in the retraction and deployment of said panels and said reels, respectively, being simultaneous, and whereby tension forces acting on said panels and said cables are unified.

20. The retractable covering of claim **15**, further including means of applying additional and variable tension acting perpendicular to said cables and said extensions at predetermined points along said cables and said extensions, whereby an increase in tension provides an additional stabilizing force for said panels, and whereby a variable tension allows a shock-absorbing movement for said panels, and whereby a decrease in tension allows a more-rapid and more-efficient operation during deployment or retraction of said panels.

*    *    *    *    *

# EXHIBIT B - APPENDIX

11=03-03 11:11:  Plaintiff NOTES:  The following material relates to the infringement of U.S. Patent 6,003,269, entitled "Retractable Covering for spaces – hereinafter ("**the 269 Patent**"); and is hereby incorporated for reference to specific dates, facts, and allegations in accordance with Northern District recommendation to "tell the story in the order it happened," to summarize interactions, and to document matters.

## ORIGINAL PATENT DEVELOPMENT – c. 1990 to 1998

1.    1990+ - < GENESIS OF INVENTION:  As Defendants promoted a new "Downtown Stadium" in the early 1990's, Candlestick was criticized for being "too windy."  Being familiar with large-scale design, Plaintiff saw a "problem looking for a solution" and his early studies suggested that a new combination of disparate technologies, together with some new assumptions about engineering and configurations might enable a versatile method for retractably covering vast spaces like the huge roof opening at Candlestick (Early 1990's).

2.    1992 - < Plaintiff had long been interested in "redefining progress" to promote Adaptive Re-Use to extend the life of structures.  As the wholesale replacement of existing sports stadia gained popularity, his concern about disregarding the energy implications of such projects led Plaintiff to refined his sketches and test models; which revealed surprising conflicts that were resolved after constructing further models; which in turn led to his identification that uncommon "helical crossings" that solved many difficulties with the concepts.  Well-aware of the necessity of protecting ideas and fascinated by the broad ramifications of the new arrangements, Plaintiff read a self-help book for patenting and embarked on "due diligence" with an "Inventor's Notebook" and a deep search for "Prior Art" that revealed nothing in conflict with his inventions - a fact reinforced by select colleagues trusted with his work  (1993).

3.    1993 - < (93=Feb) - < Plaintiff filed initial U.S. Patent documentation with the U.S. Patent and Trademark Office – hereinafter ("PTO") – (93=Feb) in full expectation of timely filing a completed patent application, and continued his search for "Prior Art."  Encouraged by the process, he consulted with well-respected structural engineers who recommended a quantified engineering feasibility study based on the physical parameters of the existing stadium as soon as practicable.

4.    1994 - < 94=April 20 - < On an anniversary trip, Plaintiff and his wife were rescued from a riptide by an off-duty lifeguard returning home who went miles out of his way to "check the beach."

5.    94=May 25 - < Back home and grateful for the family's good fortune; with PTO documentation established; Plaintiff pursued the engineers' recommendations and discussed the matter with a patent attorney, who also provided a form for confidential disclosure  A contact arranged a confidential meeting to explore sponsorship with the Managers of Candlestick; but no sponsorship was available, and the matter was soon forgotten.

6.    94=June 8 - < Ten days after the Candlestick meeting, a close family member on the East Coast suffered a serious illness that required lengthy hospitalization and extended time out-of-state for Plaintiff and his family.  All work on the patent application was halted.

7.    1995 - < For Plaintiff and his wife, much of the year was spent caring for the family member, closing estate matters after she passed away, and returning to work.  Plaintiff bought his first computer, learned Word and Auto CADD essential for finishing the patent application and for creating RCS embodiments.  Plaintiff was unaware of political intrigue.

8.    1996 - < 96=Jan 2 - < Only days before the DDP filing deadline, as the U.S. Patent application neared completion, Plaintiff's computer suddenly crashed and much of his application work was destroyed; so he immediately called the PTO to inquire what might be done - even possibly filing some sort of abbreviated submittal; whereupon the PTO representative stressed that it was vitally important to "get it right" and proceeded to instruct Plaintiff in specific procedures to preserve primacy of his 1994 DDP submittal and allow Plaintiff to replace lost data.

9.    1997 - < 97=April - < Plaintiff filed the completed patent application in accordance with PTO directions, and soon began establishing contacts with colleagues and leading companies in the Marine and Fabric industries that revealed a high level of interest in the new inventions.

10.    1998 - < 98=Mar 30 - < With the patent now pending, Plaintiff's first venture into the Market was to develop a proposal for a 28-panel RCS array for a major sports stadium, and the presentation

was well-received. However, the trend for destroying and replacing existing stadia was growing rapidly and would later claim the subject stadium as well.

```
MAYORS OFFICE MEETING
          1998
See Complaint, Complaint, ¶ 22
```

Followed by:

```
DEFENDANTS' WRONGFUL ACTS
       1998 to 2005
  See Complaint, ¶ 23, et seq
```

```
PLAINTIFF PATENT
  DEVELOPMENT
   1998 to 2005
```

11.   Plaintiff hereby incorporates the allegations in paragraphs 1-11 above and adds the following allegations outlining progress made by Plaintiff for advancing the '269 Patent inventions after his meeting in the Mayors Office meeting and before discovering infringement.

12.   1998 and 1999 - < Plaintiff continued consultation and professional employment, learned vital computer skills, continued searching for Prior Art, and addressed PTO Office Actions until the '269 Patent issued:

```
99=Dec 21 - < – Patent Issues
United States Patent Number 6,003,269
    Retractable Covering for Spaces"
```

13.   2000 and 2001 - < After the PTO had declared "inventive step, novelty, industrial application", Plaintiff drew equity and applied for foreign a patent protections through the Patent Convention Treaty (PCT).b. A registered trademark was established; a graphic identity was created; and an interactive RCS model constructed and used for a promotional video. Supportive industry contacts were nurtured with which Plaintiff would create numerous designs for highly-varied RCS embodiments a over coming years, including some in the context of collaborative architectural projects. However, the great tragedy of "9/11" created serious challenges for nearly everyone, and Plaintiff was no exception.

a.  : Japan, Britain, Canada, Germany, Greece, Spain, Italy, and France.

b.   During PCT examination, the only Prior Art reference for an RCS was the "opposite" of the '269 Patent (Norbert, WO 97/21014 - Int Pat Classification" E04H 15/58, E04B 7/16). Its offshoot product - "SunSquare" would later be introduced in the United States (2007)

14.   Plaintiff: 2002 to 2005 – < EMBODIMENTS: One RCS design and presentation after "9/11" would eventually and ironically prove to be identical to the Grove's RCS - except with opposite sloping RCS Panels. Another allowed a versatile and fully-equipped mobile application long envisioned by Plaintiff for efficiently delivering emergency services under highly-varied conditions (it was entered in a prominent and highly-admired international competition, where it created intense discussion). One embodiment addressed the cultural and environmental program needs for a tropical entertainment venue. Another was designed to encircle an ice skating rink with alternative RCS Supports – one a pure tension structure, the other a steel space frame analogous to the Grove's RCS Support. Other RCS were designed for resort dining terraces, balconies, rooftops, a golf driving range, atria, etc. A major collaborative computer study with a leading firm demonstrated 40% or better energy-savings with an RCS.

15.   VULNERABILITY:  Some of that witnessed by Plaintiff:

a.   TAKEOVER: A foreign Firm worked to "take over the North American Market" from their recently acquired American leader.  To keep tight reins, a "Friday Massacre" critically reduced staff, trimmed worldwide access, and placed "more and more people in charge".

b.   IP THEFT: A contact apologetically said "I will be very disappointed if you don't hear immediately back from the guy" after a foreign industry boss absconded with SkyCover materials.  Plaintiff didn't.

c.   PROPERTY THEFT: A contact told Plaintiff that he sent Plaintiff's video to "his engineer in Brisbane", returned shortly to Brisbane himself after admitting to Plaintiff that it was "kind of shitty."  When he was finally tracked down in Brisbane 20 months later, he said "I'm still a fan of the system (but) nobody knows where it (the video) ended up"  An Australia manufacturer's website later announced: "Finally, Retractable Sails" with the only other image of a '269 Patent RCS seen by Plaintiff.

d.   SPONSORSHIP:  Venture Capitalists often seemed to be fixated on "Hi-tech" products and endeavors.  Environmental concerns seemed foreign to those with whom Plaintiff met. Plaintiff had to propose new terms like "Green Tech" or "Mid-Tech" for meaningful discussion.

```
EFFORTS SEEKING RESOLUTION
        2005 to 2011
```



05=Jun 19 - Grove's FIRST SEASON opens

16.   05=Jun 20 - < DISCOVERY - < Plaintiff identifies infringement in newspaper (¶ 12).

17.   05=Jun 20 < Plaintiff's First Visit - < Plaintiff visits Grove to verify infringement (¶ 13).

18.   Plaintiff knew that quick resolution would be needed to prevent serious damage to a decade of his work with the '269 Patent; so he gathered advice, reviewed all materials, and

determined that Halprin, credited with the Design, was a primary User of the patent. Feeling urgency of due process and unable to hire a patent attorney, Plaintiff prepared notification:

05=Jun 24 < Halprin – NOTIFICATION: (mailed RRR):
"(It has) always been my goal to enable others like you to apply my new concepts … any delay in our resolving this matter results in ever increasing difficulty for me as it damages my credibility and undermines my current work.  I have been denied the opportunity of introducing my own concepts to my profession. …"

19.   Next, Plaintiff prepared notification to Newsom - Mayor of San Francisco, a User - in trust that Newsom had a Duty to help resolve the matter in the broadest interests of both the City and a constituent's Constitutional Rights.  Plaintiff included a copy of the '269 Patent.

05=Jun 28 < Mayor (Newsom) –NOTIFICATION: (hand-delivered)
"… the City is suddenly using, without authorization, the same principles that we offered to the Mayor's office several years ago, but were turned away. … It is a requirement of "due diligence" in the patenting process that I bring this matter to your attention for resolution as quickly as possible. …any delay … results in ever increasing difficulty for me personally as it damages my credibility and undermines my work…"

20.   Halprin quickly deferred the matter to Glenn Isaacson of CMA (¶15), who called and said "if you just want to call it "SkyCover", fine!" and "We can't be expected to know about all patents," etc.  Each weekend, twelve thousand people were enjoying the Renewal with the infringing RCS Proscenium. When Newsom failed to respond, a second  letter was sent

05=Jul 7 < Newsom – Letter #2: (hand-delivered)
"We are disappointed at having received no response … only wish to avert much trouble for all involved. … wish to have a GOOD result for our city and for your Administration as well.
"Please meet with us to hear our matter, as it has disrupted our lives and threatens more than twelve years of work. … believe that you are a fair-minded person and could make the difference in this case. … would give a great boost to the City in the eyes of others.  It would bolster faith in individual achievement and innovation, and counter growing cynicism that Government favors only big business and connections. … have diligently developed a pioneering idea of which San Francisco should be proud.  You have seen my patent, so I'm sure that you understand our position."

21.   Plaintiff thanked his respected colleague Halprin for his quick response:

05=Jul 11 < Halprin – Letter #2: (mailed)
"…you are in a key position to help all responsible parties understand and bring this issue to an honorable conclusion … wish to avert much difficulty for all … your participation in this case can give a great boost to our profession in the eyes of others …"

22.   Anxiety increased for Plaintiff and his family as more people saw the RCS and as reports observed "Stern Grove stage is a beauty to behold, all wood and steel."  After no substantive response following two entreaties to Newsom, Plaintiff

consulted patent attorneys and prepared coordinated letters for Newsom, Isaacson, and Halprin to equalize matters - each including a full copy of the '269 Patent with highlighted references showing how the Grove's RCS Proscenium infringed the '269 Patent.  Each holding out hopes of creating fair and equitable discussion for establishing an amicable and mutually-productive resolution.

05=Jul 22 < Newsom – Letter #3:  (coordinated with others) - (hand-delivered):
05=Jul 22 < Halprin – Letter #2: (coordinated with others) - (hand-delivered):
05=Jul 22 < Isaacson – Letter #1: (coordinated with others) - (hand-delivered):
(To the Mayor):  "this issue continues to create extremely serious damage to my family and my career.  We are writing, yet a third time … Mr. Mayor, in the final analysis, it is only you - the key representative for the User of my patented invention - who is in the position to step in and clear this mess up before it gets out of hand. … my work may present a historic breakthrough that will affect the Design-Construction Industry and others.  San Francisco may want to embrace that breakthrough…For the sake of good will, please step in and help …"
(To each): "we maintain our hope, and we restate our desire for a fair solution that may be honorable and productive for everyone.  We look forward to meeting you…"

23.   Productive work was rapidly becoming impossible for Plaintiff, so when Newsom again failed to respond, Plaintiff sent a short letter to prompt him.

05=Jul 28 < Newsom – Letter #4: (hand-delivered):
"As indicated in our three letters to you, this matter is not going away.  Your response to this vital issue will speak volumes about your commitment to your constituents. …"

24.   As the Grove season drew to a close, Plaintiff experienced ever-increasing frustration.  Since Isaacson seemed to be the "point man" (contractually responsible for "due diligence"), Plaintiff left a message for him, and Isaacson replied a few hours later with a puzzling message that indicated that Isaacson had, long before, passed the matter over to DE Goldman.  Plaintiff called back seeking clarification of the garbled message, but Isaacson failed to respond.

25.   Before writing Goldman, Plaintiff found evidence that his philanthropy was noble, and that Goldman himself appeared to be a man of principle and good character:

"Douglas E. Goldman, M.D., announced his immediate resignation today from the Fire Commission … 'This is a Commission whose main job appears to be to protect the Fire Department from scrutiny and to rubber stamp its attempts to avoid dealing with criticism from the outside' said Goldman"

Business Wire - 5/25/2005

26.   After a leading patent attorney reviewed his materials, Plaintiff wrote a 2-page letter to DE Goldman, including the '269 Patent frontispiece and current photos of the Grove's RCS:

05=Aug 9 - < DE Goldman - NOTIFICATION ° :

(letter - hand-delivered):

"(We) prefer to establish ... support and understanding from others in your circle, and share the benefits ... seeking a friendly ear to hear about our work with the hope of constructively addressing the matter. ... have experienced nothing but continued and further evasion.

"Patent Descriptions and Patent Drawings make it clear how smaller and varied Applications may be accomplished using the same principles, as Stern Grove demonstrates so well. For the past several years, I have identified any Applications using my patented inventions as SkyCover®, and have done much work on a wide variety of Applications, of which you Stern Grove work represents a Prototype."

27.    While attempting to contact him, Plaintiff admired Newsom's website biography:

> "Mayor Gavin Newsom has made bold ideas the driving force of his administration. As Mayor, Gavin Newsom uses ideas, innovation and practical solutions to improve the quality of life for all San Franciscans. His administration draws upon San Francisco's greatest asset- the diversity and the talents of its people- to meet any challenges that face the City"

28.    Newsom had someone call Plaintiff with a pause-filled message a that confirmed fears that Newsom might be compromised by associations and politics:

05=Aug 9 - < Newsom Agent voicemail to Plaintiff:
   "Your file ... regarding Stern and Grove (ibid.) use of SkyCover ... is being referred [a] and worked on by ... Deputy City Attorney (unintelligible) ...Please follow up with her [b] (click)

a. It had been the Duty of Newsom and his City Administrator Ed Lee [b] to respond to Plaintiff in timely manner. Failing that, the City Attorney was now obligated by City Charter to notify the Board in writing and "within five days" of any "potential conflict" and provide written recommendations for addressing such conflicts. Plaintiff has no evidence of such.
b. Ed Lee had been the DPW Director who oversaw all Renewal contracting work between 2003 and 2005. In 2010, the Board-appointed Lee "Interim Mayor" to replace Newsom.

29.    With no meaningful response from Principals and 100,000 having already enjoyed their work, it had now became essential that the secondary Others (¶22) be formally notified. Each received current photos of the RCS deployment and a copy of the '269 Patent frontispiece:

05=Aug 10, 12 - < Others –NOTIFICATIONS - total sent:
7: (mail / certified)
   "...Because (your firm) has been involved in the design-fabrication-erection-use of the new stage covering and it's supporting structure, it is a requirement of "due diligence" in the patenting process that I bring this issue to your attention ... I am not able to condone any use of your Stern Grove work for promotional, competition, or informational materials until..."

30.    Compounding Plaintiff's concerns, he suddenly discovered a new Australian website that declared: "Finally, Retractable Sails" – confirming old fears after an Australian contact two years earlier had absconded with his SkyCover video (2003).

31.    The Grove season was already closing. 120,000 people enjoyed the renewed venue. Still nothing substantial had been

heard after all the letters sent to Defendants and their Contractors. Anxiety increased for Plaintiff and his family about their welfare if the infringement were not soon resolved, for it had already monopolized 1200 hours of time. Meanwhile, the Renewal with the new RCS proceeded to win high compliments and awards:

> 2005 Beautification Awards Presentation
> "...go there today, and you will be astonished ....A grand stage framed and protected by a retreating canopy has replaced the old wooden platform ..."
> Dee Dee Workman -San Francisco Beautiful –
>
> 05=Aug 21 - Grove's FIRST SEASON ends
> '269 Patent Exposure: ~120,000

32.    < UNSOLICITED CALLS: It had clearly been to Defendants' advantage for them to stall meeting Plaintiff while thousands were enjoying the Renewal. While Defendants' took their time, Plaintiff received some unusual calls from people likely associated with Defendants – one inquiring into the nature of Plaintiff's business, another drew a visit by Plaintiff.

e.    The caller requested a "quotation for an approaching budget submittal" and said " got your brochure." However, SkyCover brochures were selectively delivered; and, as it happened, SGFA Staff had received unofficial copies one year before (04=06-13). Nevertheless, Plaintiff met with the caller and discussed exciting possibilities for an RCS application; but the contact balked at showing his copy of the "brochure" and later failed to return calls from Plaintiff.

33.    DESIGNERS SENTIMENT: Halprin echoed sentiments of designers when he said:

> "It's the core of my life... What else would I rather do? I just love what I'm doing.
> It's the core of my life, making things, making these places."
> J – Jewish news weekly – "Planting a legacy"
> Joe Eskenazi, staff writer – 9/16/2005

34.    Plaintiff and his wife had to draw equity from their home to engage a leading patent attorney, Tom Smegal (former ABA president), to review matters and help them in dealing with the complicated infringement matter. For the only meeting in the first two years, they assembled a portfolio of '269 Patent work in hopes of generating cooperation and amicable resolution:

> -- SGFA AVOIDS FIRST CONFERENCE --
35.    05=Sep 19 - < CONFERENCE #1 - < (SGFA absent) - < The first meeting occurred in City Hall. Plaintiff, his wife, and attorney Smegal were met at the door by DCA James Emery and an intern, led by DCA Virginia Elizondo - who shocked the group by informing them that SGFA would not be represented - Goldman Agent Greg Lippetz, [a] SGFA's pro-bono legal counsel, had just called in (after previous delays) to announce that he now would not be attending. Disappointed, Plaintiff nevertheless made a full showing of the '269 Patent, explained how the Grove's RCS Supports and RCS Panels infringed, and estimated their cost to be 10% of the entire $15 million dollar budget. He also presented some of the numerous RCS projects he had taken to various stages of completion over the preceding years. DCA Elizondo provided a

copy of the 2004 City-SGFA contract and explained that SGFA (now conspicuously absent) had "indemnified"[*] the City. As the meeting ended, DCA Emery looked into Plaintiff's eyes and proclaimed "I'm PAID to do this work!" - Plaintiff was too shocked to remind DCA Emery who was paying his salary

a. No Goldman Agent would appear for yet another eighteen months (07=May 23).

b. Goldman Agents had "indemnified" Brown, despite his foreknowledge of Defendant

36.    05=Sep 20 – A review of 2004 Permit Documents for the Renewal revealed that the '269 Patent characteristics cited in the Mayors Office in 1998 had been fully exploited (98=Sep 14).

37.    As Plaintiff pressed some Brown Agents, others were busy with older business:

> "..."After years of having their proposed mega-stadium-mall languish in developmental limbo, the San Francisco 49ers are contemplating something much bigger – an entire Niner Town out at the 'Stick, complete with housing, storefronts and even a hotel.... a significant shift in strategy ... "
> Chronicle, 10/9/2005 - Matier and Ross

38.    Having skipped Conference #1, it took Lippetz two months to introduce himself in a self-promoting fax that revealed the start of the Goldman-City Renewal:

05=Nov 16 - < Lippetz to Smegal: (email)
> "In the fall of 1999, SGFA and community partners made a commitment to renovate..."

39.    Within two weeks, Smegal sent Lippetz a major 3-page response regarding all issues, including many that Lippetz had either avoided or missed:

05=Nov 30 - < Smegal to Lippetz (3-page letter):
> "Unfortunately, my understanding of the progress being made, as a result of the meeting that occurred several months ago ...appears to have been misplaced.
> "...your letter completely ignores the discussion the occurred on September 19.
> "Unfortunately, your absence prevented you from having the benefit of the constructive exchange the occurred among those who were there.
> "...the infringing (RCS) also includes its gear, the foundation and supporting structures for that gear. All of those components are included in the claims ...
> "...our estimates of the cost ... were about $1.5 Million.
> "...it does not appear a payment to Mr. Halprin of $300,000 for 'conceptual plans' was below market rate ...
> "...you provide no analysis of how infringement has been avoided (as claimed).
> "I would appreciate your giving this matter the kind of attention that we had been assured would occur when we met with Ms. Elizondo several months ago."

40.    This time, when Lippetz replied to Smegal, it was quickly and with a telephone call in which he appeared open to a positive resolution; indicating to Smegal the following:

05=Dec 7 - < Lippetz to Smegal (phone conference):  (notes, Ed.)
   a.    Lippetz claimed that Halprin "did not design (the) cover"
   b.    Lippetz asserted "circumstances" were such that, being a charity, SGFA had no money.
   c.    SGFA was "amenable to resolving the matter"
   d.    SGFA was amenable to "recognizing patent rights"
   e.    SGFA was amenable to providing "acknowledgement"
   f.    A monetary settlement in the "$50,000 range" had been discussed
   g.    SGFA was "of the view that 50% of the structure is dual function."
   h.    Smegal thought all of the above "might be OK at this time"
   i.    Lippetz requested Plaintiff prepare "pronouncements" b for SGFA consideration.

a. Lippetz failed to say exactly who designed the RCS - i.e., who: 1) located and configured RCS Supports, 2) chose overlapping negative slope RCS Panels; 3) resolved resultant RCS forces; etc. – design tasks usually done in sketch form by one experienced in engineering.

b. Lippetz request for "pronouncements" would cause anxiety for Plaintiff - seeming no more than putting words in someone's mouth – efforts Lippetz would later dismiss.

41.    The requested "pronouncements" (semi- completed) were forwarded to Lippetz:

05=Dec 23 - < Smegal to Lippetz: (faxed "pronouncements" with cover notation):
> "(Plaintiff) feels strongly that he has been damaged in his profession by the failure of SGFA to have earlier acknowledged his contributions to this exciting architectural advancement..."

42.    UNSOLICITED CALLS: - < Plaintiff again received an unsolicited call.  A "designer" called on behalf of  "Martin Brown of the Empire Group" who "had a photocopy of the brochure" a and wanted to "check it out for one of his projects."  Plaintiff visited the beautiful site overlooking Ghiradelli Square and discussed various RCS possibilities with the designer; then prepared an informative letter that the contact delivered to the enigmatic Mr. Brown, who never responded to Plaintiff's letter. His "designer" failed to return calls.

## 2006

43.    The infringement was an ever-increasing personal and professional threat to Plaintiff - references to the Grove and the RCS appeared in articles as together with phrases like "magical outdoor theater" - "mystical place" – "artfully inserting stage" – "Halprin sketched (the design)" b - "strenuous public review" c :etc.

a. A.I.A. (Architects) - "Small Firms, Great Projects" - p.68 – 1/15/2006

b. ASLA (Landscape Architectects) – "The Spirit of Stone - Stern Grove": - 2/6/2006

c. Scant evidence of "review" has been found - except one (04=Jun 13).

44.    A trade publication praised the Renewal thus (emphasis, Ed.):

> "Calling upon a **reiterative and collaborative design process** ... **artfully** inserting a stage,
>
> ....Halprin recalls his first visit to the grove in the 1950s ...Nearly 50 years later, Halprin attended a concert at the invitation of Doug Goldman....While discussing the theater's condition with Doug's father, Richard Goldman, **Halprin sketched a concept**...The three men left the concert agreeing (SGFA) must address Stern Grove's deteriorating conditions "
>
> "The Spirit of Stone" by Linda Jewell, FASLA
>
> Landscape Architecture Magazine - February, 2006

45.   It took Lippetz ten weeks to send a brief email in response to Smegal's detailed letter:

06=Feb 14 - < Lippetz response to Smegal: (email):

> "I appreciate your creativity [a] in presenting certain options (05=Dec 12) ...in exchange for a fully paid-up, lifetime license to the ('269 Patent) and a mutual release of all ...(we offer):
>
> "1) a complimentary one-quarter page ad (two seasons) in Grove Notes..."
>
> "2) Recognition on SGFA's website" [b]
>
> "3) a certificate of appreciation..."
>
> "4) a cash payment of $5,000 [c]
>
> "...we have evaluated several possible design modifications [d] that will preclude any further allegation of infringement (for) less than $10,000...".

a. Lippetz lightly dismisses the troublesome "pronouncements" he himself had requested.

b. SGFA website page access has since been restricted, and Plaintiff has no website.

c. Major reduction after Lippetz phone conference with Smegal (05=Dec 7).

d. Lippetz again tacitly admits infringement and threatens to "design around."

46.   In one week, Smegal responded to Lippetz with a clear and detailed letter:

06=Feb 21 - < Smegal response to Lippetz: (3-page letter):

> "While your long awaited (response) appears to be intended to assist ... it falls far short of the mark.  ...your February 14 email ... consisting of essentially four numbered paragraphs ... either represents no advancement over your Nov 16 letter sent several months after the meeting you missed in September, or fails to aid in resolving this matter.... .... There must be an appropriate acknowledgement of the patent license visibly displayed on the facility and readable from the lawn, such as on a support member"
>
> "your proposal ... ignores the discussion that occurred on September 19 in the City Attorney's Office, my letter of November 30 and our conversation prior to my December 23 email. ...  In fact, I understood our conversation in December to include your acknowledgement that an appropriate portion of such structural costs, including site preparation foundation and ... design fees, which (Plaintiff) estimates to easily approach $1 million of the $15 Million that Stern Grove publicizes ......there is still a royalty payment due of at least $50,000.
>
> "Finally, for some reason which defies logic under patent law, you continue to suggest that by redesigning the Stern Grove retractable covering system, past infringement of (the

'269 Patent) by the existing structure would magically disappear; like it never happened.  I would be interested to hear what case law you believe supports such a theory."

47.   06=Mar 8 –A colleague with social and economic connections to Defendants had been helping Plaintiff promote a major embodiment of the '269 Patent; but when Plaintiff asked his advice if he were in Plaintiff's position, his complete dismissal of Plaintiff's predicament was alarming coming from a colleague so long-respected.

48.   06=Mar 24 - < DE Goldman was already well aware of Plaintiff and the infringement through Agent Lippetz.  Yet, he allowed himself to be photographed for self-promotion using major RCS components as a prominent frame for a photo seen by knowledgeable colleagues.  He fraudulently credited only his family with the Renewal, ignoring the vital and substantial public donations attracted by his family's "seed money.

> "Founder's great-grandson orchestrates festival's renewal"
>
> "'I call this particular renovation the second g to San Francisco, my great-grand-mother's being the first', (DE) Goldman said."
>
> "Urban Rehab: Stern Grove",
>
> by Sarah Duxbury
>
> S.F. Business Times,
>
> "Real Estate Deals", p. 42 - 3/24/2006

49.   Lippetz took six weeks to respond to Smeg

06=Apr 6 - < Lippetz to Smegal:

> "First, (Plaintiff) wants money ...
>
> "Second, (marking) ...
>
> "Third (recognition)...
>
> "As I have mentioned, given the ease with which we can revise the design, thus cutting off future liability and avoiding the impact of any potential injunctions, SGFA will not authorize any additional money to resolve this matter."

50.   Lippetz' Apr 6 email had been forwarded to Plaintiff (now unable to afford legal representation, and unaware of DE Goldman's March propaganda).  The contents were so threatening, divergent, and contrary to Goldman's professed "core values" that Plaintiff decided to appeal privately to DE Goldman in hopes that goodwill might yet prevail:

06=Apr 17 - < DE Goldman – Letter #2 - Private: (no copies sent / hand-delivered):

> "...My priorities are the reverse of those portrayed by Mr. Lippetz ...we admire the causes that the Goldman Family supports.  ...  We should be allies...The new ideas promise some important movement past oil-dependency and wasteful habits. With Goldman Family support, it could be a beneficial new industry for progressive San Francisco...."

# LIPPETZ
# CLANDESTINE MEETING
# PROPOSAL

51.   Lippetz fired back an email this time.  However, Smegal was of town and it was quickly forwarded to Plaintiff:

<u>06=Apr 25 – < Lippetz to Smegal: (email)</u>

"Dear Tom, Last week, (DE Goldman) received a letter from your client (who) requests a meeting with Mr. Goldman as his only concrete demand. SGFA is prepared to comply under the following conditions:

1.  Prior to the meeting, (Plaintiff) executes a fully enforceable release and settlement
2.  The meeting will take place at Stern Grove.
3.  The meeting will last no more than than 30 minutes …..`
4.  No one other than (Plaintiff), Mr. Goldman, myself and you will attend.
5.  There will be no photographic or other recording of the meeting.
6.  Neither Mr. Goldman, Stern Grove, nor (other) will have any further obligations

Additionally … the stage covering … was designed by a sail maker."

Lippetz' remarks were alarming - appearing to be bizarre stonewalling intended to create more delay as the Grove's RCS would be on display again soon.  Plaintiff decided that Free Speech was now his only defense and that, despite danger of being misunderstood, he needed to appeal publicly to the sworn representatives on the Board to uphold his Rights and seek redress a for Newsom's negligence.  Copies of his testimony were submitted b to the Board.

<u>06=May 09 - < BOARD – Testimony #1:</u>

"…my family and I have been pushed to our limits by actions of the City.  I am here to assert my rights and defend my work… Mayor Newsom boasts that San Francisco's "greatest asset is the talent of its people", but his behavior denies that claim. … Why should any San Franciscan bother to invent anything if elected officials and philanthropists can misrepresent their work? … Please help correct this unfairness "

a.  The Supervisors are obligated to redress grievance and investigate wrongdoing such as Newsom's repeated failure to redress grievance and uphold Constitutional Rights.

b.  Evidence of the submittal was illegally denied entry in following Agendas (<u>08=Dec 15</u>).

52.   Holding Goldman to his public portrayal, Plaintiff wrote him a 3-page letter with detailed responses to Lippetz' communication.  This time, a copy was sent to DCA Elizondo.

<u>06=May 31 - < DE Goldman – Letter #3: (hand-delivered / cc DCA Elizondo only):</u>

"(I write again) because of the Goldman family's very public support and apparent commitment to all forms of ethical, social, and environmental justice. …I do not understand why a person of your commitment would refuse to learn first-hand from us how our SkyCover® RCS principles, as exhibited at Stern Grove, have been similarly inspired. …your lawyer Greg Lippetz' tactics have only continued to undermine (amicable settlement)

"First, he failed to attend our September 19 meeting …
"Second, he continues to ignore crucial facts, covered in the September meeting …

"Third, he has never itemized a single way (in which) Stern Grove does <u>not</u> infringe …

"Fourth, he repeatedly threatens to "design around" our patent …

"Finally, he twists our words…

"(I have) no desire to detract in any way from the fine work that other designers have done … Ten thousand people sit on top of the landscaping … attention is focused on the large stage fully framed - top and sides - by … the first embodiment of our own U.S. Patent … advantages that enhance the enjoyment of the productions.

"We have been severely impacted in many ways … denied the rightful opportunity to introduce our innovative principles … lost one year of productivity …. Been presented no rationale (to) alter our original position…. achievement is minimized by … denials …".

53.   On the eve of the second Grove season, Plaintiff addressed the Board a second time:

<u>06=Jun 6 – BOARD –Testimony #2:</u>

"Stern Grove now represents every Inventor's nightmare – that despite one's best efforts to protect and launch one's own innovation, wealthy and politically-connected people can effectively steal, bankroll and execute your idea before you do – then, simply deny and refuse to fairly correct the offense...please help stop this fraud and achieve an honorable result …"

This time, having carefully prepared for the "three minutes" allowed for Public Comment, Plaintiff was taken aback when Board President Peskin arbitrarily cut off Public Comment at only two minutes a.  Plaintiff again submitted copies of his first testimony b for the record.  Dufty instructed his Aide Boe Hayward c to intercept Plaintiff, and they walked to his office to make a copy; but Hayward failed to engage, and subsequent calls were not returned.

a.  Peskin would persist in the practice, and Plaintiff repeatedly questioned it (08=Dec 15).

b.  Evidence of the submittal was again illegally denied entry in the record (08=Dec 15).

c.  Hayward - a close associate of DE Goldman - would join the SGFA Board of Directors, thus providing oversight of Plaintiff's protracted appearances at City Hall (07=September).

54.   06=June - < Plaintiff's prospects improved when a leading Fabric Structures engineering consultant admired the new inventions and a local manufacturer of high-quality RCS-related products became deeply interested in promoting the '269 Patent inventions.  Good progress towards creating an RCS design-build company would be made in the coming year.  However, the infringement would ultimately cause the prospects to evaporate (07=September).

<u>06=Jun 18- Grove's SECOND SEASON opens</u>



55.   Plaintiff pursued new prospects while he hoped for a reasoned response from Goldman to his May 31 letter. , but return twice to the Board Plaintiff submitted copies of his testimony to the

Board, but record of the submittals would be omitted from the record and Plaintiff's name would be repeatedly misspelled, making it difficult to verify his appearances. Although the first Minutes accurately noted that Plaintiff had "expressed concern with issues relating to the possible framing of the Sigmond (ibid.) Stern Grove Stage"; nevertheless, the actual submittals of corresponding documents went unrecorded. There was also a shuffling of Clerks Office staff after the May 5 meeting, wherein the Clerk of the Board was replaced by a former aide for Tom Ammiano (as Board President, the City representative who formally approached DE Goldman about exploring strategies for Grove improvements (2000).

56.    06=Jul 19 Eight weeks after the May 31 letter and having now confirmed that Plaintiff was without legal representation; Lippetz tried to take advantage a of the situation: Thus, Lippetz tried to mislead and intimidate Plaintiff by distorting case findings, making false claims, disregarding communications, and ignoring specifically-detailed letters sent early to Newsom, Halprin, and Isaacson (05=Jul 22).

06=Jul 19 – > Lippetz to Plaintiff: (email)
    "Typically, the patent holder will prepare (claim charts) … there has been no showing …
    "…light and sound towers will not be considered …
    "… impact of any infringement would be minimal … can limit our use …
    "… purpose of the (RCS) is solely to protect the artists …
    "… Patent holder is limited to damages / from the time of actual notice …
    "…ANY mark on the product itself / is sufficient.  Not only doesn't the marking need to be easily seen / it can even be completely hidden, such as inside a wall.  See Rutherford v. Trim-Tex, Inc, 803 F.Supp. 158, 164 (N.D. Ill. 1992)"

57.    It now became clear that the second season would pass while Plaintiff needed to perform unfamiliar and time-consuming legal research to check Lippetz assertions.  After a new patent attorney had reviewed the case, she admitted it was too much for her to handle.

58.    To keep issues alive, Plaintiff testified again:

06=Aug 1 – BOARD – Testimony #7: - <
"My City is condoning the illegal presentation of my protected concepts, without proper acknowledgment, to 10,000 people every weekend at Stern Grove. … my family and I refuse to accept the City's infringement of our patent at Stern Grove

59.    Plaintiff and his wife met with successful class-action lawyers who were enthusiastic about the case and copied materials, but later reported they "regretted" to decline the case.

06=Aug 20 - SECOND SEASON ends '269 Patent Exposure:
~240,000

60.    The second season closed while Plaintiff investigated Lippetz July 19 assertions - research that destroyed Lippetz' credibility with Plaintiff and utterly contradicting his perceptions of the Goldmans. After much thought about the matter, a four-page, point-by-point response was completed, and copies were sent to Newsom and Halprin to make sure each was clear about where matters stood since Plaintiff's last communication:

06=Aug 21 - < DE Goldman – Letter #4: (cc: RN Goldman, Halprin, Isaacson –certified mail)
    "…Lippetz … raises new points that warrant personal attention of the Principals … in no way can or will we betray 14 years of our work …. have designed dozens of applications - many using space frames similar to Stern Grove's.  Lippetz has … only sidestepped this issue …
    "..(Lippetz) avoided a crucial meeting (one year ago) … would have had a complete showing of our extensive material … might have helped everyone come to mutual understanding…
    "Mr. Lippetz claims … he must now have detailed "claim charts" before he can respond.  … they do not appear to be the only acceptable form of "showing":

"(U.S. Magistrate Judge Jacob P. Hart in S.S. White Burs Inc. v. Neo-Flo Inc) found that the plaintiffs were correct in pointing out that (the defendant) "has no basis for demanding that (plaintiff) produce information in a specific form, such as a chart."

Shannon P. Duffy, The Legal Intelligencer, 05-06-2003

    "(Lippetz) claims that "ANY mark" is OK.  He cites the 1992 case … that the mark can "even be completely hidden, such as inside a wall." However, in reading the case, it becomes obvious that the ONLY reason the judge allowed the marking "inside the wall" was that the invention was a trench shoring device –consequently, the "inside" of the wall was the only place where it could be "easily seen by the Users":

"…above all, a practical common sense approach must be taken when dealing with issues of compliance for the marking provisions of Section 287…The notice required by the statute is most effective when it can be easily seen by the users …"

(Rutherford v. Trim-Tex)

    "…will be pleased to work with you to make … marks … mutually agreeable. … A fair resolution of this infringement with everyone has been our goal from the beginning….perhaps we might all get onto a cooperative footing for solving real problems and implementing this new technology for the benefit of San Francisco."

61.    Plaintiff decided that it had now become necessary to notify RN Goldman (1970's), for he was known as a man of near-legendary generosity, and there had always been a possibility that he had been a pawn in a Brown-City "strategy" (00=Sep 19).  As the Renewal's majority donor, RN Goldman was more than entitled to know directly from the Offended what had happened as an end result of his philanthropic largesse, for his public image portrayed a man of the highest character and the best intentions; an individual most unlikely to infringe a U.S. Patent or to allow an infringement to continue.  The Public RN Goldman would not destroy anyone's dream.  He seemed to be more likely aid the progress of Plaintiff's new technology:

06=Aug 21 - < RN Goldman – NOTIFICATION: (certified mail)
    "(Plaintiff writes with) great respect for the many fine things your Fund has done, including your very generous contribution to the Stern Grove Festival Association for the Improvements at Stern Grove…. Sadly, one year ago, we discovered (the infringement) ….SGFA apparently contracted with the City and "indemnified" the Brown Administration from infringement, and may have been caught unawares….

"...causes which your family supports are vital to the respect people have for ethical and moral values ... We feel that a fair and honorable settlement of our matter will give needed encouragement to other private American Inventors, who enjoy little protection from theft of ideas despite the U.S. Patent system ... It has always been our fondest hope that this San Francisco invention might become something of which the entire City would be proud."

62.    Lippetz reply came fast, but his promise would take four months (06=Dec 5):

06=Aug 22 - < Lippetz to Plaintiff: (email)
"... are working on a response ...
"... will have it to you when it is approved by all of the parties ..."

63.    Not long after Plaintiff's August letter to RN Goldman, and as Plaintiff continued to exercise his Free Speech in televised meetings of the full Board, RN Goldman sponsored a new magazine that would benefit both himself and his "good friend" Newsom:

06=Sep-Oct - < NEW MAGAZINE FOR NEWSOM AND THE GOLDMANS

| 2006=Sep-Oct - "BENEFIT": - FIRST ISSUE  "Why Gavin Gives" |
|---|

Newsom Agent and associate Tim Gaskin "founder/editor"; the cover story featured Newsom. a  The short-lived bi-monthly was sponsored by associates of RN Goldman b - expressed purpose: promote the virtues of Philanthropy.

a.  In February, 2007, Newsom will be caught in a public scandal with his friend / aide's wife, Ruby Rippey-Tourk, presently engaged by Gaskin for "Benefit Radio" – a "Benefit" offshoot.

b.  Besides Tourk, sponsors and staff included: Amy Lyons (07=Apr 11: met Plaintiff), Lisa Mirza (94=May 25: Giants '269 Patent inventions confidant); Chris Barnett, (1980.a: LA writer who visited San Francisco to interview Plaintiff after he first directly encountered Defendants.)

64.    06=September - < SGFA now quietly hired a new Executive Director, Steven P. Haines, who would later stand in for Goldman in a "useful" meeting (07=Apr 17), and whose hiring Lippetz later used to excuse unaccounted delays after repeated inquiries and his refusal of telephone contact (06=Dec 5). Despite infringement serving only to undermine "community", Haines would soon promote DE Goldman's non-profit saying:

"... 'Festival is all about community; it... strengthens community.  We are honored to be recognized for our ongoing efforts to serve the people of the Bay Area.'" - SGFA website 2006

65.    The second edition of "Benefit" featured Goldman himself for the cover story:

| 2006 Nov-Dec - "BENEFIT"- SECOND ISSUE:  "The Goldman Rule" a |
|---|



A cleverly-titled a cover story featured RN Goldman b as "Philanthropist of the Year" in an article that offered a rare insight into the man. c :

a.  The article quoted Goldman's grandson commenting on the "Golden Rule" (emphasis, Ed.):

"'I grew up with the assumption that this philosophy had been conceived by my grandfather (RN Goldman) and was really only applicable to me and my extended family,' And why not? Richard Goldman has lived every moment of his life by the Golden Rule. Not only has he done unto others what he would have done unto himself, but he has gone above and beyond the call of duty. For him, it's not just about..."

b.  The new publication seemed perfectly timed to take "heat" off both RN Goldman and Newsom after their avoidance had forced Plaintiff to testify against them both publicly.

c.  Asked whether "...there any awards or grants that you made that you regret?"; Goldman: responded (emphasis, Ed.):

"I've often pondered that. I'd say basically, no.  We've never given a grant where the people did not act honestly. On occasion they... But at least the purpose was a legitimate one." ...By the way, we never micro-manage. We never ... said, 'You've got to do this.' We just give it to them and let them run with it. ... If we don't think they have done well, we wish them good luck and look for the next opportunity."

Goldman's advantage was to thus declare "arms-length" disclaimer of liability.  Adams might have asked: "What if Goldman funding somehow resulted in destroying the work of someone?"

66.    After months of no communication, Lippetz now sent an email that represented little progress after fifteen more weeks. However, Plaintiff was now provided some confirmation of the '269 Patent that signified important colleague recognition:

06=Dec 5 - < Lippetz to Plaintiff: (email)
SETTLEMENT COMMUNICATION
"...have sought, and obtained (a Patent License Agreement) approved by all (parties)" (¶15):

| "Patent License Agreement"  "The Stern Grove Parties acknowledge that, to the best of their knowledge, the Stern Grove Stage Canopy is the first application of the Licensed Patent.  The SternGrove Parties further agree that, if inquiries are made by third parties interested in the technology covered by the Licensed Patent, they shall direct such inquiries to (Plaintiff)." |
|---|

## 2007

67.    Plaintiff's efforts for starting an RCS  business appeared to be encouraging.  However - and with important implications for American Innovation and Commerce - a European RCS a product using related RCS technology was introduced to the U.S. market. b

a.  "SunSquare", based on PCT Patent referenced in PCT Office Action. (2000 to 2002.b)

b. In 1998, Plaintiff had proposed an RCS industry at Hunters Point to Nemeth (98=Sep 14).

68.    Lippetz Dec 5 email had displayed none of the integrity portrayed by DE Goldman; so a response was again sent directly to him

07=Mar 6 – < DE Goldman – Letter #5: (cc: all)
"(Lippetz' actions) put into question the fundamental meanings of both Philanthropy and U.S. Patents. …Greg Lippetz' long-awaited December reply only proposes that we accept a "gag order" and a partial settlement in exchange for unlimited rights. We are asked to deny major elements of our invention and allow everyone to freely use our ideas again with no royalty…

"…you can not now simply wash your hands and divorce yourself from our matter. You have been the lead figure in the Stern Grove Improvements from the very beginning. … You personally know what happened as your work came to now illegally exhibit the primary elements of our patented SkyCover RCS inventions. … you were integrally connected as relevant events transpired from conception

"… In 1998 … (we) disclosed to The City how our proprietary ideas might help …we stressed that they would also be "ideal for an open-air amphitheatre like Stern Grove". Not long after, you confederated with the City to hold the City harmless … It may be possible that you were duped. … The City quickly used that questionable agreement to conveniently divert our attention from the City to you. …

"…If you and more-deeply principled people can't help us, then you will force us to approach other avenues for understanding and support. We remain willing to forgive the damage this has created for us if we can quickly reach a fair settlement.

69.    To point out the dichotomy of SGFA "indemnification" and update all parties, copies were sent to all involved,

07=Mar 06 – < Mayor (Newsom) – Letter #5: (cc to all) - <
"San Francisco has high-jacked our invention and paralyzed 15 years of our work. (You) may not feel personally concerned about the City's infringement on our patent rights - but perhaps you should be.
"When we last wrote to you twenty months ago, … your people used a questionable contract to divert our attention to the Stern Grove Festival Association …This issue may have incubated under your predecessor Willie Brown, but it is now you who is in a position to help make things right. You may either continue to ignore our situation, or finally step in to bring all parties to a fair settlement. It's your choice…"

70.< A month passed with no response. With now a third season approaching, something had to be done. As lead donor for the Renewal and figurehead of Goldman philanthropy, RN Goldman was now considered accountable and Plaintiff wrote to update the gentleman - enclosing the Mar 6 Letter to DE Goldman

07=Apr 10 < RN Goldman – Letter #2: - < -:
"…you are a symbol of Goldman Philanthropy and the head of the Goldman Family, … Goldman funding has created a complete disruption of our personal and professional lives … … not possible for us to regard you as a peripheral figure in the totality of this matter.…

"…the legal system has evolved to heavily-favor only well-established and well-endowed 'corporate' entities. This has created an extremely uneven playing field for independent persons like us. If this is not corrected, then no American should be advised to invent anything on their own:… our goal is to help American Invention regain its lead by not quashing individual inventors … You may see honest and constructive possibilities in helping to support our endeavors instead of seeing them destroyed.

71.    07=Apr 11 - < When delivering Goldman's letter, Plaintiff and Fund Executive Director Amy Lyons (2006=Sep-Oct) had a brief discussion, a that left hopes of a constructive response:

a. Plaintiff recapped events for Lyons, flipped through his portfolio, and stressed that he held good will toward the Goldman family. The two agreed about the value of patents for innovation and how vitally important ethical positions like those of the Goldmans were; following which, Lyons stressed the "arms-length relationship" of RN Goldman to the project.

72.    07=April 17 - < While Plaintiff continued to press for accountability, the SGFA Board inducted Elizabeth Goldstein (99=March), who had knowledge of both Renewal and Plaintiff (2003). Only days after Plaintiff delivered the April 10 letter to RN Goldman, Lippetz was directed send an email to Plaintiff proposing to meet, saying:

"…we believe that it would be useful to meet in person."(emphasis, Ed.).

73.    < A family emergency had caused Plaintiff to miss several emails. When able to respond, Plaintiff agreed, but had to correct some of Lippetz assertions in his first email

07=April 27 -:< Plaintiff to Lippetz: (email):
"…... will attend meeting on Thursday, May 3…In response to your 12 April email, we have accused neither SGFA nor any individual of infringing … many were involved in creating it - not simply the Stern Grove Festival Committee. … Now that our RCS has been displayed to everyone, the destruction of our work is the result of the combined effort… (the Renewal) would not have been possible without … Douglas and Richard Goldman …The attendance by either at our meeting would be highly respected. … prefer not to be in opposition to any of the parties …"

74.    After two years, Plaintiff and Lippetz had never met, but Plaintiff would soon meet with him and two others who undoubtedly knew more about him than he did them. While gathered presentation materials and once finding himself near Lippetz' office, Plaintiff stopped in briefly to learn about the firm and get acquainted with what he would soon be facing

07=May 23 - <.

**-- INDEMNIFYING PARTY TRIES INTIMIDATION**
**"Considering the remedies available to you …"**

75. 07=May 23 –CONFERENCE #2 – < (City absent

Greg Lippetz[a] - SGFA Secretary (pro-bono Bingham-McCutchen patent attorney)
Steven Haines[b]- SGFA Staff Executive Director (surrogate for DE Goldman)

Gaetano Muzio [c]- SGFA Treasurer - Goldman-Sachs-retired
(returning to New York)

Lippetz had failed to attend the 2005 meeting in City Hall
eighteen months before.  In the only conference with SGFA
present, -the City would not be represented.  Plaintiff's party was
made to wait a long time in uncomfortable circumstances. [d]
When finally admitted to the conference room, any sort of
presentation seemed pointless and was not requested.  Instead,
after a brief discussion, the party was asked to leave so the
Goldman Agents could deliberate.  Directed to nearby darkened
rooms to wait; the party hoped for some sort of constructive
result.  Lippetz soon called the party back into the conference
room and quickly prefaced his "offer" by stating: "Considering
the remedies available to you ..." and proceeded to recite less
than agreeable terms [e].  When Plaintiff expressed his
dissatisfaction; Muzio turned to Plaintiff's wife and attempted to
play her against Plaintiff, tactics to which Plaintiff voiced his
objection.  As the meeting wrapped up; Haines (new to SGFA)
admitted that he had only read Plaintiff's "last two letters" [#4
(06=Aug 21) and #5 (07=Mar 6)].  As the party rose to leave,
Lippetz suddenly claimed to have "a drawing from (glances at
the '269 Patent / checks the 1997 date / then looks up and says)
1996".  Plaintiff immediately asked to see the drawing, but
Lippetz refused and provided no explanation.  The party left
after Haines was promised a call with Plaintiff's decision in two
weeks.

a.  Lippetz soon left Bingham-McCutchen, moved to the law
firm of Jones and Day, and first appeared with Boe Hayward
(06=Jun 6) on the SGFA Board roster in 2008.

b.  Muzio - a long-time Goldman associate - was hired by
Goldman-Sachs (1977) and rose to become the first Global
Mortgage and Asset Backed Sales Manager: "responsible for
creating the sales team and strategy", as well as "one of the
founding members" of the Mortgage and Asset Backed
Department (1986).  A General Partner and Co-Head of the
Mortgage Department (1990) and San Francisco Sales Manager
(1995), he retired in June, 2004.  On the SGFA Board roster in
2005, he was Treasurer from 2007 to 2009.  He left the Board
after this meeting, returned to New York and joined a "long-term
wealth creation vehicle" around the time that Asset Backed
Mortgages and Wall Street began receiving much criticism and
many lost much of their asset portfolios - but not the Richard and
Rhoda Goldman Fund (¶ 36) –

c.  Haines, ostensible stand-in for DE Goldman and very new to
SGFA (06=Sep 18)

d.  Lippetz had not told Plaintiff that the entire 28th floor of his
offices would be shut down on this mid-week afternoon.  For
nearly thirty minutes, with no place to sit, and surrounded by
darkened offices, Plaintiff's party felt under surveillance and had
to wait until Lippetz finally appeared and ushered them back to a
huge glazed conference room suitable for dozens of people and
irritating by its coldness.  Lippetz and Haines were seated at a
distant corner of the huge table looking at open laptops.  After
waiting still longer, Muzio made his entrance at last and it quickly
became obvious that the gentlemen of SGFA harbored no good
will.

e.  Terms (generally): (1) no use of images of Stern Grove RCS,
2) a gag order, 3) minimal Patent Marking, and 4) several
thousand dollars for a paid up one-time "royalty" in exchange for
worldwide license to allow all parties involved to continue
infringing freely.

76.    Plaintiff called Haines as promised and declined the SGFA
offer, but was shocked by Haines assertions, a as he was so new
and had admitted reading only two of the Plaintiff's letters to DE
Goldman.  It would take time to determine what to do moving
forward and, once again, Defendants had stalled matters before the
Grove season

07=Jun 4 - < Plaintiff phone conference with Haines: (Haines
assertions)

    a.  "(You can't prosecute) claims going back ten years"
    b.  "I was advised the patent is invalid"
    c.  "(You are) trying to take advantage of a non-profit"



**07=06-17 - Grove's THIRD SEASON begins**

77.    The infringement now began to force
Plaintiff's family to again refinance their
home and take early retirement.  Nevertheless,
some excellent possibilities for a '269 Patent
RCS business seemed more than promising a.
A mass-producible prototypical
embodiment was taking shape with a buyer.
Industry suppliers maintained contact and were ready to move
forward.  Steps were taken to incorporate the business and contract
with component suppliers.  Plaintiff's contact reported high interest
among his partners with the RCS-related company.  A highly-
interested PR consultant linked them with venture capitalists, who
were showing serious interest in the '269 Patent.

78.    Grove season again undermined his work; Plaintiff appeared
again before the Board.

07=Jul 10 – BOARD – Testimony #8:
" In light of the City's apparent breach of contract with the Stern
Grove Festival Committee in not divulging the City's
Confidential Disclosure Agreement with us to honor our
invention, this City must respond to our charges.  You are our
elected officials to help make that happen without delay."

79.    Season now running out, Plaintiff returned to stake his claim
publicly and seek redress:

07=Aug 07 – BOARD –Testimony #9:
"Last year I first protested the City's outrageous theft and
misrepresentation of my U.S. Patent with the Grand Proscenium
that illegally frames the Stern Grove Stage … SGFA is now
accusing us of seeking to "take advantage of a non-profit" when
the fact is that the City has only passed the buck to them.  This
City and former-mayor Willie Brown are most accountable for
this, but none of you has stepped forward to ask me about this
matter."

07=Aug 19   THIRD SEASON  / ends '269 Patent Exposure:
~360,000

80.    In addition to Response to the May 23 meeting was overdue
because it had taken time to collect thoughts about what to say
directly to both Goldmans with respect to their public portrayals as
champions of fairness and democracy.  The letters were sent in
Trust that both men were committed to their public
pronouncements, despite the contradictory actions of Goldman
intermediaries Lippetz, Muzio, and Haines.  The primary letter was

to DE Goldman and copies were sent to update all regarding the May 23 meeting.

07=Sep 13 –DE Goldman – Letter #6: - <:
" … disappointment that you seek to escape any personal responsibility… The entire project, including … my patented inventions, resulted from and with your personal involvement from the start, including majority Goldman funding ($8M/$15M) and your full cooperation …

"…Your intermediaries would have me believe that you will "not be personally involved in a settlement". However, the facts indicate that you are deeply involved in the infringement. …

"…Your misrepresentation of my patented inventions for three seasons now has created very serious challenges to my life's purpose and work, directly impacting my family's welfare. … Your continued evasion only extends the damage. … "

81. A copy of the Sep 13 letter to his son was sent to RN Goldman, with a brief cover letter expressing desire for an amicable resolution:

07=Sep 13 –RN Goldman – Letter #3: - <
"…My family and I still hope that something mutually beneficial might yet happen, as we have never wished to find ourselves in opposition to any of your humanitarian efforts. … "

82. 07=Sep 23 - < Ten days later, RN Goldman was honored as a "Selfless One":

> "THE SELFLESS ONES"
> "USA's 400 richest (Forbes) -Richard Goldman, a Levi Strauss heir …
> Has given away $650 million … Current wealth: $350 million."
>
> USA TODAY – 9/23/2007 - By Del Jones

83. After one month passed with no response from the Goldmans, Plaintiff sent a cover letter and copies of his Sep 13 letter to update Others

07=Oct 17 – Others – Letter #3: - <::
"Finding myself suddenly in opposition to you my colleagues (is) quite destructive to many years of hard work and inspiring dreams. … Your agreement last year … was and is appreciated, and I will uphold the work and honor your roles in its creation just as my patent is respected.

"Unfortunately … Douglas Goldman's pro-bono attorney and intermediaries argue that he is unaccountable for the results of his own involvement. … I strongly disagree … My family and I yet maintain hope that there might be a constructive outcome for everyone in this destructive matter and I invite anyone with questions or suggestions to please contact me."

84. Continuing silence forced resumption of testimony to the Board, during which Plaintiff also expressed thoughts about related issues

07=Oct 23 – BOARD – Testimony #10:- <:
"The Public trust has been violated by political favoritism, and I don't know how things might turn around except for speaking out and being heard. Global Warming is real … we need a sea change in our attitudes … halt replacing our earthquake-tested Candlestick Park and the large Trans-Bay

Terminal.* Each one represents millions upon millions of gallons of fossil fuel …America has carelessly (fostered the) notion that Progress is simply "New, Bigger, Better"…"

f. A major project of Defendants, City Fathers wished to replace the existing facility despite demonstrated potential and practical designs for rejuvenation, which were largely ignored. Hundreds of millions in Federal funds were secured for a replacement thru Nancy Pelosi (¶ 14.a)

85. Plaintiff again tried to keep his issues alive before the Board while also addressing broader related issues:

07=Oct 30 - < BOARD – Testimony #11: - <
"…Architects have finally officially admitted that buildings are "bigger resource hogs … than cars and trucks"… with Climate Change pressing down, new directions and new thinking is required is we are to spend our energy more wisely. San Francisco should show the way …"

86. 07=Nov 9 - < Brown was honored when San Francisco State announced: "Willie Brown launches leadership center", which Brown himself described as follows:

> I am delighted to help prepare, inspire and train the "next generation of Willie Brown's," who also will leave here prepared to take on the world -- and make a difference -- through distinguished careers in public service

a. The school acknowledged that Brown had drawn "criticism for what has been called a patronage system of appointments." Nevertheless, plans were to open a new program in his name in summer of 2008 that would draw upon Brown's "many contacts in the political world" for grooming "political leaders" and Brown donated "200 boxes" of "papers and videotapes".

87.< With Newsom re-elected Mayor with support of Defendants, Plaintiff continued to exercise Free Speech a in defense of his Rights:

07=Nov 13 - < BOARD – Testimony #13: -
"After defending my rights for two years, it is now clear that U.S. Patent Law has become so 'Corporate' that individuals may forget about patenting their ideas if they don't have money to burn. San Francisco offers a sobering example. Fer the sake of anyone who trusts that a U.S. Patent will help protect them, I insist that my patent be honorably recognized…

"In 1998 … I confided my ideas directly with (the Mayors) Office. Not long after, Douglas and Richard Goldman set aside $8M in Goldman funding that ultimately resulted in their building my ideas at Stern Grove without my knowledge…. City lawyers had brokered a deal with Goldman interests indemnifying Willie and City Agencies for infringement. This Board unwittingly accepted my patented ideas in 2005 as part of the Goldman's 'Second Gift to San Francisco'"

a. After Plaintiff finished his testimony, Supervisor Alioto-Pier indicated willingness to meet with him. After talking with her Aide Sarah Ballard (the wife of top Newsom confidant and Aide Nathan Ballard) the meeting date Dec 20 was set – Plaintiff relieved by the interest shown.

88. 07=Nov 14 - < RN Goldman was accorded major Press that included his picture:

> "Richard Goldman…fell off the Forbes 400 Billionaires List because of what Forbes describes as his 'selfless' philanthropic

work … (for) environmental causes and organizations in the last ten years, will be honored at the Full Circle Fund Forum 2007."

(Goldman, when asked about being dropped from "the billionaires list"):
"...a compliment...I feel like you shouldn't sit on the money..."

(Goldman, when asked about advice for the reelected Mayor):
"...Gavin Newsom … I think he'll become more active since his first term.
I don't know anyone more dedicated to The City than Gavin Newsom."

S.F. Examiner, 11/14/07, p4 –B.W. Liou

89.~07=December - < RN Goldman now engaged a writer for a rare personal interview, in which he pro moted the idea that he was not accountable for the end result of his philanthropy:

> RN Goldman Interview - Nob Hill Gazette - (SH = Simon Hayes)
>
> SH: "When researching this article, the overwhelming feeling we got was of your modesty: there's little information out there; you give surprisingly few interviews; you're a self-effacing man. Given this privacy why have you agreed to talk with the Nob Hill Gazette?"
>
> RNG: "Well, I'm familiar with the Nob Hill Gazette... I've known Lois since she started out.
>
> SH: "You are also known as quite hands-off. While there is oversight, you trust many of your grantees to spend the money how they best see fit to support their own causes.
>
> RNG: "I don't think we have had any particular disappointments. For example, we've never had anybody who has taken the money and gone south."
>
> SH: "Rhoda Haas Goldman was a descendant of Levi Strauss a, and served on the company board of directors. Were you intimidated by your wife's family heritage?"
>
> RNG: "No. My wife gave me so much support. … I've always been a registered Republican … … I do like our mayor. I've had many quiet talks with him; I'm pleased to count him as a friend. He's done a lot for this city."

07=Dec 15 – MEETING with Alioto-Pier: Only her Aide shows up

90. After waiting one month, Plaintiff and his wife went to City Hall for the scheduled meeting to present his work with the '269 Patent and explore discussing issues. They were met by her Aide Sarah Ballard (07=Nov 13.a). Ballard sat down with the couple but, when asked why Michela was not there, she abruptly walked out - guests left to wonder and wander out alone

91. < Plaintiff returned to the full Board:

07=Dec 20 – BOARD –Testimony #14: -
"We - your neighbors - elected you to represent us. You swore to uphold and defend our U.S. Constitution – the one that promises writers and inventors like me protection for our vulnerable work. I've been holding my case up in front of you now for more than a year and not one of you has stepped over to help me."

92. Goldman resources made "The List" after having grown $100 million since 2005:

> "Largest Foundations in the Bay Area"
> "# 16 - Richard and Rhoda Goldman Fund - $ 453,300,000"
> S.F. Business Times, 12/31/2007 - p.40

## 2008

93. His own RCS business plans now effectively thwarted, Plaintiff was not yet aware that his rival RCS product - "SunSqure" – had just been introduced in the United States (2000). As a fourth season would come and go, Plaintiff would testify many times before the Board to defend the '269 Patent before Elections would replace complicit Supervisors, and before health matters would increase difficulties for his family.

94. Supervisor Sandoval (soon to be elected to the Bench with Defendants support) admitted to Plaintiff that few can afford to protect their Rights in court saying:

08=June - < Supervisor Sandoval hall discussion outside Chambers with Plaintiff
""I actually asked the City Attorney [a] about your matter six months ago [b], and he said that your case doesn't hold water" [c]

a. The CA was obligated to inform the Board of infringement from the start (05=Aug 9.b).
b. Sandoval could have informed plaintiff sooner and spared unnecessary testimony.
c. The City Attorney's Office: 1) had interest in allowing Supervisors to stonewall Plaintiff and perhaps dissuade him from pursuing an embarrassing city matter, 2) was not qualified to pass judgment on a U.S. Patent, and 3) never expressed any such opinion to Plaintiff.

95. 08=June - < Brown Center opens at S.F. State for grooming political leaders (07=Nov 9)

> 08=Jun 15 - Grove's 4th SEASON begins



96. 08= Jun to Aug - < Frustration increased for Plaintiff as Defendants continued stonewalling. His only defense was his Free Speech, so he continued to testify before the Board, as several members complicit in the infringement of the '269 Patent were now serving to only prolong matters for Plaintiff. It had become Board President Aaron Peskin's practice to arbitrarily limit "general Public Comment" to only two minutes a, with never calling a required quorum vote to allow the narrower interpretation of written rules regarding Free Speech, and none of his colleagues responded to objections to his practice b – a disregard that was challenged by Plaintiff (08= Dec 15) and passed to successors.

a. The Board's printed rules specify "up to three minutes" for each speaker (some need only one minute) and calls for Public Comment to last at least "30 minutes" (ten speakers = thirty minutes consumed). Peskin's practice allowed him to listen only twenty minutes before moving on if there were only ten speakers, while in most hearings, the Board allowed the full three minutes. Two minutes are insufficient for matters of complexity - but too much if the Board wishes to silence objectionable challenges. Peskin would cut-off some speakers by loudly hitting the buzzer and shutting off the microphone, but allow others to speak for four

minutes if they were bi-lingual with English as a second language. Others were encouraged to sing.

b. Dufty - Plaintiff's own representative - could have defended objections to the restriction. Peskin himself could otherwise have explained how his practice was appropriate under the Law.

08=Aug 17 - FOURTH SEASON ends / '269 Patent Exposure:
~480,000

97.   08=September - < With Elections near, Plaintiff realized that Members complicit in the infringement would be soon leaving and continued to testify before the Board. At the same time, Brown's weekly column boasted about his "spies" and claimed "I still know what's going on before City Hall does" - providing assurance that one Defendant was paying attention.

98.   08=Sep 29 - < Muzio left the SGFA Board and returned to New York as Asset-backed securities caused the "housing bubble" to burst, but sparing Goldman Funds (07=May 23.b).

99.   08=October - < DE Goldman - his father a self-described "life-long Republican" - became a primary Bay Area fundraiser for Barak Obama, who later helped bail out Wall Street.

100.   A major movie a about patent infringement and reminiscent of Plaintiff's ordeal was released briefly around this time. To Defendants likely advantage, it was quickly removed from distribution soon after Plaintiff had made reference to the movie during Public Comment.
a. The documentary movie was about the inventor of the intermittent windshield wiper who sued the auto industry for patent infringement and won. It had been well-advertised and received good reviews, but few Bay Area theatres were found to be showing it.

101.   08=November - < ELECTIONS - < Obama's election generated hope for change, but Plaintiff kept testifying before the Board because complicit Supervisors a would soon leave.
   a.   Ammiano (00=Sep 19) moved to State Assembly;
   b.   Sandoval (08= June) was elected Judge.
   c.   Dufty remained Plaintiff's Supervisor, and
   d.   other Brown-Newsom allies remained on the Board.

102.   Plaintiff instigated email dialogue with David Pressman, Author of Patent It Yourself ("PIY") - a leading self-help patent manual and guide for the '269 Patent:

08=Nov 11 - < Author – Plaintiff discussion: (email):
"Congratulations on getting a patent using PIY. It makes me very proud to hear a success story like yours ... I looked at your patent and it looks very well prepared and written. I hope you commercialize it and profit handsomely."
When Plaintiff inquired about representation, Pressman clarified a fact about Patent Law:
"...I am not a litigator because I am not good in court. If you have an infringement you will need a litigator. Most of them will be willing to take it on a contingence if the defendant has a deep pocket and there is significant exposure. If not then you are OOL since patent law currently is for the rich or those who have a great case."

103.   < 08=December – When Plaintiff discovered that official records of his testimony and submittals had been suppressed for two years, he sent emails to Peskin, his Clerk Kay Gulbengay,

Legal Aide Rose Chung, and the Board Clerk - all of whom failed to respond.

104.   08= Dec 15 - < SUPPRESSION OF TESTIMONY - < President Peskin and all Board members approved repeated errors a that served to obscure record of Plaintiff's testimony:
"These errors may not be deliberate, but they do prevent any Google search from revealing any but a few of my earliest three appeals to you and the Board since May 9, 2006. I would appreciate your having the corrections made as soon as possible...."

a. Peskin and the Board repeatedly failed to log in Plaintiff' submittals and approved bizarre misspellings of Plaintiff's name more that 20 times in official Board Minutes. Likewise, Chronicle "Insider" reporters ignored Plaintiff's testimony and submittals.

105.   RESTRICTION OF FREE SPEECH –< Chung's restriction of Public Comment (08=Jun to Aug) prompted study of the California Constitution; and Plaintiff confronted Peskin with his sworn Duties. Copies were sent to Gulbengay, Chung, and the Clerk.:

08= Dec 15 - < Plaintiff to Board President Peskin: (email)
"Your failure as President to uphold and defend Constitutional Rights ..."
"...you have held responsibility and authority (to) instigate investigations into wrongful actions by City officials and agencies. Your continuing refusal to "take up (my) issue", or even simply discuss the matter with me, betrays your oath to uphold and defend our Constitution(s), as well as other principles that define your position
"...I believe that (you) have long been in violation of the Constitution with your arbitrary exception of "two minutes" to the Board's written guidelines...as Board President, you are now inextricably tied to the City's ongoing infringement ..."

106.   SUPPRESSION OF RECORDS - < Letters and testimony submitted to the Board, including the 06=May 6 and 06=June 13 submissions, a are missing from the Record:

08=Dec 15 - < Plaintiff to Board Clerk: (email)

"Request official verification of receipt of Letters Delivered to Board

"Dear Ms. Gulbengay, It is my understanding from the Clerk's Office that, as the President's Clerk, you keep for a minimum of three years any and all correspondence. Accordingly, I hereby request that you please verify ... I am attaching a copy of the originals in .doc format, for your verification /use ... In addition; please list the attached copies under "Communication" for today's meeting if possible. Thank you very much,..."

a. Copies of the 2006 originals were attached and requested recorded, though no such record has been found. This email was copied to Peskin, Chung, and the Board Clerk):

107.   SUPPRESSION OF RECORDS - < Letters and testimony submitted to the Board, including the 06=May 6 and 06=June 13 submissions, a are missing from the Record:

08=Dec 16 – Plaintiff Testimony before the sitting Board (in person)
"I respect the complexity of your responsibilities and need to say there are so many good people in this Town that it's

difficult to stand here now and say what I must.... I would hope that the members of the San Francisco Board of Supervisors and the Mayor will find it within their shared good graces and official responsibilities: (1) to redress this grievance; and (2) to abate any remaining hint of the public theft by a municipal government of the personal intellectual property (secured under registered U.S. Patent) of one of its longtime, resident, taxpaying and voting citizens.... San Francisco can be the first American City Government to collude with wealthy philanthropists in order to infringe a U.S. Patent of a citizen of its City."

108.   08=December - < Plaintiff was now diagnosed with cancer that would require radiation.

## 2009

109.   Plaintiff's year would be dominated by health issues - radiation treatment / recuperation / and an accident that produced a debilitating and long-lasting sciatica.

110.   - < Before termed out Supervisors left, copies of the Dec 16 testimony were given to their assistants, followed by emails the next day

09=Jan 7 – BOARD – < email to Supervisors -:.
   " ... After forty personal appeals to you, none of you has responded to my grievance, so this matter must move past your sole consideration - but not your accountability.... I invite you to call me directly with any questions ...

111.   09=Jan 20 < Barak Obama was inaugurated as President (after Goldman had led support for his campaign) and it was his stated goal that "intellectual property owners (be) fairly treated". Despite undergoing radiation treatment, Plaintiff began drafting an appeal to the President, but ultimately suspended the task with concerns that the Goldman conflict would nullify his efforts.

112.   09=Feb 5 - < Growing frustration with Influence was echoed by a columnist:

> "Permanent constituents and the damage they do"
> "...very powerful entities and individuals have the ear and other body parts of legislators and their staffs. ... They can protect themselves and their sundry malfeasances by rewriting some section just a little ... 'permanent government' has long been used to describe the cadre of career bureaucrats and lobbyist ....I'd like to add the phrase "permanent constituents" to the lexicon ... voters who are more special than the other voters..."
> S.F. Chronicle - Jon Carroll - 2/5/2009

113.   09=March - < "Patent Reform" again threatened individual patentees (¶34.a) and, with patent maintenance fees coming due, resolving the infringement gained urgency for Plaintiff.

114.   09=April - < As Newsom announced his candidacy for the 2010 race for Governor, hope revived for Plaintiff when a new attorney was highly recommended.  Plaintiff's health made collecting materials for her difficult and it took time to deliver them for her review.

115.   09=May 5 - < Halprin's wife presented a dance tribute under the Grove's RCS:

> "Majestic spirits glide in Halprin's grove"
> "...seminal landscape architect Lawrence Halprin is 92; his wife of 68 years, sat side by side in the stunning amphitheater that Lawrence designed."
> "'Spirit of Place' (Anna Halprin's dance creation, Ed.) is something I wanted to do for Larry.' ... a gift from two creative ...lifetimes ...unflagging intensity ...challenge was the majestic scale"
> San Francisco Chronicle – 5/5/09 - p. E-3:

> 09=Jun 21 - Grove's FIFTH SEASON begins



116.   09=June - < As television ads featured the Grove's infringing RCS and legal action grew remote; continuing silence from Defendants prompted Plaintiff, despite painful sciatica, to testify several times before the Board for Free Speech as his only alternative to remote Law, despite his appeals for redress being ridiculed by Defendants.

117.   09=July~ - < The Grove's pioneering RCS had already been enjoyed by 500,000 people since it opened.  Over  and Plaintiff had repeatedly approached RN Goldman about joining in goodwill to enable the '269 Patent technology to help address the same concerns in which RN Goldman professed interest:

> : As ... problems such as climate change continue to pose a threat, private foundations will continue to play a vital role.
> Letter from Richard Goldman – Richard and Rhoda Goldman Fund 2010 Annual Report

In the same writing,

> In the past year, we have seen our assets drop in-step with the market and other foundations.... The Goldman Fund has weathered many economic fluctuations in our nearly 60-year history. We have had the clarity of vision and adaptability to maintain philanthropy in the face of these challenges.

118.   09=Jul – Aug - < Plaintiff grew concerned when the new lawyer failed to return calls for a while after he delivered his materials to her.  When she finally called back, she said that the letters to Defendants were "heartfelt" and offered to pursue the previous attorney's elusive "Folder".  Once the "Folder" was in her possession, she again failed to return messages for another month, so Plaintiff continued testifying before the Board as hopes faded for action and another 120,000 guests at the Grove enjoyed the '269 Patent RCS.

> 09=Aug 23 - FIFTH SEASON ends     '269 Patent Exposure:
> ~600,000

119.   09=September:  Individuals and the Law: A monthly publication cited important facts:

> "Corporate Personhood"
> "The fanciful notion that a corporation is a 'person' and is thus imbued with fundamental constitutional right stems from – get this – a mistake.

"It happened in 1886, when the Supreme Court considered an obscure tax case, Santa Clara County v. Southern Pacific Railroad. ... railroad attorneys tried to get the high court to rule for corporate personhood. The justices, however, deliberately did not do so – nor did they even discuss the matter. As Chief Justice Morrison Waite later put it, 'We avoided meeting the Constitutional question.' ...

"However, J.C. Bancroft Davis, a court reporter for a private publisher of legal documents, made The Big Mistake when he wrote a summary of the case. His opening sentence wrongly declared, 'The defendant Corporations are persons within the intent of the clause in Section 1 of the Fourteenth Amendment...'"

"That's it. Today's grandiose claims of personhood for corporations are (grounded in) a mistake made by a clerk writing a case summary. Flimsy as it is, Davis' erroneous statement was seized upon by corporate attorneys, and before long even the Court was asserting it as the law of the land."
<u>Hightower LOWDOWN</u> – September, 2009 - p. 4

120. 09=October - < After the season was done, a meeting with the new attorney was set ... then cancelled when the attorney reported illness, after which she again failed to return phone calls for another month. Finally, without warning in early October, she sent an email declining representation. a Plaintiff now found himself back at "square one" - no lawyer; anxiety about lost time and opportunity, and now wary of Patent Law deficiencies.
a. The lawyer even carefully referenced her legal right to specifically "not say" why she declined. She also reported that the valuable Folder had been "lost" somehow. Not long after, she stalked Plaintiff to inform him that the Goldmans were "putting up a hell a defense", call the matter "Class War", and suggest that Plaintiff could always try a pro se action.

121. 09=Oct 22 –Plaintiff soon received a letter from the attorney justifying the lost "Folder" by asserting that "all documents received (were) included in files discharged."

122. 09=Oct 24 - < LAWRENCE HALPRIN DIES - <
Plaintiff regretted that he was unable to meet and create an amicable resolution with Lawrence Halprin before he passed.

123. < Plaintiff prepared testimony a in appreciation of Halprin's work and his acknowledgement of the "269 Patent" (06=Dec 5).
09=Oct 27 – BOARD – Halprin Memorial –
"I note with great sadness the very recent passing of internationally renowned Landscape Architect Lawrence Halprin, also a San Francisco Bay Area resident, whose gifted insights into the inherent relationship between nature, man, and man's need to "construct" resulted in his development of profoundly complementary landscaping schemes for local, national and international sites – designs which have, over his long lifetime, endowed past and current generations of architects with the most exemplary applications of his talent, and which will similarly inspire future generations of architectural and landscape designers.
"...Even thirty years later, each time I visit Levi's Plaza, my appreciation of Mr. Halprin's landscaping acumen grows. Few people have been blessed with his pleasing sense of scale, use of materials, plants and proportions that ultimately create Landscape worthy to be called Art.

124. < Hard copies of Plaintiff's memorial were submitted to the Board – again, no record was made of the submission (08=Dec 15).
09=Nov 10 - BOARD– Halprin Memorial –
"I note with great sadness the very recent passing of internationally renowned Landscape Architect Lawrence Halprin, also ...."

125. 09=November - < Newsom suddenly dropped out of the 2010 race for Governor after only six months (09=April). Despite Defendants' support and endorsement by former President Bill Clinton only one month before, Newsom had suffered low poll numbers a
a. Newsom trailed Democratic front-runner Jerry Brown in most polls by more than 20 points. With Defendants help, Newsom would be elected Lt. Governor in November 2010.

126. < After Halprin's passing, Plaintiff found himself at a crossroads with no attorney. He wrote to RN Goldman a last time to state his position and share his memorial to the philanthropist's Landscape Architect. If there was a response, Plaintiff would take it from there. If not; it might be necessary to proceed pro se - The only other option; to abandon years of hopes of effectively applying the '269 Patent
09=12-31 –RN Goldman – Letter #4: (mailed. RRR) -:
"My last letters communicated how Goldman intermediaries Lippetz, Muzio, and Haynes had presented me an unacceptable, insulting offer and tried to shield you by declaring: "The Goldman's will have nothing to do with resolving this matter." However - far from a "nuisance" matter - this case shows how current Patent Law allows Wealth and Power to easily scuttle an Individual's Patent with impunity. ...
"Thousands aspire to a U.S. Patent, trusting that their work will be honored by Government and, certainly, by a Philanthropist of your caliber. For the sake of all aspiring inventors and for the sake of future American Innovation, I will not rest until this matter is resolved. Hereby, I consider this matter to be personally and squarely in your own hands, and not in those of any intermediary."

## 2010

127. While waiting for a reply from Goldman, Plaintiff reviewed a voluminous EIR for the Hunters Point development promoted by Defendants. Cursory review revealed bogus "Alternatives" manipulated in the same way Plaintiff's had been when he and Brown first met (1979.b). Plaintiff submitted a three page letter ("Letter 48"). When the EIR Responses were published months later, "Response 48" regurgitated old data and dodged issues.

128. 10=February – < RN Goldman had again failed to respond - posing two possibilities:
a. RN Goldman was somehow shielded from the issues by intermediaries, or
b. RN Goldman individually had no problem with what his philanthropy did to Plaintiff.

129. 10=March - < Daunting though it was, the only civilized choice left was to file pro se and Trust the Legal System. With Goldman-Sachs was under heavy scrutiny, Plaintiff attended a panel discussion, "Do Corporations Have Constitutional Rights?",

after which a highly-regarded jurist told Plaintiff: "individuals are at disadvantage with the present legal system."

130. < In Goldman's silence, Plaintiff wrote a final update to all with copies of the Dec 31 Letter and his Halprin Memorial:

10=Mar 25 –FINAL LETTER to Newsom and Others: -

"Dear Mayor Newsom and others concerned:

"...Nearly five years ago, the sudden discovery of this infringement began suppressing more than a decade of my own efforts refining and introducing this new technology to industries often limited by various constraints and sometimes willing to take advantage of the vulnerable work of individuals. ...

"...a U.S. Patent that has been secured by an individual must be valued accordingly by Industry and Government alike and afforded the Constitutional protection originally promised. Since any constitutional injustice reflects poorly on proud San Francisco values, it is the Mayor's Charter Duty to step in and "promote harmony" on matters like this, instead of passing it off for others as he has done to date. ...

"I nevertheless repeat my appreciation that the professionals responsible for the work (including the late Lawrence Halprin) have acknowledged that the Stern Grove Proscenium represents the first known application of my patented RCS inventions. Although this has not helped channel any work our way, it is understood that the Market Power of a few individuals can make doing the right thing difficult.

131. 10=Apr 24 - < Plaintiff is an Architect; but now studied Federal Rules of Evidence, Pro-Se in Ninth District Court, etc. RN Goldman was accorded another honor by these faculties:

California Alumni Association - Charter Gala AWARD
The Alumnus of the Year for 2010

"... businessman, civic leader, and philanthropist Richard N. Goldman of the Class of 1941, who (among many other accomplishments) helped transform Berkeley's Goldman School of Public Policy into the nation's number one graduate school in public policy analysis."

132. < Though Supervisors continued dictating arbitrary guidelines and failed sworn duties; Plaintiff again addressed the complicit officials, who would later approve Minutes that only mention the "oil spell" (emphasis, Ed.):

10=May 11 – BOARD –Testimony #49: –

"First, I must again remind this body that its past and current members are complicit in the highjacking of my U.S. Patent, as evidenced in the Proscenium gracing the stage at Stern Grove - COMPLICT by Supervisors deliberately avoiding sworn duties under the Constitution and the S.F. City Charter.

"BEYOND THAT: The recent tragic oil spill in the Gulf of Mexico and the betrayal of Wall Street should both be clues that, as a Society, there are things that have been wrong for too many years. Our prevailing notion of "Progress" has been based on an unwise sense that all Growth is inherently good. In medicine, unceasing growth is sometimes diagnosed as "Cancer.

"Planning Dreams like Hunters Point and the replacement of Candlestick Park – often reflect a deep-seated impression that we will somehow find endless cheap energy. However, "Progress" in the future must first be responsible to the Earth through Conservation of all resources...."

133. 10=June – Plaintiff had hoped to submit this pro se Complaint before the season started, but the complexity of matters required that more attention be diverted to the matters:

134. 10=Jun 19 – Download Dufty's bio:

"...was elected in December 2002 / reelected 2007 ... "represents... Noe Valley, The Castro, Glen Park, Diamond Heights, Dubocde Triangle, Delores Par, & San Jose / Guerrero, and Buena Vista Heights neighborhoods." (no mention of Eureka Valley – Ed.) ... Voted "Most Radical" by his classmates at Menlo-Atherton High School, Supervisor Dufty describes his professional career as moving up and down the political food chain."

10=06-20 - Grove's SIXTH SEASON begins



135. 10=Jun to Aug - < Throughout the Grove's sixth season with the '269 Patent RCS Proscenium; Plaintiff continued to work on this pro se action. The Goldmans remained elusive. Newsom refused to intercede. Supervisors refused to investigate. No lawyers rushed to help. The infringement continued to undermine Plaintiff's life. The stalemate undermined the meaning itself of a U.S Patent. Colleagues may still found the Grove "beautifully done" (¶ 12); but are unlikely to realize that the RCS can be a versatile technology for the health of their own business and the economy. Plaintiff re-doubled his attention to the pro se action for the sake of others vulnerable to people willing and able to take advantage of deficient Patent Law (¶25), for the Grove's RCS had now grown to symbolize to Plaintiff how the Law can stifle an individual's work with impunity – just as in Europe before Jefferson.

10=08-22 - Grove's SIXTH SEASON ends / '269 Patent Exposure:
~720,000

136. 10=September - < Intense work continued to complete this complex pro se matter.

137. 10=November - < ELECTIONS - <
- Newsom was narrowly elected Lt. Governor.
- Dufty aspires to Mayor.
- Supervisors complicit in the infringement were termed out.
- Kamala Harris (a close friend of Defendant Brown) was narrowly elected Attorney General of the State of California (as such, she may oversee the prosecution of Causes in this action). After being elected, she was quoted thus:

"Our criminal justice system relies on the integrity of those sworn to uphold it," District Attorney Kamala Harris said. "Any breach of this code threatens the safety of our community. So there is zero tolerance for individuals who violate the public trust by abusing their authority and breaking our laws for their own personal gain."

"Retired S.F. police officer charged ..." – Chronicle, 12/2/ 2010, p. C4 – Henry K. Lee

138.   `10=Nov 29 - < RN GOLDMAN DIES` - < As this Complaint neared completion, word arrived that RN Goldman passed away at the age of ninety.  Plaintiff regrets that RN Goldman refused to talk with Plaintiff about the '269 Patent - the infringement of which was induced by no less than his munificence - for they might have amicably resolved this matter and thus enabled maximum benefit from a fair and full exploitation of the RCS technology for San Francisco.  RN Goldman was praised for his "fierce dedication to friends" and eulogized thus:

> "Over his long lifetime, Richard Goldman basked in the pleasure of having contributed to many good causes.…His good works benefited humanity and all its habitants, but when all wasn't serene, Goldman relished a fight. … A righteous man who lived a long life … He'll also be remembered, perhaps a little less fondly, in some corporate boardrooms, too.  He liked that."
>
> Chronicle, Dec 1, 2010, pE10, Leah Garchik

## 2011

139.   11=February - < Intense work has finally resulted in the completion of this complex pro se matter.  May Justice be done and future individual person inventors profit honorably.

## CHRONOLOGY CONCLUSION

140.   Plaintiff incorporates by reference the allegations in paragraphs 1-224 above and adds the following in conclusion:

141.   This Complaint is brought to counter the multiple injustices of infringement under present Patent Law.  But for their lack of goodwill and respect for an individual's U.S. Patent, Defendants might otherwise have used their extensive influence, market power, and resources to empower progress by supporting Plaintiff's work.  Instead; their tactics created disharmony between Plaintiff and many others.  Their betrayal of their own sworn oaths and professed roles has stifled a new technology that could have otherwise helped raise awareness and helped America to reverse wasteful habits by conserving resources for the past six years.

142.   Defendants' refusal to be accountable is deceitful and a clear betrayal of their professed character and commitment.  If left unresolved, the '269 Patent infringement will serve to illustrate how individuals in positions of power may set aside "core values" - even their own - for their own promotion and advantage.  Unless basic issues in this matter may be fairly examined and all legal deficiencies corrected, no individual will be able to fully Trust that his/her U.S. Patent will be respected by people in Defendants' position – thus making it correspondingly easier for any "entity" or unscrupulous individual to infringe.

143.   Upon information and belief, it has been nothing less than the Money, Market Power and Politics of Defendants that served to undermine the '269 Patent.  The failure of current Patent Law to afford proportional protections and sanctions for inherently-

more-vulnerable individual persons must be corrected.  Plaintiff therefore believes that future American Progress and Innovation would be immeasurably enhanced by restoring and ensuring the Constitutional purpose of a U.S. Patent for individuals – the "Authors and Inventors" themselves.

144.   To be made whole again, Plaintiff prays the Court restore his ability to resume progress with respect to the '269 Patent that will honestly and fairly empower colleagues and other professionals in the Design and Construction professions to create new and environmentally-responsible projects with Green Industry jobs for exploring and capitalizing upon a full range of '269 Patent embodiments long waiting to be applied for achieving a less energy-intensive world.

## ISSUES

145.   Plaintiff brings this action in firm belief that U.S. Patents are vital to American Innovation and that the '269 Patent defines a technology for countless "Green" jobs.

## PATENTS

146.   INDIVIDUALS: - < The Founding Fathers, familiar with Old World suppression, used words a that allowed individual persons the benefit of the only federally-sanctioned monopoly:z

> **U.S. Constitution - Article 1, Section 8** (Powers of Congress)
> *"To promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."*

In the writing, there is no suggestion of "entities" of any kind.  Nor was there mention of individuals privileged by birth, fortune, or office.  Thomas Jefferson was particularly proud of Section 8 for the creativity it fostered in his own time, for it inspired increased innovation.

147.   LAW: - < Congressional Acts recognize the importance of context (emphasis, Ed):

> **1 United States Code, Section 1**
> ***"Words denoting number, gender, and so forth"***
> *"In determining the meaning of any Act of Congress, **unless the context indicates otherwise** … the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals…"*

148.   CONTEXT: - < In the context of U.S. Patents; an "individual person" cannot be fairly equated to an "entity" of any size, for the creative work of an individual is inherently vulnerable to misuse by others –particularly those privileged with greater power.  It is neither fair nor reasonable to equate the two.

However, for many years, Patent Law has classified both equally "Small Entities", making no provision for proportionate protection in the event of infringement.

149. California Law recognizes the vulnerability of individual persons thus (emphasis, Ed.):

---

### ca bus & prof §22370 (a)

"**The Legislature finds** that there are in the State of California members of the general public who have ideas or inventions that they believe have substantial commercial value but which members of the general public **do not have the resources or expertise necessary to develop, manufacture or market** these ideas or inventions; that these members of the general public are commonly referred to as **"inventors"**; that these inventors are generally **not** people who earn their livelihood from developing, manufacturing, promoting or marketing ideas or inventions, from manufacturing or marketing products, from publishing literary works or from owning, operating or controlling commercial enterprises"

---

150. The present action represents a classic case of inequality. Defendants' complex legal and political ties and ready philanthropic riches approaching half a billion dollars have allowed them to hide behind their more honorable and widely-recognized good deeds and their "giving back". In this manner, Defendants' disproportionate economic, social, and political influence enables them to weather investigations and exercise influence in various media, thus making it virtually impossible for individuals to prevail in a challenge - regardless of Rights.

151. PATENT PROCESS INSPIRING: - < From the beginning of the patenting process, Plaintiff found inspiration in the challenge of searching for prior art and in providing full and useful descriptions of the new RCS system – refinements a which, in turn, led to instructive further ramifications. Based on his success in applying for the '269 Patent, Plaintiff proceeded to invest much additional time, money, and energy to secure and enable expensive foreign Patents (2000 to 2002) in hopes of making possible American control of the technology – all efforts that now would appear to have been futile.

a. The refinements found acceptance in '269 Patent claims and "teach" significant means for greatly expanding the span, operational, and configuration limits of conventional lightweight retractable covering methods, which colleagues confirmed surprising with their seeming unlimited possibilities, of which the Groves RCS now represents a most-satisfactory prototype.

152. LEGAL REPRESENTATION: - < Plaintiff is an individual person of limited means who works privately and has had limited contact with persons in Defendants' circles. He has encountered great resistance from Defendants, who have refused to meet with him, who immediately took a defensive legal position, and who have only continued obstruction after Plaintiff first notified them of the infringement in 2005. Plaintiff has been thus forced to suspend creative endeavor and make exhaustive efforts searching for legal representation in this matter, and is now forced to bring this action "pro se" after learning how fundamental Patent Law fails to empower patent lawyers to be of help to individual patentees who may often face the same difficulties Plaintiff has encountered (09=September).

Professional patent legal counsel have given high praise to the '269 Patent. However they have also exhibited puzzling resistance a to providing representation for Plaintiff which, combined with Defendants behavior, appears to nullify the meaning of any individual's U.S. Patent and raises deep concern for future inventors who may reasonably expect that a U.S. Patent would naturally be respected by people in Defendants positions as officers of government and leaders of philanthropy. With grave concern for American Innovation and future patentees, this action is respectfully hereby brought to this Court for resolution.

a. An experienced and highly-regarded patent attorney, after reviewing the '269 Patent and its prosecution folder, characterized the '269 Patent as "one in a thousand", concluding that it was both "commercially viable" and "well-prepared"; "like doing brain surgery on yourself", he said. However, when pressed about his reversal regarding possible contingency representation in this action, he explained that current legal provisions prevent a just determination for individuals. Pressed further about individual rights and his motivation for practicing Patent Law, he bluntly declared that Patent Law is quite simply "Corporate". Another, an author whose patent self-help book has been a guide and inspiration to many, including Plaintiff, declared the '269 Patent to be "very well done" and wished Plaintiff much success; but declined representation because he simply "does not do well in the courtroom." (08=Nov 11) Others declared patents "a rich man's game" and a "license to wage war". One delayed reviewing materials for months, sent Plaintiff on a goose chase for materials; lost the requested materials; finally declined to help; then refused to say why she declined to help, and finally declared Plaintiff's case as simply "Class War", that Defendants were putting up "a hell of a defense", and suggested that he could "always file *pro se*. (09=October) Reinforcing all of this, a leading jurist and academic scholar readily admitted to Plaintiff that "the Law often disadvantages individuals". (10=March)

153. LOSSES: - <Plaintiff is a creative and experienced individual person. His "product" is his professional experience with architecture, structures, and planning which bolster his intimate knowledge of the ramifications and potential of the '269 Patent – assets that, before infringement, Plaintiff had worked to share productively and fairly with professionals and colleagues in the Design and Manufacturing Industries. Plaintiff knows of no way to evaluate the professional, emotional and physical losses a thus suffered at the hand of Defendants.

a. Beside damage to his family, Plaintiff's losses include more than ten years of his prior work advancing the '269 Patent (2000 to 2002); loss of his past six years attempting to deal with Defendants tactics, loss of years to his collaborators; loss to society by Defendants' prolonged suppression of a new technological means for addressing Climate Change, and loss to America by the undermining of U.S. Patents and Innovation – losses that could have been obviated by goodwill corrections by Defendants instead of their evasion and deceit.

154. PLAINTIFF'S EXPERIENCE: While Defendants are well-known, Plaintiff is a private individual and relatively unknown - except perhaps to Defendants themselves (¶ 16.a). His love of design and the environment stems from the earliest age a and, over the past 40 years, he has derived great pleasure from the privilege of collaborating with some of the finest designers and the most capable firms on exciting national and international design projects

of all sorts - including some that have received awards and wide recognition. In 1967 he graduated with Honors in Architecture from the University of Illinois. In 1971, he achieved "some of the highest scores" on the Architectural Registration exams, and is proud of the work he has done over the years with others. He still hopes to help create new jobs faithfully applying the inventions of the '269 Patent through collaboration with respected colleagues

a.    Plaintiff very early developed a keen and abiding interest in Architecture that was amplified as his father coordinated the design and construction of notable church designs around the U.S in the 1950's with an architect inspired by Frank Lloyd Wright. Plaintiff also became committed to fairness as his father, a minister, worked with the World Council of Churches in the 1950's to bridge gaps between Catholic, Jewish and Protestant religions.

155.  INNOVATION VULNERABILITY – (witnessed by Plaintiff) The following experiences confirmed for Plaintiff that American Innovation has long been facing serious threats – in no small measure owing to the powerlessness of individual persons to defend their patents under the practice of current U.S. Patent Law – making them and their achievements "fair game" for the cunning and powerful:

g.    TAKEOVER: A foreign Firm worked to "take over the North American Market" from their recently acquired American leader. To keep tight reins, a "Friday Massacre" critically reduced staff, trimmed worldwide access, and placed "more and more people in charge".

h.    IP THEFT: A foreign industry boss absconded with SkyCover materials. A contact apologetically said "I will be very disappointed if you don't hear immediately back from the guy." Plaintiff didn't.

i. PROPERTY THEFT: A contact told Plaintiff that he had sent Plaintiff's video to "his engineer in Brisbane", then returned to Brisbane himself - after admitting to Plaintiff that it was "kind of shitty." When he was finally tracked down in Brisbane 20 months later, he said "I'm still a fan of the system (but) nobody knows where it (the video) ended up" An Australia manufacturer's website later announced: "Finally, Retractable Sails" with the only other image of a '269 Patent RCS seen by Plaintiff.

j.    SPONSORSHIP: Venture Capitalists often seemed to be fixated on "Hi-tech" products and endeavors. Environmental concerns seemed foreign to those with whom Plaintiff met. Plaintiff had to propose new terms like "Green Tech" or "Mid-Tech" for meaningful discussion

---

**DEFENDANTS**

156.  PRIOR INTERACTIONS: - < Prior interactions between Plaintiff and Defendants have direct bearing on the present action (¶ 16), such that Defendants may have drawn a presumption of ease in disregarding Plaintiff's Rights a second time after the earliest encounters. For six years, none of the Defendants have consented to meet Plaintiff regarding the present matter.

157.  INTEGRITY: - < Defendants comprise, not only philanthropists who proclaim dedication to "core values" of "fairness and democracy" (¶ 34), but also elected and sworn officers Duty-bound to respect U.S. Patents and the Constitutional Rights of Constituents, and to respond to their Constituents. Whereas Defendants have verbalized their support of helping others improve society; in the present matter, Defendants instead have fraudulently ignore their own utterances and their fiduciary duties as they regard infringement of the '269 Patent. Defendants' influence on market, political, and social forces is so great that their actions in this matter has done more than simply damage the rights, happiness, health, and welfare of Plaintiff and his family. Their actions have moreover served to suppress a a new technology - one that (with their goodwill instead of their denials of accountability) could otherwise have helped to provide American jobs and viable, practical means for reducing wasteful energy usage b.

a.    Indicative of such suppression; an analogous European RCS product – "SunSquare" (2000 to 2002) - has, since 1998, demonstrated the potential of RCS products by attaining a high level of sophistication and global market success that may otherwise have been achieved for America with the '269 Patent by honest goodwill aid from Defendants instead of their intractable and unapologetic infringement.

b.    Professional calculations have shown great energy benefits using the '269 Patent (2004)

158.  INTIMIDATION: - < Defendants through their Agents had already acknowledged the '269 Patent" (¶ 19), but Defendants themselves only refused be accountable in any way; instead leaving it to their Agents to obstruct productive resolution, delay matters, and attempt intimidation a - thus refusing all attempts by Plaintiff to seek a fair positive outcome for all.

a. In the very first meeting with Agents in 2005, DCA Emery pointedly told Plaintiff at the end of the first meeting: *"I'm PAID to do this work"* (05=09-14).

b. Defendants preferred representative Lippetz skipped the first meeting with Plaintiff. Before he had met Plaintiff face to face, Lippetz attempted to confuse Plaintiff by misquoting case law (06=Jul 19).

c. Lippetz also simultaneously threatened to "design-around (the '269 Patent) to avoid penalties" and repeatedly denied infringement while (06=Jul 19).

d. When the two finally met face-to-face in 2007, Lippetz prefaced a predictably disagreeable "offer" to Plaintiff with a take-it-or-leave-it "considering the remedies available to you …." (07=May 23).

e. SGFA's surrogate for DE Goldman told Plaintiff that he was "trying to take advantage of a non-profit" and also informed Plaintiff that he had been "advised the patent is invalid" (07=Jun 4).

159.  INTIMIDATION: - < Defendants' contractors had already acknowledged the '269 Patent" (¶ 19), but Defendants themselves only refused be accountable in any way; instead leaving it to their Agents to obstruct productive resolution, delay matters, and attempt intimidation a - thus refusing all attempts by Plaintiff to seek a fair positive outcome for all.

a.    In the very first meeting with Agents in 2005, one Agent pointedly told Plaintiff at the end of the first meeting: *"I'm PAID to*

*do this work"* (05=09-14). Defendants primary Agent, *pro bono* legal counsel Greg Lippetz – hereinafter **("Lippetz")** – deliberately skipped the first meeting with Plaintiff. Before meeting Plaintiff, Lippetz attempted to confuse Plaintiff by misquoting case law (06=Jul 19). Lippetz also repeatedly denied infringement while simultaneously and illogically threatening to "design-around (the '269 Patent) to avoid penalties" (06=Jul 19). When the two finally met face-to-face in 2007, Lippetz prefaced a predictably disagreeable "offer" to Plaintiff with a take-it-or-leave-it "considering the remedies available to you ...." (07=May 23). SGFA's surrogate for DE Goldman told Plaintiff that he was "trying to take advantage of a non-profit" and also informed Plaintiff that he had been "advised the patent is invalid" (07=Jun 4).

160.  POWER: - < It cannot be denied that Defendants have each done many good things in service to society and in accordance with ethical and legal guidelines. However, in the present matter, they have betrayed any such noble goals. Plaintiff found it particularly difficult to repeatedly confront RN Goldman in the present matter, for he lived a full life and was highly regarded by so many, including Plaintiff himself (06=Aug 21). Nevertheless, Plaintiff fails to understand how a man of his stated positions would appear to lack the courage to face his accuser. Defendants have only allowed their intermediaries to shield them from engaging Plaintiff, proudly believing themselves immune and unaccountable - thus prompting them to refuse any and all requests to resolve the matter in a manner that would fairly and equitably allow the honest exploitation of Plaintiff's knowledge of the RCS for greater benefit to society.

> *"...the real problem isn't big government.  It's power and privilege at the top."*
> "Big government isn't the problem",
> Robert Reich, Chronicle, 12/19/2010, p.E8,

161.  HONOR: - < Defendants are self-proclaimed philanthropists and elected representatives – i.e., persons reasonably expected by most citizens to be accountable for the outcomes of their deeds.  While they may otherwise be generous individuals and dedicated "public servants", their actions in Plaintiff's matter contradict their own oaths and their own professed "core values" - a dichotomy that serves only to create distrust and disillusionment that undermines aspirations of some to better this world, destroys respect for government and the more fortunate, and betrays the same Constitutional ideals of America's Founding Fathers they quickly espouse.

---

### PHILANTHROPY

162.  NOBILITY: - < Philanthropy has increasing noble purpose when great wealth is concentrated in the hands of fewer and fewer people.  Plaintiff has long respected the altruistic Hass-Stern-Strauss philanthropic legacy  - RN Goldman a beneficiary by marriage (1970's.a).

163.  BETRAYAL: - < If Philanthropy is used to obscure misdeeds of Government, it undermines its core purpose by

undermining democracy, obstructing justice, fostering corruption in exchange for benefit to unscrupulous individuals.

164.  RN GOLDMAN: –< A successful insurance executive, Goldman was on Forbes Billionaires list for many years, during which he directed hundreds of millions of his earnings to a Trust he established in the 1950's as a "tax-advantaged vehicle" (07=December).  In the late 1970's, Goldman decided to use the Trust to embrace philanthropy.  In the, and later focused some of his "giving back" on international environmental "pioneers" with an annual prize for which he has become well known and widely admired.

165.  During the same period, Plaintiff – "before his time" - posed a challenge to Defendants when he publicly advocated "redefining progress" to address environmental problems, after which Goldman ironically funded an organization named "Redefining Progress", which appears to have been relatively ineffective.

166.  Furthermore, he might reasonably seek an amicable and productive resolution of Plaintiff's matter in light apparently shared mutual and long-standing support of the same environmental and social causes - particularly as RN Goldman's proclamations spoke eloquently to deeper principles than a simple amassing of wealth and power:

> *"Our leaders need to be reminded that implementation of the core values of our country - charity, fairness, democracy -requires backing by the top sources of wealth.*

RN Goldman - Founder's Report: - 2003 Annual Report (emphasis, Ed.)

167.  After discovering Defendants' infringement and before first appealing to RN Goldman about the result of his funding, Plaintiff trusted him to be a man of integrity and dedicated vision based upon recent public statements in which Goldman said the following:

> *"... the key to good grant making is striking a balance between our realism and our idealism. ... finding and funding big ideas with big aspirations while keeping an eye toward results.*
>
> *" ...our grant-making philosophy (is) to act as a catalyst for bold, new ideas, give them our support, and then get out of the way. This is what makes our work as a catalyst for change particularly effective."*

RN Goldman - 2004 Annual Report (emphasis, Ed.)

In 2006, the above statement suggested to Plaintiff that Goldman might become an ally for helping the '269 Patent reach its full potential.  In retrospect, and given events since then, the proclamations appear to be more a disclaimer of accountability, in line with an associate's assertion that Goldman merely had an "arm's length" relationship to the work that his largesse and support induced (07=Apr 11).  Goldman was a long-standing member of Forbes Billionaires List who established a Trust with his earnings in the 1950's "because there was a benefit, tax-wise" and repurposed its hundreds of millions of dollars to philanthropy in the late 1970's – the same period during which Plaintiff first encountered Defendants.

168.  LEGACY: - < After the memorial service honoring his life, the press reported that RN Goldman had been praised for being a

"fierce friend" and it was noted that he "basked in the pleasure of having contributed to many good causes … to support and reward protectors of the environment." One associate commented that Goldman's "good works benefited humanity and all its habitats, but when all wasn't serene, Goldman relished a fight". If he was innocent in this matter and truly the altruistic person he presented himself to be, there would appear to have been no reason for RN Goldman to refuse as he did to meet Plaintiff to learn about the advantages and benefits of the '269 Patent, which his generosity had infringed.

169. FAMILY: - < When Plaintiff prepared to first notify DE Goldman of the infringement in 2005, he was pleased to see that RN Goldman's son appeared to be a man of principle, as professed in his public declarations: (emphasis, Ed.):

*"This whole sense of **giving back, of sharing, of providing**, to me is an expression of a **philanthropic intent** (of our background and belief)".*
DE Goldman - Jewish News Weekly – 7/25/1997

Similarly, DE Goldman had resigned on principle from a major public body prior to Plaintiff's discovery of infringement,:

*"Douglas E. Goldman, M.D., announced his immediate resignation today from the Fire Commission (saying) 'This is a Commission whose main job appears to be to protect the Fire Department from scrutiny and to rubber stamp its attempts to avoid dealing with criticism from the outside'"*
Business Wire, May 25, 2005

Before Plaintiff turned to RN Goldman for understanding, he had already repeatedly addressed his son in trust that DE Goldman's impressive public statements and deeds were sincere:

"President's Statement"

*"... transparency and ethics are values that are very much in the public interest. ... We are honored to be part of the nonprofit community — a global community that shares a generous spirit and commitment to improving our world. We continue to be **inspired by the creativity** and dedication that people bring to **solving problems** that impact all of our lives. We are **grateful** for their efforts and **pleased to partner** with them in their work."*
DE Goldman, President - Foundation Center 2005

Despite his claim (above) of being "inspired" and "grateful"; soon after being strongly challenged by Plaintiff's Counsel (06=Feb 14); DE Goldman nevertheless ignored both Plaintiff's creativity and the problem-solving '269 Patent when he deliberately used major RCS / '269 Patent features of the Grove's infringing RCS as a prominent frame for his photograph in major publicity to the business community (06=Mar 24) – disregard suggesting that DE Goldman:

    j.  must agree that the '269 Patent helped in "solving problems",
    k.  was not "grateful" that the '269 Patent preceded "his" work, and
    l.  was not "pleased" when Plaintiff's suggested joining efforts.

170. SMOKESCREEN: - < But for the Goldmans' primary participation, responsible actions, and determined approvals; the Renewal and the infringement of the '269 Patent would not have

happened. Nevertheless, both DE & RN Goldman held themselves above accountability for the infringement, secure behind legal counsel and aided by dependable "servants", including SGFA pro bono attorney and Board Member Greg Lippetz who, upon direct questioning in person by Plaintiff during a much-delayed conference (07=05-25), refused to respond or produce his purported evidence of a sketch or drawing that he claimed to have that he claimed would nullify the '269 Patent.

171. INFLUENCE: - < Goldman influence extends to the White House and their strength draws upon the Stock Market itself (07=May 23) and, upon information and belief, intimate ties to Goldman Sachs helped their philanthropies suffer a fraction of the losses suffered by other charities as Wall Street collapsed in 2008:

> *"We have had the clarity of vision and adaptability to maintain philanthropy in the face of these challenges."*
> Richard and Rhoda Goldman Fund - 2009 Annual Report -

    b.  Ever-increasing resistance from Defendants once prompted Plaintiff to consider appealing to Presidential Candidate Barak Obama with national issues in this matter, but the effort quickly appeared futile after Plaintiff learned that DE Goldman had become a prime Bay Area fund-raiser for the candidate (08=October).

---

### GOVERNMENT

172. INTEGRITY: - < Integrity in government is vital to the realization of democratic ideals. However, Brown's successor Newsom a and his protégé Dufty b, as democratically-elected and sworn government representatives willfully ignored their sworn fiduciary duties as defined under the US Constitution, the California Constitution, the San Francisco City Charter; and the San Francisco Administration Code – among them: to uphold the Constitution, redress grievance, investigate official misconduct, deliver findings, and promote harmony.

    a.  Newsom and Brown both received widespread criticism for wrongdoings while in office.

    b.  Dufty, on his official City website, defined his career as "feeding up and down the political food chain".

173. STRATEGY: - < The Brown Administration learned of the '269 Patent in 1998; the Goldmans made a commitment to pursue the Renewal in 1999; Brown and Supervisors Newsom, Ammiano Kaufman (SGFA Board in 2005), et al began to "strategize" with the Goldmans in 2000 to quietly build exactly what Plaintiff had entrusted with the Mayors Office only two years before. a  The end result is that Defendants' overwhelming market power, influence, and infringement devastated the years of Plaintiff's intensive work to establish new jobs and industry with the '269 Patent – efforts that had been long bolstered by trust that leaders such as Defendants portray themselves to be would honor a U.S. Patent.

    a.  Plaintiff had no knowledge of Brown's little-publicized actions until the Renewal was completed in 2005 – seven years after great expense expending patent protections to foreign jurisdiction, advanced the new inventions, designing RCS embodiments, and growing healthy alliances with respected and related industry and professional colleagues. (2000-2005)

174.  601 SPECIAL AIDES: - < The Brown Administration was remarkable for many known controversies that need no reference here. However, in Plaintiff's experience since his meeting in Brown's Mayors Office in 1998 – and particularly since Plaintiff's discovery of the infringement in 2005 – he has observed many public occurrences in connection with Brown's Administrated (and extending to current politics) that raise questions that relate directly or near-directly to the present matter. Brown's influence extends to the present day with his own access to weekly leading newspaper coverage at the top of the page. Brown is well known in nearly all political, media, social, and other circles of influence. Acts done under the oversight of Brown were executed with coordinated help of more that 600 "Special Aides" beholden, upon information and belief, to no oath but the blind loyalty commonly required by Brown, who expected underlings to volunteer time for his benefit and cover their tracks. (01=April 30)

175.  BROWN'S LEGACY: - < Brown's political influence has continued since he left office in 2005 a. Since then, Plaintiff has encountered odd reactions b from elected officers from which he has sought redress and who have flatly refused to respond to reasoned questions raised by Plaintiff (07=12-15) and who have shamelessly mocked his public testimony as he sought justice.

    a.    Brown's Chronicle column, "Willie's World", still runs weekly next to seasoned veteran journalists Matier and Ross, and in that column he has promoted his image as a gangster, boasted about having "spies", and proclaimed "I know what goes on in City Hall before (most others)"

    b.    Board Presidents Aaron Peskin and his successor David Chiu unconstitutionally inhibited Free Speech by the manner in which they conducted Public Comment in weekly meetings. Both failed to explain on what basis they arbitrarily limited comment to two minutes knowing that total time would fall short of the mandated minimum of thirty minutes. Both would allow bilingual speaker additional time to do their own translations. Both encouraged singing by Speakers and rudely cut speakers off if they didn't want to hear what was being said. Plaintiff's Supervisor Dufty once turned on his heels and said "I'm not talking to you" when approached by Plaintiff. Newsom repeatedly failed to respond to Plaintiff's appeals and made no effort to meet with Plaintiff or to intercede to promote harmony and public benefit, thus deliberately helping to prolong the infringement.

## CONCLUSION

176.  GOODWILL: - < Since 2005, Plaintiff has continuously held out intentions of goodwill: sending six letters to DE Goldman, four letters to RN Goldman, five letters to Newsom, four letters to Halprin, and four letters to Others – all copied as necessary to update the parties. The response has been stonewalling, avoidance, and obfuscation by Defendants and those under their influence.

177.  CLIMATE CHANGE - < Plaintiff brings this action to the Court in the same spirit with which he first brought the '269

Patent to Defendants attention - i.e. in firm belief that the '269 Patent defines an important means for enabling future generations to deal with Climate Change. When Plaintiff first encountered Defendants in the late 1970's, there was little belief in Climate Change. Ironically, in the late 1970's, Plaintiff early came to acute awareness of danger to environment partly owing to RN Goldman's support of David Brower and the Earth Island Institute, of which Plaintiff was a member. However, he observed great resistance among Defendants associates to those advocating that America transition towards measured consumption to minimize difficulties that would result from environmental change. People of influence such as Defendants and their associates appeared – and often still appear - to prefer the status quo and to consider such notions antithetical to "Progress" as they preferred to interpret it.

178.  ASSOCIATES AFFECTED: - < Over the course of his career, Plaintiff has had rewarding and considerable master planning and design experience in collaboration with talented colleagues, clients and others who may be associates of Defendants. Owing to the market power of Defendants and the necessity of now having to bring this action to the Court against Defendants alone as a result of their actions regarding the infringement of the '269 Patent, Plaintiff now therefore finds himself in the difficult position of possibly appearing to be at odds with his own respected colleagues and others despite the experience of good will and productive collaboration he has long enjoyed after working and associating with each of them. Nevertheless, the alternative of abandoning his work together with his commitment to improving matters is unacceptable.

179.  APPRECIATION: - < Plaintiff believes that America can have a healthy economy and society by promoting productive measures in response to environmental change. It was out of such sensibilities that the '269 Patent evolved. Defendants' infringement has forced unsought and vexing problems in the life of Plaintiff, his family, and his professional associations. Plaintiff remains literally and figuratively indebted to collaborators and many others who have helped advance and aid his work with the '269 Patent over the years, and he hereby asserts that they have likewise been directly and indirectly harmed by Defendant's infringement.

180.  DISILLUSIONMENT: - < The discovery of Defendants' damaging infringement of the '269 Patent had immediate and increasingly devastating effects on the health and welfare of Plaintiff's family from the moment of its discovery in 2005 – effects exacerbated by Defendants' subsequent willful prolonging of the infringement, which only magnified resulting anxiety and difficulty for Plaintiff and his family. Having long trusted that a U.S. Patent would represent important value to both Industry and Government alike, it was most disappointing for Plaintiff to learn that the provisions and practice of U.S. Patent Law automatically disadvantage individuals; thus making the creative work of independent individuals all the more vulnerable to the unscrupulous. It has gradually became apparent that U.S. Patent themselves today inherently constitute a type of fraud on the unsuspecting by holding out false hope and expectation that their contributions will be respected.

181.   CHALLENGE OF IMBALANCE: - < By failing to provide proper and proportionate protection for individual inventors, U.S. Patent Law and regulations create false expectations while enabling willful infringement of intellectual property belonging to an individual – a serious form of theft, for it robs one of incentive, usurps a vital personal possession, undermines commitment, and denies a fundamental Civil Right while incidentally discrediting honest work. Given the scarcity of years, the potential of one's benefiting society based on one's accumulated knowledge about an invention is stymied and perhaps even lost to society by infringement with impunity. Present patent Law offers virtually no such proportionate sanctions or protections for individuals. Individuals must often deal with inherently larger "entities." When, as presently the case, "entities" of any size are wrongfully regarded as "equals" to said individuals, legal assistance can be difficult to find. To confront influence and wealth like that of Defendants, such problems are only magnified and doubly so when reputable philanthropy and widely interconnected politics are co-joined, as they are in this case. As a result of such legal imbalance, it may be expected that "strategists" of greater influence like Defendants (00=Sep-19) may expect an unsuspecting individual victim to eventually capitulate to their greater market power. Single-handedly defending one's own Constitutional Patent Rights entirely disrupts one's life and robs society of professional experience and energy that might more likely be of significantly more productive service to the country. Patents, properly applied, ought to foster, and not impair, such instincts for helping improve the lives of others - instead of denying society any such benefit.

182.   PATENT REFORM: - < The U.S. Legislature continues to debate various changes to effect meaningful and appropriate Patent Reform. Plaintiff believes that the present action presents important questions that have direct bearing on any such reform, and further believes that proper resolution of this matter and the establishment of appropriate sanctions and incentives for protecting individual inventors will enable a revitalization of American Innovation.

183.   THREAT: - < This matter is respectfully brought to the Court in the belief that patent injustice is a threat to Democracy and to American Innovation and Progress, for it holds out false hope to creative persons in the population while also fostering a plagiarism and an opportunism that preys on the powerless. It seems that, over the past century, the Court has not always properly ruled on equating persons with entities, particularly as it relates to Patent Law (09=September). This serves only to damage the lives and motivation of citizens, as evidenced by Defendants misuse of their greater power and influence in this action so as to willfully both create and also prolong the infringement of the '269 Patent. If it pleases the Court, and an honorable judgment may be determined in this case; the outcome may lead to providing individual patentees the protective provisions they need in the future and the sanctions to discourage and prevent such infringement. It that is possible, and associates of Defendants and America will be empowered to draw

appropriate benefit from fairly exploiting the '269 Patent, Plaintiff would feel that his work on the patent was not in vain, Justice will have been served, and there may be more hope for youth.

184.   CASTE: - < Plaintiff U.S. Patent law must be modified if it is to provide meaningful and proportionate protection for individual persons who are inventors. Legal provisions should enable no one to infringe an individual's Patent Rights. If, as in this case, a combination of sworn government and honored philanthropy may be empowered to infringe with impunity, and that is deemed acceptable, then U.S. Patents are meaningless to citizens under the Constitution and only money and influence will count for generations to come. In a former time when rights of individuals were being subjugated by corporate interests and erroneous precedent of Law; Justice Harlan, in a famous dissent, expressed a view that Plaintiff believes best serves Democracy and America:

> "...in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here".
>
> Justice Harlan in dissent - Plessy v. Ferguson  - 1896

— End of EXHIBIT B —

## CONFIDENTIAL DISCLOSURE AGREEMENT


This Confidential Disclosure Agreement is made between _____ _RICHARD MCREE_____ and _Terezia Nemeth_____ (hereinafter "COMPANY"), its officers, agents, employees and assigns.

_____ _RICHARD MCREE_____ possesses ideas, concepts, designs, names, marks and marketing concepts (hereinafter referred to as "Information") that may be of commercial interest to COMPANY. The purpose of this Agreement is disclosure and discussion of the Information to COMPANY under circumstances that permit evaluation and, at the same time, both insure the continued confidentiality of the Information and protect _RICHARD MCREE_____'s proprietary rights.

COMPANY hereby acknowledges (1) that all of the Information is the property of _RICHARD MCREE_____; (2) that COMPANY is receiving said Information in strictest confidence; and (3) that COMPANY will not disclose any of the ideas, concepts, designs, names, marks and marketing concepts to others or use them itself in whole or in part for any purpose without the prior written consent of _RICHARD MCREE_____.

COMPANY agrees that each officer, agent, employee or other person to whom the Information is disclosed for purposes of evaluation shall read and be bound by the terms of this Agreement.

I have read this Confidential Disclosure Agreement and agree to its terms.

By: _____

Title: _Special Assistant to the Mayor_

Date: _9/14/98_____