RICHARD McREE, *pro se*
P.O. Box 14064
San Francisco, California 94114
Telephone: (415) 437-0900
Facsimile: (415) 437-0900
E-mail: rjsmcree@comcast.net

FILED
AUG 24 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHARD T. McREE, pro se<br><br>Plaintiff,<br><br>v.<br><br>RICHARD N. GOLDMAN, ET AL.<br><br>Defendants | Case No. 5:11-cv-00991-LHK<br><br>**PLAINTIFF'S NOTICE<br>AND<br>OPPOSITION TO<br>DEFENDANT DOUGLAS E<br>GOLDMAN, M.D.'S NOTICE OF<br>MOTION AND MOTION TO<br>DISMISS**<br><br>**HEARING**<br>Date: Thursday, October 13, 2011<br>Time: 1:30 p.m.<br>Place: Courtroom 4, 5th Floor<br>Judge: Honorable Lucy H. Koh |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD::

PLEASE TAKE NOTICE that the Court has neither ruled nor yet made a determination regarding PLAINTIFFS *Ex Parte* MOTION SEEKING TO COMPEL RESPONSE (dkt. #36) regarding the adequacy of June 8, 2011 service to Interim Mayor Ed Lee of the City and County of San Francisco for former City officials and named Defendants in this matter: Willie L. Brown, Jr., Gavin Newsom, and Bevan Dufty. On June 24, 2011, the June 8 service was entered on the docket by the Court as served (dkt # 19).

## I   INTRODUCTION

Since new ideas have always been prone to theft by others, Plaintiff believes this complex case presents a microcosm of problems that retard our country's Progress, and that various branches of Government may be challenged to resolve some of the problems involved in this case. Evidence indicates that Defendants actions have now placed America ten years behind other countries with the new RCS technology. They alone have already benefited. As a direct result of this patent infringement, Plaintiff has endured six years of suppression of his work and virtual nullification of prior years defining, testing, refining, and promoting the new RCS inventions. The present action is brought out of necessity and in hopes that effective remedies may evolve so that U.S Patents will one day afford meaningful protection to engender wider respect for private exploration by individual persons who hope to benefit posterity.

In his Motion to Dismiss, Defendant Goldman seeks to shield, not only his father's involvement in matters directly-related to the infringement, but also that of the other defendants by eviscerating Plaintiff's fully-documented Complaint and Exhibits regarding the infringement.

## II   GOLDMAN ALTRUISM

As true with his father, Defendant Douglas E. Goldman has done many good things through his philanthropy and its considerable resources. Nevertheless, Plaintiff has suffered greatly as a result of the same deliberate actions. As a practicing Architect for many years prior to discovering the infringement in 2005, Plaintiff enjoyed designing many varied projects in collaboration with fine and talented colleagues - some being close associates of the Goldmans and other Defendants. He loved designing and planning, and paid little attention to legal and political matters. He never sued anyone; was never sued; voted; paid his taxes; and spoke

publicly to promote conservation before it became popular and while many feared that anything but consumption would threaten "Progress". In his own work, Plaintiff addressed such larger issues by developing new ways to design in response to environmental needs and cultivating a deep appreciation of conserving resources.

Throughout that time, the Richard and Rhoda Goldman Fund was a source of inspiration to Plaintiff because of its support of causes aligned with his own. As a result, Plaintiff's most difficult task in this matter was ultimately to both challenge philanthropy and hold out good will in a final letter to Richard N. Goldman in 2010, after his designer for Stern Grove passed away. Because Mr. Goldman died not long ago and while Plaintiff was preparing this pro se action, it is now necessary that his survivors answer to his involvement.

However, in his Motion to Dismiss, his son Douglas - a key figure along with his father throughout these matters – now argues that Plaintiff is trying "sue a dead man", that he himself was merely an officer of SGFA and thus entitled to hide behind a corporate veil, that he cannot be technically or legally liable for any ethical and moral offenses, and that he is deserving of complete absolution from all responsibility. All defendants in this matter would appreciate similar release based alone on the arguments he presents. However, Defendant's interchangeable adjectives - "irrelevant, immaterial, and impertinent" - ignore the complexity of the fact-based causes, elements of which accrued for Plaintiff only while preparing this action.

### III   INTERDEPENDENCY OF GOLDMAN FAMILY AND CCSF

The heath and welfare of Plaintiff's family has been devastated by the collaboration between CCSF and the Goldmans. It is illogical to isolate Douglas E. Goldman from any events, for they have been very closely interconnected for many years, particularly through the Mayors Office. With their combined influence, many dynamic factors come into play regarding all of Plaintiff's allegations — particularly as Plaintiffs' patent work had been confidentially shared

with both parties before the Goldmans considered the Stern Grove Renewal, and before CCSF then approached Defendant Douglas E. Goldman himself to "strategize" for the collaboration despite their shared knowledge of Plaintiff's RCS inventions.

Plaintiff himself presented no threat to the power and influence of Defendants. But his proposal for an RCS on Candlestick Park stadium did threaten their plans to replace the existing sports venue with a brand new "Downtown Stadium". For many years, and unknown to Plaintiff until recently, decedent Defendant Richard N. Goldman was San Francisco Chief of Protocol in the Mayors Office and the principal Owner of the SF Giants in the 1990's, when he and Defendant Willie L. Brown were the epicenter of a concerted effort to build a new "Downtown Stadium" and also privy to Plaintiff's work with the new inventions of the '269 Patent. In retrospect, Defendants were thus likely to have welcomed new information about Plaintiff's RCS work and also have tried to suppress it. In fact, after Plaintiff had filed his first materials with the United States Patent Office (contrary to Atty. Lippetz suggestions), the Giant's Attorney for public affairs together with his Aide learned, first-hand from Plaintiff, confidential knowledge about his inventions (Complaint, Exhibit B, p1, ¶5), and the Aide was soon to became the Chief of Protocol for the Mayors Office under Defendant Brown. She served Defendant Brown loyally until just prior to Plaintiff's confidential meeting in his Mayor's Office in 1998, when top Staff became excited after hearing of Plaintiff's brief suggestion that an RCS would be "perfect for an amphitheater like Stern Grove". One of those individuals soon moved to a distant job in Sports and another to a local job with an entitlements developer. Still, the idea seems to have found fertile ground with the new Mayor's inclination towards public/private projects – controversial collaborations, but mergers that enabled the extraordinary teamwork for the Stern Grove Renewal between Goldman non-profits and CCSF between 2000 and 2005 - a relationship that in no way can thus be considered "irrelevant" to the infringement of the '269 Patent.

## IV  PLAINTIFF'S OTHER PATENTS:

Defendant Douglas E. Goldman, through his attorney, Gregory Lippetz (SBN 154228) hereinafter - "(Atty. Lippetz) - whose work Plaintiff has experienced since the beginning of these matters in 2005, would now have the Court believe that Plaintiff merely secured one patent for his inventions, and had "little or no success" in promoting them. This is not true. As early as **2000**, Plaintiff was already securing PCT patent protections and eligibility for the '269 Patent inventions in Canada, Great Britain, Greece, Italy, France, Spain, Germany, and Japan. In fact, the PCT patenting process not only confirmed the uniqueness of the American '269 Patent inventions, but also revealed a new non-infringing European RCS, which has since become a great success that threatens to invade American Markets. Given their wealth and connections, if Defendants respected U.S. Patents, by now there would likely be a successful American "Green" innovation that would be globally competitive. Plaintiff realizes that is unlikely that Defendants might agree; so even more time is likely to be lost due to San Francisco's "first application".

## V  ENTIRE TIMELINE IN COMPLAINT IS RELEVANT:

Defendant Douglas E. Goldman, again through Atty. Lippetz, tries not to call attention to the close interactions between CCSF and SGFA. In addition, he would also have the Court believe that Plaintiff willingly and purposely delayed nearly six years to bring this action.

The reason Plaintiff was not able to bring suit in Federal Court in **2006** was the fact that (as later explained by his patent lawyer and confirmed by Plaintiff in recent research into some U.S. Patent Law) provisions of Patent Law make it difficult for patent attorneys to recoup the expenses involved in defending individual inventors. Defendants / Atty. Lippetz knew well that such vulnerability handicapped Plaintiff, so they would stall and place roadblocks repeatedly as one concert season would follow another. It was Plaintiff who daily suffered the consequences of that treatment. The unfair and predatory treatment created major health problems for Plaintiff

and his family that increased as time passed and Plaintiff was left to do his best in an unfamiliar field. That is one major reason that Plaintiff needed "(more than five years)" to bring this action. The following compressed timeline from the Complaint chronicles main events and focuses on factual matters related directly to SGFA and Defendants Richard N. and Douglas E. Goldman:

In **2005**, after discovering the infringement, Plaintiff withdrew home equity to retain a highly-qualified patent attorney, who praised Plaintiff's work on the '269 Patent very highly and considered it worthy of contingency representation. Defendants delayed until after the first concert season had finished before scheduling a first meeting that was to occur in the City Attorney's Office at City Hall with both SGFA and CCSF represented. However, upon arrival, Plaintiff and his party were suddenly informed that Atty. Lippetz had just called and was not going to be there after all (and would not be met nor seen by Plaintiff until 2007). After skipping that meeting, Atty. Lippetz took three months to contact Plaintiff's lawyer.

In **2006**, Plaintiff lacked $300,000 to continue with legal counsel. Knowing that Plaintiff was without counsel; Atty. Lippetz first proposed a clandestine meeting, then later tried to mislead Plaintiff by deliberately misrepresenting actual case findings – some of Plaintiff's charges to which Atty. Lippetz never raised an objection. Repulsed by his tactics, Plaintiff then appealed directly to Douglas E. Goldman because Plaintiff believed the tactics to be opposite to the gentleman's expressed values. But he got no response. As a second season began and Stern Grove received accolades, increasing upset was felt by Plaintiff and his family, and he had to resort to using his Free Speech to publicly uphold his U.S. Patent rights at City Hall while his inventions went on display to thousands again. At City Hall, his own representative (Defendant Dufty) abruptly refused to speak to him and soon hired an SGFA Board Member to serve as his new Aide, able to report directly to SGFA about Plaintiff's actions.

As the second Grove season drew to a close, Plaintiff received yet another disturbing offer from Atty. Lippetz. Frustration with the attorney's chicanery caused Plaintiff, still puzzled

by dichotomy, to prepare a detailed response to the offer in a final personal appeal to Defendant Douglas E. Goldman (**Exhibit A**), in trust that he was basically true to the altruistic image he portrayed. Plaintiff also sent a copy with a first appeal to his father, Richard N. Goldman, whom Plaintiff had long trusted and respected (**Exhibit B**).

Despite the troubles, Plaintiff made promising progress with contacts to establish a Bay Area business using the '269 Patent. Mayor-Defendant Gavin Newsom was narrowly reelected with major support from Defendants. SGFA hired a "replacement" for Douglas Goldman. Finally, at the end of the year, Plaintiff received another unacceptable offer from SGFA.

In **2007**, it took some time until Plaintiff was able to digest the offer before writing one last time to Douglas E. Goldman, objecting strongly to his lawyer's tactics and to terms of the offer (which nevertheless did include "first application" acknowledgement of RCS from those, including colleagues, who had actually built it). A third season was approaching and there had been no response. Plaintiff had no option but to appeal, now a second time, directly to Defendant Richard N. Goldman, still trusting in his "core values" and because it was he who had provided majority seed money for the project, had deep connections with CCSF and the Mayors Office essential to creating the infringing RCS, and because Plaintiff himself had reasonable doubts about the gentleman's involvement beyond simply contributing "seed money" for the project.

This time, Atty. Lippetz quickly arranged what SGFA considered to be a meeting that would be "useful" (afterwards seeming to Plaintiff simply intended to intimidate and forestall Plaintiff before a third season was soon to begin). The strange encounter failed (Complaint, Exhibit B, p11, ¶75) and it took months for Plaintiff to find the words to respond to the outrageous event. Consequently, Plaintiff returned several times to the Board of Supervisors to keep his issues alive while his inventions were once again on weekly display.

Contrary to Atty. Lippetz assertions for Defendant Douglas E. Goldman and despite the infringement, Plaintiff had growing success in promoting the RCS as a local enterprise through

2007. However the VC ultimately refused to use images of the Stern Grove RCS, after which the venture fizzled. Gradually, the stress from the on-going infringement was creating greater anxiety for Plaintiff and his family. Early retirement and other adjustments had to be made.

In **2008**, the SGFA website began showing exciting dynamic views of the RCS as active page headers. Plaintiff renewed his U.S. Trademark, even as international publications promoted the competing European RCS. Defendant Willie L. Brown, Jr. got a weekly column broadcasting his influence over City matters. Plaintiff repeatedly experienced a bizarre disrespect by the Board of Supervisors for the weekly Public Comment period. Repeat speakers were not refrained from singing and joking and the President shaved the time allotted for speakers from three minutes to two (without taking the constitutionally required vote to depart from written regulations). Nevertheless, it was the only way for Plaintiff to uphold his Patent rights while the Grove's RCS was used for a fourth season. Fall elections would soon create regime change, so Plaintiff formally protested the Board's behavior, but a City attorney intercepted Plaintiff and informed him the "the President is not going to take up your issue". Associates of Defendants ran for public office; Defendant Douglas E Goldman became a "bundler" of Bay Area money for a popular Presidential candidate. During the troubling year, Plaintiff developed a serious physical condition that would soon require surgery.

In **2009**, Surgery and a physical injury hindered Plaintiff's activity, but early contact with a new IP attorney offered great promise through most of the fifth Stern Grove season. However, after the season ended, the prospective attorney "lost" Plaintiff's file; declared the case a "Class War"; said "they're putting up a hell of a Defense"; and then declined representation and withheld any explanation - her "legal right". Not long after, the Goldmans' designer for Stern Grove died, and Plaintiff wrote a final letter to Defendant Richard N. Goldman.

In **2010**, when there was again no response from Defendant Goldman, Plaintiff updated all parties involved of the status of matters a last time. The six-year statute of limitations for

patent infringement was fast-approaching and, if not addressed, would force Plaintiff to abandon both his patent protection and nearly two decades of rewarding work.

Despite conventional wisdom, Plaintiff began to study applicable Law and to learn how he might represent himself in this complex action - first learning about things like "elements" and "pleadings"; which led to some degree of clarity about matters like Fraud, Unfair Competition, Negligence, etc. (limited knowledge not accrued for Plaintiff until that time, and knowledge that created appreciation for the evolving nature of jurisprudence). As the year ended and this pleading neared completion, Defendant Richard N. Goldman died before Plaintiff could finish.

In **2011**, Plaintiff had to adjust his pro se Complaint in light of Defendant Richard N. Goldman's passing, and proceeded to filed suit in March. Mid-year, Plaintiff drew equity to pay his 11-1/2 year Patent Maintenance Fee for the '269 Patent, putting him in mind of the thousands of Green jobs that should already have been created by fairly exploiting the '269 Patent.

**VI    CONCLUSION**

The above compressed listing from the chronology contained in Complaint, Exhibit B reflects both factual documentation regarding the Goldmans' relationship to the infringement and the first-hand experiences of Plaintiff - both relevant and vital in their entirety to the causes derived from these matters. The Complaint should remain unchanged and the Richard and Rhoda Goldman fund substituted for recently-deceased Defendant Richard N. Goldman named in this action and as previous moved by Plaintiff (Complaint, p2, ¶3, 1 .13)

Similarly, the City and County of San Francisco cannot be omitted from this action, for all named Defendants played interconnected roles regarding the infringement of the '269 Patent. The Complaint should remain unchanged until CCSF is engaged, as requested in   PLAINTIFF'S Ex Parte MOTION FOR ADMINISTRATIVE RELIEF (dkt. #41) and in   PLAINTIFF'S Ex Parte MOTION TO COMPEL RESPONSE (dkt. #36).

1    In accordance with the above, Plaintiff respectfully submits that the Court should dismiss
2    Defendant Douglas E. Goldman's MOTION TO DISMISS.

4    Dated: August 24, 2011          Respectfully submitted,

6                                    By: /s/ R.T. McRee

7                                    Richard T. McRee
                                     Plaintiff, *pro se*


**SkyCover®**

Retractable Covering System - (RCS) PAT

Richard McRee - ARCHITECT

Licensed Applications - Consultation and Collaboration

August 20, 2006

Mr. Douglas Goldman, Chairman
Stern Grove Festival Association
44 Page Street, Suite 600
San Francisco, CA  94102

RE:  **SkyCover® RCS<sub>PAT</sub> at Stern Grove**
     Response to July 19, 2006 offers

>>>>   URGENT   <<<

Dear Mr. Goldman,

This is our fourth time writing to you.  We are sorry that apparently this matter must go on.  Despite what Mr. Lippetz says for you, certain things are still not acceptable.  While we share his desire to move on to "*more productive pursuits*", his responses to our May 31 proposals only *now* address points we made long ago in the meeting he inconsiderately missed one year ago.  He also raises new points that warrant personal attention of the Principals in the matter - you, Lawrence Halprin (as "Designer"), and Mayor Gavin Newsom (as figurehead for the "User" - the City).  Contrary to your attorney, we have "accused" no single party of infringing.  However, we do hold parties who received showings of our patented inventions accountable for their role in this infringement since 1998, while our U.S. Patent was still in final review.

We are grateful that you and others see the wisdom in calling the application of our U.S. Patent at Stern Grove "SkyCover®".  We are encouraged by the willingness of parties involved to honor the terms of a license agreement.  However, in no way can or will we betray 14 years of our work by denying a major, adaptable, and integral component that our Patent stipulates - the RCS Supports – which make it possible to securely store and operate the retractable panels high overhead.  We have designed dozens of applications - many using space frames similar to Stern Grove's.  Mr. Lippetz has presented no credible argument for us to do otherwise, and has only sidestepped this issue for one year until now.

As a philanthropist and the Stern Grove figurehead, it is you who has personally overseen the entire conception, design, construction, and fundraising for creating an RCS that uses our patented inventions. Now, at the very end of a second season, two hundred thousand spectators have already enjoyed this first application of a SkyCover® Retractable Covering System – with absolutely no knowledge of our extensive and prior patented work on the very same concepts.  This has:

- Illegally exposed our patented inventions to Designers, who may assume they are free to copy.
- Disrupted our on-going work and taken much time, money, and energy.
- Undermined years of our work and denied us introducing the promising new concepts.

Persons most closely-related to this matter are entitled to be on the same page, so we are sending copies of this letter to Mayor Newsom, Lawrence Halprin, and Richard Goldman - who supplied four times the funding needed for the infringing Stern Grove RCS alone – an infringement that presently undermines the very meaning of **any** U.S. Patent for individuals and could easily become a symbol of American Influence trumping Creativity and Dedication.

For many years, we have been proud that SkyCover® is a San Francisco invention.  Before your infringement, we had long looked forward to introducing the concepts ourselves to the Professions as an exciting new means to address Global Warming and Energy Conservation.  As individuals promoting a new technology that challenges prevailing theories, we have enjoyed the enthusiastic support of some of San Francisco's most talented professionals and are deeply indebted to them for their vision.

eureka valley, san francisco                        (415) 437-0900                              mcree@comcast.net

**EXHIBIT A**



Despite how this unfair match has been conducted, we are nevertheless encouraged by some positive movement and hopeful that a quick and fair resolution of this infringement will put it all behind us and might benefit everyone, including infringers.

Before responding to your latest offers, we must address some of Mr. Lippetz comments. It must be remembered once again that, one year ago, your attorney avoided a crucial meeting arranged for him with us. Had he attended, he would have had a <u>complete showing</u> of our extensive material. Had he attended, he might have helped everyone come to mutual understanding, and we could have discussed some issues that he has only repeatedly ignored, and only now finally addresses.

---------------------------------▲---------------------------------

## Responses to Attorney's Points

A. **"Liability"**: Mr. Lippetz claims we have made *"no showing"* of infringement and that he must now have detailed "claim charts" before he can respond. "Claim charts" may be useful for formal litigation, but we believe few want such a destructive process. In addition, they do not appear to be the only acceptable form of "showing":

> *"(U.S. Magistrate Judge Jacob P. Hart in S.S. White Burs Inc. v. Neo-Flo Inc) found that the plaintiffs were correct in pointing out that (the defendant) "has no basis for demanding that (plaintiff) produce information in a specific form, such as a chart."*
>
> Shannon P. Duffy, The Legal Intelligencer, 05-06-2003

All parties listed at the end of this letter have received showings. In September, 2005, Mr. Lippetz himself would have witnessed an important showing if he had attended our meeting. On July 22, 2005, we hand-delivered a showing to each Principal that included a full copy of our U.S. Patent with highlighted Specifications, Drawings, and Claim No. 1. In August, 2005, showings to six others included the Patent Frontispiece (attached) and references to Patent Drawings and Specifications. We believe that all showings to Principals since 1998 have been sufficient for some response.

B. **"Damages"**: He discusses only "Royalties" under this title, and it should be remembered that we have been seeking only an amicable settlement - not "Damages" in a very destructive matter. We agree with his opening statement: *"A patent holder is typically entitled to recover a reasonable royalty for the use of its patent"*.

*"Time of first infringement"*: His mention of this raises very important questions for Principals and others - such as: *Just when did the "time of first infringement" occur in the case of SkyCover and Stern Grove?* Long before we discovered last year that SkyCover® had actually been built at Stern Grove, Principals and others received showings of our patented inventions as far back as 1998.

**"Royalty Base"** – Attempting to deny SkyCover® RCS Support components, he asserts: *"You would not claim that the light and sound towers were part of your product."* One friend asked: *"How else does he think RCS Panels would stay up there?"*

RCS Support components may use *any* structure to provide the means for storing RCS Panels and gear and properly anchoring them in the ground. Such means are part of Patent Claim No. 1. We absolutely <u>do</u> claim any RCS Support as a major component of a complete SkyCover® RCS and a major component of any "Royalty Base". We intend to license qualified firms to collaborate with us to create RCS Support structures of all kinds with respect to our patented inventions. The Patent Frontispiece (attached) highlights one form of SkyCover® RCS Supports with repeated references throughout the Patent. The patent further specifies that RCS Supports can take various forms for storing RCS Panels and gear in position, and that *"lighting"* and *"sound"* are only two of many possible *"secondary functions"* (Patent, col. 14, line 29).


**SkyCover®**
Richard McRee - ARCHITECT

*"Purpose"* – Few, if any, professionals would dispute our contention that the SkyCover® RCS at Stern Grove forms a significant and new kind of <u>Proscenium</u> for the outdoor amphitheatre Stage. It is a visually-dominant and defining presence during concerts. This fact is borne out on websites for Stern Grove and other parties, which proudly display lead photos that include SkyCover® as a memorable image for visitors.

C. **"Non-infringing Alternatives":** Still threatening "designing around" our Patent, Mr. Lippetz now argues that this might limit your infringement to only *"1-2 seasons"*. This overlooks the fact that various showings made to Principals and others since 1998 could make that time period considerably longer.

D. **"Marking":** Your attorney attempts to justify the un-seeable marking offered. He claims that *"ANY mark"* is OK. He cites the 1992 case of *Rutherford v. Trim-Tex,* claiming that the case indicates that the mark can *"even be completely hidden, such as inside a wall."* However, in reading the case, it becomes obvious that the ONLY reason the judge allowed the marking *"inside the wall"* was that the invention was a *trench shoring device – and* consequently, the "inside" of the wall was the **only** place where it could be "easily seen by the Users":

> "... above all, a practical common sense approach must be taken when dealing with issues of compliance for the marking provisions of Section 287...**The notice required by the statute is most effective when it can be easily seen by the users ...**"     (*Rutherford v. Trim-Tex*)

Other patented products used at Stern Grove contain identifying markings to be seen by Users. We require the same. Such markings are distinct from your banned commemorative "plaques". We will be pleased to work with you to make clear identifying marks that are aesthetically and mutually agreeable.

---------------------------------------▲---------------------------------------

**Responses to Offers:**

1. **Advertisement:** We will accept the proposed 3-year advertisement.
2. **Website and other notices:** We will accept the link and website notice with the following wording:

> **The Retractable Covering System surrounding the Stern Grove Stage is the first licensed from Architect-Inventor Richard McRee under his U.S. Patent No. 6,003,269.**
> **Interested parties may contact SkyCover® at** (*words and link to be determined* )"

We will accept the website notice and link similar to that last proposed.
We fully acknowledge that the SkyCover® RCS at Stern Grove is a well-executed work physically created by "The Team". It is also a full embodiment of our U.S. Patent No. 6,300,269. Parties interested in "The Team" should be equally informed about SkyCover®. "The Team" webpage remains the logical location for both the notice and link without detracting from any "Team" participants. We therefore propose that a mutually-agreeable image of the SkyCover® RCS at Stern Grove be added to the Team page with the credit / link shown above.
**General Media and Publications:** Whenever a "Team member" is cited in conjunction with views or mention of the RCS, appropriate reference must be made to *"SkyCover® Retractable Covering System$_{PAT}$"* and *"U.S. Patent 6,003,269"*.
**Other notices:** Principals and all other parties must similarly and appropriately inform the Public about the first licensed application of the SkyCover® Retractable Covering System$_{PAT}$ at Stern Grove in any lead illustration or mention.

3. <u>**Certificate of Appreciation from the City:**</u> No thank you. This idea was prompted by your lawyer pushing us for some sort of "public declaration", and we have always felt it would mean nothing if it didn't came from the heart.
4. <u>**Certificate of Appreciation from Stern Grove:**</u> No thank you (same as above)


**SkyCover.**
Richard McRee - ARCHITECT

5. **Mutual Releases:** We will accept mutual releases that contain an acknowledgement that the stage canopy and supports are the first licensed application of SkyCover® Retractable Covering System principles of U.S. Patent 6,003,269, and that they will comply with the terms of the license to the patent in all future applications they pursue.

   The following parties received our notification of infringement and are subject to mutual release:
   1. Lawrence Halprin - ( 6/24...6/28...7/8...7/28 (highlighted Patent, CDA
   2. Mayor Gavin Newsom - ( 6/24...6/28...7/7...7/28 (highlighted Patent, Nemeth CDA
   3. Conversion Management Associates < Isaacson ( 6/24...7/6 / 7/7(calls)...7/22...7/28 (highlighted Patent
   4. Stern Grove Festival Association < Goldman ( 8/12 - Patent Abstract, 7/22 (ltr to CMA, 7/2 photo
   5. Vance Brown Builders < Brown ( 8/10 - Patent Frontispiece and 7/2 photo
   6. Hamilton + Aitken <Hamilton ( 8/10 - Patent Frontispiece and 7/2 photo
   7. Pineapple Sails < Richards ( 8/10 - Patent Frontispiece and 7/2 photo
   8. S.F. Rec and Park < Agunbiade ( 8/12 - Patent Frontispiece and 7/2 photo
   9. S.F. DPW < Lee ( 8/12 - Patent Frontispiece and 7/2 photo

6. **Product Marking:** To harmonize SkyCover® RCS markings with the setting, we propose one well-crafted, mutually-agreeable, bronze label with our logo, trademark, and patent number designed and affixed to one of the RCS Support components (as suggested previously) with our mutual agreement. With that marking in place, the RCS Panel components need only have corresponding visible, mutually-agreeable, underside logos with the requisite patent number possibly co-attached on the topside.

7. **Money:** We have still been given no acceptable rationale for revising our position as stated in the September 2005 meeting with the City Attorney, when we reasonably estimated the costs (design, construction, foundations, power, space frame, etc) for the Retractable Covering System, including both RCS Panels/gear and RCS Supports, to be approximately 10% of the total $15,000,000 project costs, or $1,500,000 -- To be done with this matter once and for all, and so that we all might move on cooperatively, we are willing to accept a 5% (five percent) royalty, which totals a paid-up lifetime licensing royalty of $75,000 (seventy five thousand) dollars.

We ask for a resolution of these matters as soon as possible. Please either call us or send a progress update within fourteen days.

A fair resolution of this infringement with everyone has been our goal from the beginning. Once this is settled, perhaps we might all get onto a cooperative footing for solving real problems and implementing this new technology for the benefit of San Francisco.

Sincerely,

*(R)*

Richard McRee, Architect-Inventor    Judy E. McRee, Partner

Att:   Frontispiece, U.S. Patent 6,003,269
       Retractable Covering for Spaces - McRee

Cc:    Mayor Gavin Newsom, Mayor of San Francisco
       Mr. Lawrence Halprin, Office of Lawrence Halprin
       Mr. Richard Goldman
       Others

P.S. Per email notification to Mr. Lippetz on June 20, 2006, it has been necessary for us to terminate Mr. Tom Smegal's excellent services. If he is interested in our matter, please ask him to contact us directly and we will be pleased to speak with him.

----------------------------------▲----------------------------------

US006003269A

# United States Patent [19]

## McRee

[11] Patent Number: 6,003,269

[45] Date of Patent: Dec. 21, 1999

[54] **RETRACTABLE COVERING FOR SPACES**

[76] Inventor: **Richard T. McRee**, 4417 18th St., San Francisco, Calif. 94114

[21] Appl. No.: **08/838,451**

[22] Filed: **Apr. 7, 1997**

[51] Int. Cl.[6] .............................. **E04B 7/14**; E04B 7/16; E04B 1/342; E04C 3/14

[52] U.S. Cl. ........................... **52/6**; 52/63; 52/66; 52/82; 52/83

[58] Field of Search .................... 52/5, 6, 22, 23, 52/63, 66, 82, 83, 222

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,286,895 | 12/1918 | Arrel . |
| 1,711,994 | 5/1929 | Erickson . |
| 1,800,984 | 4/1931 | Erickson . |
| 2,140,220 | 12/1938 | Colvin . |
| 2,692,566 | 10/1954 | Mitchell . |
| 2,848,756 | 8/1958 | McCann . |
| 3,510,996 | 5/1970 | Popil . |
| 4,259,819 | 4/1981 | Wemyss ........................ 52/222 |
| 4,727,688 | 3/1988 | Kida et al. .................... 52/6 |
| 4,751,800 | 6/1988 | Kida . |
| 4,942,895 | 7/1990 | Lynch ........................ 135/99 |
| 5,062,243 | 11/1991 | Kumagai ....................... 52/66 |
| 5,167,097 | 12/1992 | Robbie . |
| 5,203,125 | 4/1993 | Sugizaki . |
| 5,295,501 | 3/1994 | Vigne ........................ 135/99 |
| 5,311,699 | 5/1994 | Huffman ..................... 47/26 |
| 5,355,641 | 10/1994 | Levy ........................ 52/66 |
| 5,555,681 | 9/1996 | Cawthon .................... 52/63 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 219522 | 3/1985 | Germany ........................ 52/66 |
| 86/04371 | 7/1986 | WIPO ........................... 52/66 |

OTHER PUBLICATIONS

Progressive Architecture Fuller p. 1±–137 Jun. 1967 "Bucky's Biggest Bubble".
Architectural Forum Becket p. 9 Sep. 1963 Survey of Stadiums.
Architectural Forum Otto p. 6 Oct. 1966.

*Primary Examiner*—Robert Canfield

[57] **ABSTRACT**

A retractable covering for buildings (20) or spaces (22) comprising a plurality of flexible retractable panels (32) and attached retractable cables (36) stored at the perimeter of the space and capable of being deployed in a helical pattern converging near a predetermined point above the space.

**20 Claims, 9 Drawing Sheets**





**SkyCover®**

Retractable Covering System  -  (RCS) PAT

Richard McRee - ARCHITECT

Licensed Applications - Consultation and Collaboration

August 21, 2006

Mr. Richard Goldman, Chairman
Richard and Rhoda Goldman Fund
211 Lincoln
San Francisco, CA

RE: SkyCover® RCS$_{PAT}$ infringement at Stern Grove

>>>>  F.Y.I.  <<<

Dear Mr. Goldman,

As San Franciscans, we have great respect for the many fine things your Fund has done, including your very generous contribution to the Stern Grove Festival Association for the Improvements at Stern Grove.

Sadly, one year ago, we discovered that the Proscenium around the new Stage at Stern Grove infringes on major claims of our U.S. Patent, and we have been trapped for one year in trying to deal with City Hall, a leading Designer, and Stern Grove's worthy organization. With no acknowledgment of either our Patent or our pioneering work, the Proscenium is now an exemplary application of our patented SkyCover® retractable covering system (RCS).

Since the Richard and Rhoda Goldman Fund contributed so much of the funding for the Improvements, we believe it only appropriate that you should be informed about these matters as we try to reach a fair settlement. Please review our attached communication to Douglas Goldman (copies sent to Lawrence Halprin and Mayor Newsom).

In the early 1990's, while searching for a way to retractably cover Candlestick Park, we discovered new structural principles that flew in the face of conventional thinking. These open many new possibilities - of which the SkyCover® RCS$_{PAT}$ at Stern Grove is now a wonderful example. But we are not out of the woods yet.

In 1998, we and our Structural Engineer confidentially shared our proprietary concepts with Mayor Willie Brown's Special Assistant inside City Hall because it briefly appeared that Mayor Brown was seriously interested in rehabilitating Candlestick Park - which would conserve and reuse its "Embodied Energy" and set a good example for new environmentally-responsible thinking in Planning and Design. Some time after that meeting, SGFA apparently contracted with the City and "indemnified" the Brown Administration from infringement, and may have been caught unawares.

The causes which your family supports are vital to the respect people have for ethical and moral values. We feel that a fair and honorable settlement of our matter will give needed encouragement to other private American Inventors, who enjoy little protection from theft of ideas despite the U.S. Patent system.

It has always been our fondest hope that this San Francisco invention might become something of which the entire City would be proud.

Sincerely,

*(signature)*

Richard McRee, Architect-Inventor    Judy E. McRee, Partner

Att:    Letter to Douglas Goldman, dated August 20, 2006
        Frontispiece, U.S. Patent 6,003,269 - Retractable Covering for Spaces – Richard McRee

eureka valley, san francisco            (415) 437-0900            rjsm[...]ee@[...]mcast.net



EXHIBIT B

7


US006003269A

# United States Patent [19]
## McRee

[11] Patent Number: **6,003,269**

[45] Date of Patent: **Dec. 21, 1999**

[54] **RETRACTABLE COVERING FOR SPACES**

[76] Inventor: **Richard T. McRee**, 4417 18th St., San Francisco, Calif. 94114

[21] Appl. No.: **08/838,451**

[22] Filed: **Apr. 7, 1997**

[51] Int. Cl.$^6$ .............................. **E04B 7/14**; **E04B 7/16**; E04B 1/342; E04C 3/14

[52] U.S. Cl. ........................... **52/6**; 52/63; 52/66; 52/82; 52/83

[58] Field of Search ................ 52/5, 6, 22, 23, 52/63, 66, 82, 83, 222

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,286,895 | 12/1918 | Arrel . |
| 1,711,994 | 5/1929 | Erickson . |
| 1,800,984 | 4/1931 | Erickson . |
| 2,140,220 | 12/1938 | Colvin . |
| 2,692,566 | 10/1954 | Mitchell . |
| 2,848,756 | 8/1958 | McCann . |
| 3,510,996 | 5/1970 | Popil . |
| 4,259,819 | 4/1981 | Wemyss ............................ 52/222 |
| 4,727,688 | 3/1988 | Kida et al. ........................ 52/6 |
| 4,751,800 | 6/1988 | Kida . |
| 4,942,895 | 7/1990 | Lynch ............................... 135/99 |
| 5,062,243 | 11/1991 | Kumagai .......................... 52/66 |
| 5,167,097 | 12/1992 | Robbie . |
| 5,203,125 | 4/1993 | Sugizaki . |
| 5,295,501 | 3/1994 | Vigne .............................. 135/99 |
| 5,311,699 | 5/1994 | Huffman .......................... 47/26 |
| 5,355,641 | 10/1994 | Levy ............................... 52/66 |
| 5,555,681 | 9/1996 | Cawthon .......................... 52/63 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 219522 | 3/1985 | Germany ............................ 52/66 |
| 86/04371 | 7/1986 | WIPO ................................. 52/66 |

OTHER PUBLICATIONS

Progressive Architecture Fuller p. 1±–137 Jun. 1967 "Bucky's Biggest Bubble".
Architectural Forum Becket p. 9 Sep. 1963 Survey of Stadiums.
Architectural Forum Otto p. 6 Oct. 1966.

*Primary Examiner*—Robert Canfield

[57] **ABSTRACT**

A retractable covering for buildings (**20**) or spaces (**22**) comprising a plurality of flexible retractable panels (**32**) and attached retractable cables (**36**) stored at the perimeter of the space and capable of being deployed in a helical pattern converging near a predetermined point above the space.

**20 Claims, 9 Drawing Sheets**

